BEFORE THE UNITED STATES
JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

| IN RE: CHANGE HEALTHCARE, INC., CUSTOMER DATA SECURITY BREACH LITIGATION | MDL No. 3108 |
|---|---|

**ONLY CHOICE PLAINTIFFS' RESPONSE TOWARDS THE CENTRALIZATION AND TRANSFER OF ALL RELATED ACTIONS TO THE MIDDLE DISTRICT OF TENNESSEE**

## I. Introduction

Plaintiffs Only Choice Urgent Care & Med Spa and Stewart Scharfman Physical Therapy, PC ("Only Choice Plaintiffs") in *Only Choice Urgent Care & Med Spa, et al. v. UnitedHealth Group Incorporated, et al.*, No. 24-cv-01271 (D. Minn.), submit this response to Plaintiffs Merry, Reese, Stump, and Allen's ("Movants") Motion for Transfer and Centralization of Related Actions to the Middle District of Tennessee. Dkt. No. 1.

Only Choice Plaintiffs oppose blanket centralization and transfer of all cases before the JPML under 28 U.S.C. § 1407 and instead support centralization and transfer to the Middle District of Tennessee all cases where class members had personal identifying information ("PII") or personal health information ("PHI") compromised (together, the "Patient Data Breach" actions) and centralization and transfer to District of Minnesota all cases where class members, who are healthcare providers and related entities (together, the "Healthcare Providers'" actions), suffered delays and/or stoppages in claims processing and revenue cycles services as a result of the cyberattack disclosed by Optum, Inc. on February 21, 2024 (hereafter, "Cyberattack").

Centralization of both the Patient Data Breach actions and the Healthcare Providers' actions together is inconsistent with the policy and practice of MDLs, as explained below. There are substantial differences in liability theories and damages categories between the two groups of cases, as well as potential conflicts among the Patient Data Breach actions and the Healthcare

1

Providers' actions. While both sets of cases arise out of the same factual event, the Cyberattack announced on February 21, 2024, beyond that precursor event, the two groups of cases have little in common that would warrant centralization and transfer to a singular District Court.

## II.     The Patient Data Breach & Healthcare Providers' Actions

To date, there have been over 35 or more cases filed in 8 different districts that are now before this JPML. They are identified below:

### *Patient Data Breach Actions*:

| Case Name | Case Number | District Court | Filing Date |
|---|---|---|---|
| Merry v. Change Healthcare, Inc. | 3:24-cv-00239 | M.D. Tenn. | 03/01/2024 |
| Reese v. Change Healthcare Inc. | 3:24-cv-00240 | M.D. Tenn. | 03/01/2024 |
| Keriazis v. UnitedHealth Group Inc. | 0:24-cv-00751 | D. Minn. | 03/04/2024 |
| Stump v. Change Healthcare, Inc. | 3:24-cv-00255 | M.D. Tenn. | 03/05/2024 |
| Mackey v. UnitedHealth Group Inc. | 0:24-cv-00771 | D. Minn. | 03/05/2024 |
| Allen v. Change Healthcare, Inc. | 3:24-cv-00263 | M.D. Tenn. | 03/06/2024 |
| Herrick v. Change Healthcare Inc. | 3:24-cv-00293 | M.D. Tenn. | 03/12/2024 |
| Medina v. Change Healthcare Inc. | 2:24-cv-00766 | E.D. Cal. | 03/12/2024 |
| Groom v. UnitedHealth Group Inc. | 0:24-cv-00915 | D. Minn. | 03/12/2024 |
| Castell v. Change Healthcare Inc. | 3:24-cv-00339 | M.D. Tenn. | 03/25/2024 |
| O'Bradovich v. Change Healthcare Inc. | 2:24-cv-00452 | W.D. Penn. | 03/25/2024 |
| Shelor v. Change Healthcare Inc. | 3:24-cv-00340 | M.D. Tenn. | 03/25/2024 |
| Nicholls, et al. v. Change Healthcare Inc., et al. | 3:24-cv-00349 | M.D. Tenn. | 03/27/2024 |
| Rowe v. Change Healthcare Inc., et al. | 3:24-cv-00374 | M.D. Tenn. | 04/03/2024 |
| Fraker, et al. v. Change Healthcare Inc., et al. | 3:24-cv-00384 | M.D. Tenn. | 04/03/2024 |
| Weller v. Change Healthcare Inc. | 3:24-cv-00392 | M.D. Tenn. | 04/04/2024 |

