**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| **IN RE: CHANGE HEALTHCARE, INC., CUSTOMER DATA SECURITY BREACH LITIGATION** This document related to: *Diagnostic Imaging Alliance of Louisville, P.S.C. v. Change Healthcare Operations, LLC et al.* Cause No. TNM/3:25-cv-00470 | **MDL No. 3108** |

**MEMORANDUM IN SUPPORT OF PLAINTIFF DIAGNOSTIC IMAGING ALLIANCE OF LOUISVILLE, P.S.C.'S MOTION TO VACATE CONDITIONAL TRANSFER ORDER 17 (CTO-17)**

For the reasons stated below, Plaintiff Diagnostic Imaging Alliance of Louisville, P.S.C. ("Plaintiff" or "DIAL") moves this Panel to vacate Conditional Transfer Order 17 ("CTO-17"), issued in *Diagnostic Imaging Alliance of Louisville, P.S.C. v. Change Healthcare Operations, LLC et al.* No. 3:25-cv-00470 (M.D. Tenn., filed April 25, 2025) (the "*DIAL Action*"), which conditionally transferred this action to MDL 3108: *In Re: Change Healthcare, Inc., Customer Data Security Breach Litigation* (the "Change MDL"). Plaintiff respectfully shows as follows:

## I.     BACKGROUND

### A. Factual Background

DIAL is a radiology services provider based in the greater Louisville, Kentucky area. For decades, DIAL has relied on third-party billing and management services to support its operations. In 1996, DIAL entered into a services agreement (the "Management Agreement") with Medaphis Physician Services Corporation, whose obligations under the Agreement were later assumed by the entities now known collectively as Change Healthcare (the "Change Entities"). Under this

1

agreement, the Change Entities were contractually responsible for a wide range of critical services, including billing, claims submission, and accounts receivable management.

Beginning in 2022—well before the widely publicized ransomware cyberattack in February 2024—the Change Entities began breaching the Management Agreement in material ways. Following Change Healthcare's acquisition by UnitedHealth Group ("UHG") in October 2022, the Change Entities implemented new platforms, protocols, and personnel that caused a significant and sustained degradation in their performance. DIAL began experiencing delays in claims processing, failures to timely submit charges, unresolved denials, and stagnating accounts receivable balances. These failures had a direct, measurable financial impact on DIAL and constituted clear breaches of the Change Entities' core contractual duties separate, apart from, and prior to any issue involving the cyberattack.

The poor performance became readily apparent within months of the UHG acquisition. By late 2022 and throughout 2023, DIAL's collections lagged far behind industry standards despite no corresponding drop in the volume of services rendered. The problem was further compounded by the Change Entities' failure to forward unpaid accounts to DIAL's third-party collections agency, preventing DIAL from mitigating the mounting revenue losses. These issues caused substantial financial damage and strained DIAL's operational capacity long before the 2024 data breach occurred.

It was only after nearly two years of sustained underperformance that the February 2024 ransomware attack occurred. While the attack further disrupted Change's already noncompliant services—and caused a temporary halt in claims processing—the data breach merely exacerbated the financial harm DIAL had already been suffering as a result of the Change Entities' ongoing breaches. The bulk of DIAL's financial damages were already incurred by that point.

Notably, DIAL's claims center not on the data breach itself, but on the Change Entities' longstanding failure to uphold their obligations under the Management Agreement. DIAL's lawsuit focuses on the period prior to the cyberattack, alleging consistent and systemic contract breaches that resulted in 98% of DIAL's initial computation of damages before the breach even occurred.[1] This amount is attributed to the estimated remaining cash value from January 2023 through January 2024 accounts receivable that was not collected by the Change Entities. Although DIAL is still working to quantify its damages, only 2% in currently quantifiable damages remains that accrued after the data breach (accrued interest on a loan, new interface, tax penalties, and interest on taxes).

The Change Entities now seek to bootstrap DIAL's dispute into the Change MDL, which is focused entirely on what occurred during and after the February 2024 data breach. Doing so would improperly conflate two distinct sets of factual circumstances. DIAL's claims are not about data security or cybersecurity negligence, but instead about chronic contractual failures that began in 2022 and continued unabated. The ransomware attack—and the resulting Temporary Funding Assistance Program (TFAP)—represent only the latest chapter in a broader narrative of contractual failure, not the genesis of DIAL's harm or its lawsuit.

For these reasons, consolidation into the Change MDL would be inappropriate and inefficient. It would distort the nature of DIAL's claims, mischaracterize the source of its damages, and unfairly delay resolution of a contractual dispute that significantly predates the data breach at the heart of the Change MDL.

### B. Procedural History

---

[1] By submitting this memorandum in support, DIAL does not waive any rights, claims, or defenses, nor does it waive the right to seek additional damages or relief that may be uncovered through further investigation or discovery.