### *Healthcare Providers' Actions*:

| Case Name | Case Number | District Court | Filing Date |
|---|---|---|---|
| Advanced Obstetrics & Gynecology PC v. UnitedHealth Group Inc. | 3:24-cv-00063 | N.D. Miss. | 03/14/2024 |
| Lemke v. Change Healthcare Inc. | 3:24-cv-00302 | M.D. Tenn. | 03/14/2024 |
| Amherst Psychiatric Services v. Change Healthcare Inc. | 3:24-cv-00312 | M.D. Tenn. | 03/18/2024 |
| Bay Area Therapy Group a Marriage and Family Counseling Corp. v. Change Healthcare Inc. | 3:24-cv-01682 | N.D. Cal. | 03/18/2024 |
| Luxe Dental Spa, LLC v. Change Healthcare Inc. | 3:24-cv-04044 | D.N.J. | 03/20/2024 |

2

| | | | |
|---|---|---|---|
| *Mt. Rainier Emergency Physicians, PLLC, et al. v. Change Healthcare* | 3:24-cv-00323 | M.D. Tenn. | 03/20/2024 |
| *Apex Physical Rehabilitation & Wellness PLLC v. Change Healthcare Inc.* | 3:24-cv-00331 | M.D. Tenn. | 03/21/2024 |
| *Therapy My Way, et al. v. Change Healthcare Inc.* | 3:24-cv-00345 | M.D. Tenn. | 03/26/2024 |
| *Be Well Integrative Health Partners, PLLC v. UnitedHealthcare Group Inc.* | 3:24-cv-00337 | M.D. Tenn. | 03/28/2024 |
| *Matlick v. Change Healthcare Inc., et al.* | 3:24-cv-04364 | D.N.J. | 03/28/2024 |
| *Through The Forest Counseling Inc. v. Change Healthcare Inc., et al.* | 3:24-cv-00370 | M.D. Tenn. | 04/01/2024 |
| *Paula S. Gordy LISW, LLC v. Change Healthcare Inc.* | 3:24-cv-00386 | M.D. Tenn. | 04/04/2024 |
| *Sklar v. Change Healthcare Inc.* | 3:24-cv-00387 | M.D. Tenn. | 04/04/2024 |
| *Eye Surgeons of Central New York, P.C. v. Change Healthcare Inc.* | 3:24-cv-00420 | M.D. Tenn. | 04/09/2024 |
| *Twin Cities Counseling LLC v. Change Healthcare Inc.* | 0:24-cv-01254 | M.D. Tenn. | 04/10/2024 |
| *Only Choice Urgent Care & Med Spa, et al. v. UnitedHealth Group Inc., et al.* | 0:24-cv-01271 | D. Minn. | 04/10/2024 |
| *Diagnostic and Interventional Spinal Care of Louisiana, Inc., et al. v. UnitedHealth Group Inc., et al.* | 2:24-cv-01011 | E.D. La. | 04/22/2024 |
| *Santa Rosa Orthopaedic Medical Group, Inc. v. Change Healthcare Inc., et al.* | 3:24-cv-00499 | M.D. Tenn. | 04/22/2024 |
| *VIP Physicians Consulting LLC v. Change Healthcare Inc., et al.* | 3:24-cv-00556 | M.D. Tenn. | 05/03/2024 |

Only Choice Plaintiffs do not seek to represent a class of patients impacted by the exposure of their PII and PHI resulting from the Cyberattack and only represent a class of healthcare providers financially impacted by the Cyberattack.