On March 13, 2024, the plaintiffs in *Merry v. Change Healthcare Inc.*, Case No. 3:24-cv-00239, moved the Judicial Panel on Multidistrict Litigation ("JPML") to consolidate six actions arising from the Change Healthcare data breach. On June 7, 2024, the JPML granted the motion and centralized the cases in the District of Minnesota. *Transfer Order*, ECF No. 158 at 2. The JPML noted that the actions involved "virtually identical claims" for negligence, breach of contract, and consumer protection violations, brought on behalf of individuals and providers impacted by the breach. Discovery would center on the breach's cause, Change Healthcare's security measures, and its post-breach response. *Id*.

Following the transfer order, Change Healthcare filed a Notice of Potential Tag-Along on April 28, 2025, identifying the *DIAL Action* as related to the Change MDL.[2] Subsequently, on April 30, 2025, the Court issued CTO-17, conditionally transferring that case to the Change MDL. On May 7, 2025, Plaintiff filed a Notice of Opposition to CTO-17.

## II.    ARGUMENT

### A.    Relevant Legal Standards

Under 28.U.S.C. § 1407, the Panel "may" transfer "civil actions involving one or more common questions of fact [that] are pending in different districts" to a single district for centralized pretrial proceedings. 28 U.S.C. § 1407(a). For transfer to be appropriate, three conditions must be met: (1) there must be common questions of fact among the cases; (2) consolidation must serve the convenience of the parties and witnesses; *and* (3) transfer and consolidation must be shown to serve the just and efficient conduct of the actions. *Id.*

Consolidation of the *DIAL Action* into the Change MDL would not serve the convenience of the parties and witnesses and transfer and consolidation would not serve the just and efficient conduct of the respective actions. Accordingly, the Motion to Vacate should be granted.

[2] The *DIAL Action* is attached hereto as Exhibit A, Plaintiff's First Amended Petition.

**B.      The Majority of DIAL's Damages Arise Out of Breaches that Predate the Data Breach**

The threshold requirement for MDL transfer is the existence of *common questions of fact* across actions. 28 U.S.C. § 1407(a). DIAL's case centers on a specific breach of a specifically-tailored Management Agreement. This is a contract claim involving distinct communications, performance failures, representations, and business impacts unique to DIAL and its relationship with Change Healthcare separate, apart from, and prior to any issue involving the cyberattack.

Moreover, 98% of DIAL's initial computation of damages are not remotely related to the data breach itself, but for the Change Entities' failure to uphold contractual duties (e.g., claims submission, collections, billing operations) during the January 2023 through January 2024 period. These issues have no overlap with the data privacy and consumer notification issues that predominate in the Change MDL.

Transfer would conflate individualized commercial harms that predate the data breach with systemic consumer data breach claims, undermining the factual integrity of both proceedings.

**C.      Transfer Would Not Serve the Convenience of the Parties and Witnesses**

The second statutory prong—convenience of parties and witnesses—also weighs against transfer. DIAL is a Kentucky-based healthcare provider. Its contract with the Change Entities was performed in Kentucky. The witnesses and documents relevant to this matter (e.g., DIAL's staff, billing office records, third-party vendors) are almost entirely located in or connected to Kentucky. Additionally, the billing management company that took over after the Change Entities failed to perform performs billing functions for DIAL in Georgia. These states are much closer to Tennessee than Minnesota.

Change Healthcare, which is headquartered in Nashville, Tennessee, cannot credibly claim that either it, or its relevant witnesses, may be inconvenienced by facing a litigation in its backyard (i.e., the Middle District of Tennessee).

Discovery in the Change MDL will focus on data breach and thereafter. However, to work up DIAL's case, it will need discovery on events that occurred prior to the data breach. Being included into the Change MDL would mean that DIAL would have to wait two to three years before it could work up the vast majority of its damages. This may cause witnesses that have knowledge concerning DIAL's account during the January 2023 through 2024 period to become unavailable and documents related to that period to be lost. If transferred into the Change MDL, 98% of DIAL's initial computation of damages would be stayed to allow approximately 2% of its claim to be worked up. This imbalance does not lend itself to the convenience of anyone, except the Change Entities.

Litigating this case as part of a national MDL would impose significant logistical burdens on DIAL, unnecessary coordination with class counsel, and delays in resolving its distinct claims. Tennessee remains the most convenient and appropriate forum for this matter.