### III.   Argument

#### A.  The objectives of 28 U.S.C. § 1407 do not support the centralization of all actions pending before this Panel.

Under 28 U.S.C. § 1407(a), the JPML is authorized to consolidate and coordinate pre-trial proceedings "for the convenience of parties and witnesses" and to "promote the just and efficient conduct of such actions." Even if pending actions share a common factual core, they should not be centralized, absent a persuasive showing that the interests of judicial efficiency

3

would be served. *In re Adderall XR (Amphetamine/Dextroamphetamine) Mktg., Sales Practices & Antitrust*, 968 F. Supp. 2d 1343 (J.P.M.L. 2013) ("We acknowledge that these actions share a common factual core… However, we are not persuaded, on the record before us, that centralization is necessary either to assure the convenience of the parties and witnesses or for the just and efficient conduct of this litigation.") Moreover, the burden of demonstrating that the interests of judicial efficiency are served by wholesale centralization has not been met here. *In re Cable Tie Patent Litig.*, 487 F. Supp. 1351, 1354 (J.P.M.L. 1980) ("[M]ovant has not met its burden of demonstrating that transfer will further the purposes of Section 1407.").

> **i. *Patient Data Breach actions should not be consolidated with Healthcare Providers' actions as significant factual differences exist.***

Only Choice Plaintiffs recognize all the cases arose from the same common factual core event: the initial Cyberattack. However, the similarities between these two disparate groups of cases quickly dissipate upon closer examination.

Patient Data Breach actions will contend with distinct factual issues such as: what and how much personal data had been compromised, what mitigating efforts have plaintiffs or potential class members made (or must make) to safeguard their identity and data, what level of identity theft or credit monitoring protection should be afforded for those affected and for how long, what knowledge of risk or degree of culpability may exist for Defendant Change Healthcare, Inc. in the manner the PII and PHI were stored, did the company comply with relevant PII/PHI data protection laws and industry standards, what notification process should be developed for patients who had data exposed or potentially exposed, and what compensation or remedies should be offered for the compromised PII/PHI (and will unique damage models need to be developed that specifically relate to identity theft or credit monitoring issues). These are

some of the factual issues that will be of critical importance and permeate the Patient Data Breach actions but will have little to no significance to the Healthcare Providers' actions.

In contrast, cases brought by Healthcare Providers' and Related Entities seek compensation for damages that are fiscal in nature, such as foregone or delayed billings, inability to process insurance claims, and other financial harms. Factual issues that are distinct to the Healthcare Providers' actions include questions such as: how did the payment processes fail to such a catastrophic degree, who maintained the payment processes and what redundancies were in place, what financial losses did the healthcare providers incur due to the payment system disruption, what is the recovery-offset calculations due to payments received from the Optum, Inc.'s Temporary Funding Assistance Program ("TFAP"), was the TFAP sufficient and adequately designed, what has caused the delay in restoring the payment processing system and to what degree did this harm healthcare providers, what measures did the company have in place to protect against such disruptions or mitigate such harm, did the company violate any contractual obligations to the healthcare providers by failing to maintain operational payment systems, what communication did the company provide to the affected healthcare providers regarding the breach and subsequent issues with payment processing so healthcare providers could adequately plan, what compensation or remedies might the affected healthcare providers seek from Defendants, what mitigation efforts have healthcare providers taken to limit the harm (home or personal loans, laying off staff members), and were any technological third-parties or vendors involved in the payment processing system whose actions or failures contributed to the extent of the disruption?[1]

---

[1] These disparate legal theories and related factual issues will necessitate individualized discovery for each corresponding group, which is antithetical to § 1407's goal of judicial economy through group-oriented pretrial procedures. The Panel has ruled against centralization where such unique questions

Centralizing Patient Data Breach actions and Healthcare Providers' actions under § 1407 would burden the docket with myriad issues not germane to each other while providing no relief from the duplicative discovery that could not otherwise be accomplished through the coordination of the two MDLs. *In re Pharmacy Ben. Plan Administrators Pricing Litig.*, 206 F. Supp. 2d 1362, 1363 (J.P.M.L. 2002) (denying centralization and noting that even if the actions "share common legal questions and, perhaps, a few factual questions, unique questions of fact predominate over any common questions of fact.").