### D.    Inclusion in the Change MDL Will Not Promote the Just and Efficient Conduct of the Action

Finally, MDL transfer must serve the "just and efficient conduct" of the actions. Unique factual and legal issues that do not overlap extensively with the core claims in the MDL need not be included in an MDL. *See In re Countrywide Fin. Cor. Mortgage-Backed Sec. Litig.,* 812 F.Supp.2d 1380, 1384 (J.P.M.L. 2011) (partially denying consolidation and transfer where the cases shared "minimal overlap" and transfer would "not serve the convenience the parties and witnesses or promote just and efficient conduct" of the related actions.); *In re Energy Drilling, LLC, Cont. Litig.,* 140 F.Supp.3d 1333, 1334 (J.P.M.L. 2015) (denying transfer and consolidation

6

where there was "limited factual overlap" between cases). Efficiency is not advanced by lumping together cases that lack material overlap, as this undermines judicial economy and risks prejudicing parties whose cases are delayed or mischaracterized in the MDL.

DIAL seeks specific damages for breach of a commercial agreement for breaches that predate the issues central to the Change MDL. This claim is not tethered to the broader class-action framework and will not benefit from the procedural consolidation or coordinated discovery typical of MDL proceedings. Critically, the claims in the DIAL Action do not hinge on who was responsible for the data breach or whether Change Healthcare's cybersecurity measures were adequate. Those questions—the core of the Change MDL—are largely irrelevant here. DIAL's claims arise from Change Healthcare's ongoing performance failures under a specific contract, which began well before the data breach and only worsened afterward.

Because the factual and legal issues in the *DIAL Action* are distinct from those in the Change MDL, transfer would not promote the just and efficient conduct of the litigation. Any factual overlap here is minimal at best, and consolidation would yield no meaningful efficiencies. Inclusion in the Change MDL will delay resolution, complicate proceedings, and potentially distort the factual record with unrelated evidence and discovery. These are precisely the inefficiencies 28 U.S.C. § 1407 was meant to avoid. Accordingly, the *DIAL Action* falls outside the scope of the Change MDL and should not be transferred, as doing so would neither promote efficiency nor serve the interests of justice.

**E.    Alternatively, the Transfer of Count I of the DIAL Complaint Should Be Vacated**

The Panel has discretion to transfer a portion of an action, including by directing that certain claims be severed from the original case and excluded from the transfer or later remanded. *See* 28 U.S.C. § 1407(a) (providing that after an action is transferred to the MDL, "the panel may

separate any claim, cross-claim, counter-claim, or third-party claim and remand any such claims before the remainder of the action is remanded").

The primary factual and legal basis for DIAL's breach of contract claim is wholly distinct from the issues central to the Change MDL. Of the total quantified damages DIAL has initially identified for its breach of contract claim, approximately 98% arose before the February 2024 data breach that gave rise to the Change MDL. These damages relate to the Change Entities' persistent and systemic underperformance from January 2023 through January 2024, including its failure to submit claims, collect accounts receivable, report collected payments, and staff DIAL's billing operations as promised.

The remaining 2% of the initial computation of damages in post-breach damages do not meaningfully alter the legal character of DIAL's claims. The gravamen of DIAL's complaint is a straightforward breach of contract grounded in a defined service agreement, not claims arising from cybersecurity negligence or injury from unauthorized data disclosure, which are at the heart of the Change MDL.

Because the overwhelming majority of DIAL's damages accrued independently of the breach, and the causes of action do not depend on questions of cybersecurity fault, there is no meaningful overlap in fact or law with the centralized MDL proceedings. Transfer would not serve judicial efficiency and would burden DIAL with unnecessary delay and cost. Accordingly, the portion of the breach of contract claim relating to the January 2023–January 2024 accounts receivable should be excluded from the Change MDL and the transfer order vacated. *See*, *e.g.*, *In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.*, 812 F.Supp.2d 1380, 1383-84 (J.P.M.L. 2011) (separating and remanding specific claims in an MDL).

## III.    CONCLUSION

For the above-mentioned reasons, Plaintiff DIAL submits this Motion to Vacate Conditional Transfer Order 17 as to the *DIAL Action* and remand it back to the District Court for the Middle District of Tennessee, alternatively, Plaintiff DIAL requests that the portion of the breach of contract claim relating to the January 2023–January 2024 accounts receivable should be excluded from the Change MDL and the transfer order vacated.

Dated: May 27, 2025

Respectfully submitted,

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

By: */s/ Craig D. Dillard*
    **Craig D. Dillard**
    Texas State Bar No. 24040808
    Craig.Dillard@nelsonmullins.com
    **Jason Sharp**
    Texas State Bar No. 24039170
    Jason.Sharp@nelsonmullins.com
    **Kiara C. Gradney**
    Texas State Bar No. 24097754
    Kiara.Gradney@nelsonmullins.com
    1111 Bagby Street, Suite 2100
    Houston, Texas 77002
    Telephone:  346-646-6670
    Facsimile:  346-241-375
    **Carson W. King**
    Tennessee State Bar No. 034305
    Carson.King@nelsonmullins.com
    1222 Demonbreun Street, Suite 1700
    Nashville, TN 37203
    Phone: (615) 664-5388
    Fax: (615) 664-5399

**ATTORNEYS FOR PLAINTIFF**

**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**