### ii. *Patient Data Breach actions and Healthcare Providers' actions raise distinct legal issues and further counsel against blanket centralization.*

Differences in the questions of law contribute to a finding that centralization and consolidation are improper. *In re Athena Universal Life II Cost of Ins. Increase Litig.*, 268 F. Supp. 3d 1354, 1355 (J.P.M.L. 2017) (finding that "overlap in factual and legal issues" alone is insufficient for centralization).

Patient Data Breach actions, for example, seek to compensate for breaches of individual patient's privacy rights, including the failure to protect highly sensitive PHI. These Patient Data Breach actions raise substantially different liability theories (invasion of privacy) and damages issues (quantification of harm from loss of health information and other personal information) compared to the Healthcare Providers' actions, which are concerned with compensation for business interruption arising from the initial Cyberattack. Each of the Healthcare Providers' actions asserts some, or all, of the following common law and equitable claims: negligent interference with prospective economic advantage, breach of confidence, breach of implied contract, breach of implied covenant of good faith and fair dealing, breach of fiduciary duty, and

---

predominate over any common questions. *In re Pharmacy Ben. Plan Administrators Pricing Litig.*, 206 F. Supp. 2d 1362, 1363 (J.P.M.L. 2002). As listed above, the following questions of fact that are at issue for the Patient Data Breach cases versus the Healthcare Providers' cases are irrelevant to each other.

unjust enrichment. These legal theories are distinct from those raised by Patient Data Breach actions.

The Patient Data Breach actions should not be consolidated with the Healthcare Providers' and Related Entities actions in a single MDL track as different legal theories (and resulting different damage models that must now match the legal theory post-*Comcast*) burden plaintiffs with issues that are not in any way germane to them and would be more appropriately handled by two separate MDL tracks.

### B. Consolidating and centralizing Patient Data Breach actions and Healthcare Providers' actions will not promote efficiency or serve the convenience of parties and witnesses.

The paramount consideration for centralization is whether doing so will promote efficiency and convenience. *In re Truck Accident Near Alamagordo, New Mexico, on June 18, 1969*, 387 F. Supp. 732, 733 (J.P.M.L. 1975). Elimination of inconsistent pretrial rulings, streamlined discovery, and reduction of the overall burdens of the litigation upon the courts and the parties are typical considerations the JPML will weigh, however, as demonstrated above, vastly divergent factual and legal issues exist between the Patient Data Breach actions and the Healthcare Providers' actions and any 'gains' from their centralization will clearly be outweighed by burdening one distinct group of plaintiffs with the pretrial rulings, discovery, and burdens from the other group.[2] Indeed, seeking efficiencies through "centralized treatment of disputed legal questions, merely to avoid different federal courts having to decide the same issue is, by

---

[2] Given the differences between the two groups, the convenience of witnesses or efficient discovery in these cases would not be served by centralization and transfer. Voluntary coordination of discovery in the two sets of cases, including cross-noticing depositions and using a joint repository of document productions and written discovery, would be the most efficient method to address any overlap in relevant discovery. *See Manual for Complex Litigation*, § 20.14 (2004). Judicial efficiency would be best served by leaving the Patient Data Breach actions and the Healthcare Providers' actions on separate MDL tracks.

itself, usually not sufficient to justify Section 1407 centralization." *In re ABA Law School Accreditation Litig.*, 325 F. Supp. 3d 1377, 1378 (J.P.M.L. 2018).

Blanket centralization, in fact, will likely delay resolution and make these cases more cumbersome. There is no need to involve Patient Data Breach actions and their counsel and resources in issues affecting only the Healthcare Providers' actions and vice versa, to say nothing about the clear conflicts that may arise.[3] Finally, to the extent any discovery may overlap, given the common Cyberattack affecting both sets of cases, the parties can easily resolve any duplicative discovery issues through informal coordination. *See In re: Best Buy Co., Inc., California Song-Beverly Credit Card Act Litig.*, 804 F. Supp. 2d 1376, 1379 (J.P.M.L. 2011).

### C. Centralization of Patient Data Breach actions and Healthcare Providers' actions in separate federal district courts, under §1407, is appropriate here.

Only Choice Plaintiffs strongly urge the JPML to consider, at minimum, separating the Patient Data Breach actions from the Healthcare Providers' actions. Blanket centralization is improper here. Only Choice Plaintiffs further argue that instead of transferring all cases to the Middle District of Tennessee, the JPML considers the centralization of Patient Data Breach actions in the Middle District of Tennessee and the centralization of Healthcare Providers' actions in the District of Minnesota for the reasons articulated below. When deciding on an appropriate transferee district, the Panel considers the district's central location for the parties, witnesses, documents, and counsel, as well as ease of accessibility. *In re Vehicle Carrier Servs. Antitrust Litig.,* 978 F. Supp. 2d 1382, 1383 (J.P.M.L. 2013).

---

[3] Furthermore, counsel for Patient Data Breach cases cannot adequately represent Healthcare Providers' cases when taking into consideration that their interests are in conflict and there is a need for different structures and administration of pretrial proceedings for each group. *In re Oil Spill by the Oil Rig "Deepwater Horizon" In the Gulf of Mexico, On April 20, 2010,* MDL No. 2179, Doc. 1561 at 2 (the plaintiff argued that "the MDL Plaintiffs' Steering Committee cannot adequately or ethically represent" both the plaintiff and the other plaintiffs in that MDL).

> **i. *The Middle District of Tennessee may be an appropriate transferee forum for Patient Data Breach actions.***

Only Choice Plaintiffs take no position and do not oppose centralization of the Patient Data Breach actions in the Middle District of Tennessee. Change Healthcare's ("Change") headquarters is located in Tennessee, and the Plaintiffs do not dispute that the court has the necessary resources and subject matter experience required for a typical data breach matter where PII/PHI has been exposed.

> **ii. *The District of Minnesota is the most appropriate transferee forum for the Healthcare Providers' actions.***

The Healthcare Providers' actions should be centralized and transferred to the United States District Court for the District of Minnesota. The District of Minnesota is the most appropriate venue for the Healthcare Providers' actions because three of the four Defendants are headquartered in Minnesota, whose documents and witnesses will be critical to this particular litigation, it is a convenient forum located centrally between all Healthcare Providers' actions filed to date, and because of the ease of direct travel for parties' counsel, and it has the resources and the subject matter experience that this litigation will require.

> a.  Defendants Optum, Inc., UnitedHealth Group Inc., and UnitedHealthcare, Inc. are Headquartered in Minnesota.

UnitedHealth Group Inc. and United Healthcare, Inc. (together, "UHG") own subsidiary Optum, Inc. ("Optum"). All three companies are headquartered in Minnesota and have been named as defendants in many of the actions before this Panel. The change was bought by UHG (via Optum) and completed the merger transaction in October 2022. Both UHG and Optum, including ***their*** decisions (so their witnesses and related documents), will be the core focus of the Healthcare Providers' litigation in determining why payment processes were so heavily impacted by the Cyberattack. When Optum acquired Change, it did so because it would "connect and

simplify the core clinical, administrative and ***payment processes health care providers and payers depend on to serve patients***. Increasing efficiency and reducing friction will benefit the entire health system, resulting in lower costs and a better experience for all stakeholders."[4] Optum acquired Change knowing full well that "Change was a relatively older company with older technologies, which we [UHG and Optum] had been working to upgrade since the acquisition," "[b]ut for some reason, which we continue to investigate, this particular server did not have MFA on it."[5] The witnesses, information, documents, cybersecurity policies, and decision-making will almost certainly stem heavily (if not completely) from those companies headquartered in Minnesota. Moreover, when healthcare providers started to understand the significant scope of harm on their payment processes, the American Hospital Association released a statement stating that "we recommend that all healthcare organizations that were disrupted or are potentially exposed by this incident consider disconnection from Optum until it is independently deemed safe to reconnect to Optum."[6] Optum is central to the subsequent shutdown of its services, which costs healthcare providers significant harm, both monetarily and in terms of its effectiveness in providing healthcare services. As explained above, these are unique considerations pervasive to the Healthcare Providers' actions.

One of the primary and central witnesses to this litigation is also located in Minnesota: the CEO of UHG stated that it was his decision, and his decision alone, to pay the Cyberattack ransom.[7] Not Change's decision. Moreover, one of the crucial discovery issues will be what type of due diligence Optum did before and shortly after acquiring Change Healthcare (evidence that

---

[4] https://www.optum.com/en/about-us/news/page.hub5.optum-and-change-healthcare-complete-combination.html
[5] https://energycommerce.house.gov/posts/what-we-learned-change-healthcare-cyber-attack
[6] https://www.msspalert.com/news/change-healthcare-cyberattack-event-timeline
[7] https://www.nytimes.com/2024/05/01/health/united-health-cyberattack-senate.html

will stem from Minnesota) because even Optum's own guidance indicated that it "[p]erform[s] an in-depth data risk assessment before any new business entity is integrated into our company."[8] Finally, as of December 2023, UHG employs approximately 440,000 employees worldwide.[9] Optum also employs about 80,788 employees and has $34.7 billion in revenue.[10] These numbers significantly dwarf Change and demonstrate that, statistically, if not actually, a majority of witnesses and discovery regarding the Healthcare Providers' actions will be centered in Minnesota.

      b. The District of Minnesota is centrally located for Healthcare Providers' actions.

The Healthcare Providers' actions are pending in Tennessee, Minnesota, New Jersey, California, Mississippi, and Louisiana. Minnesota is easily the most centrally located of all these locations, and Minneapolis-Saint Paul International Airport is located near the District of Minnesota, Minneapolis courthouse. These considerations provide easy and convenient access for out-of-town parties, witnesses, and counsel.

      c. The District of Minnesota has the resources and litigation experience to effectively handle this MDL.

The District of Minnesota has ample judicial resources to effectively and efficiently handle this multidistrict litigation. The Panel in *Baycol* recognized that the District of Minnesota "possesses the necessary resources, facilities, and technology to sure-handedly devote the substantial time and effort to pretrial matters that this complex docket is likely to require." *In re Baycol Prods. Liab. Litig.*, 180 F. Supp. 2d 1378, 1380 (J.P.M.L. 2001). Judges within the District of Minnesota have efficiently handled numerous MDLs. If the court decides to centralize

---

[8] https://www.optum.com/content/dam/optum4/resources/pdf/m57363-g4_data_security_sheet_v3.pdf
[9] https://www.statista.com/statistics/622047/individuals-employed-by-unitedhealth-group/
[10] https://rocketreach.co/optum-profile_b5f12b5cf42d354a

and transfer all cases to one district, Minnesota is the appropriate venue. The majority of Defendants are headquartered in Minnesota, where the key decision makers and witnesses are located and where discovery is likely to occur.

### IV.     Conclusion

For the foregoing reasons, Only Choice Plaintiffs oppose blanket centralization and transfer of all cases. Only Choice Plaintiffs does not oppose centralization and transfer to the Middle District of Tennessee all Patient Data Breach cases and support centralization and transfer to the District of Minnesota all Healthcare Providers' cases.

Dated:  May 10, 2024

Respectfully submitted,

By: /s/ William M. Audet
William M. Audet (CA SBN 117456)
Ling Y. Kuang (CA SBN 296873)
**AUDET & PARTNERS, LLP**
711 Van Ness Avenue, Suite 500
San Francisco, CA 94102-3275
Telephone: (415) 568-2555
Facsimile: (415) 568-2556
waudet@audetlaw.com
lkuang@audetlaw.com

Jacob R. Rusch (SBN 0391892)
Timothy Becker (SBN 025663)
Zackary Kaylor (SBN 0400854)
**JOHNSON//BECKER, PLLC**
444 Cedar Street, Suite 1800
St. Paul, MN 55101
Telephone: (612)436-1802
Facsimile: (612)436-1801
jrusch@johnsonbecker.com
tbecker@johnsonbecker.com
zkaylor@johnsonbecker.com

*Counsel for Plaintiffs Only Choice Urgent Care & Med Spa and Stewart Scharfman Physical Therapy, PC*