# EXHIBIT A

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| DIAGNOSTIC IMAGING ALLIANCE OF LOUISVILLE, P.S.C., | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 3-25-cv-00470 |
| CHANGE HEALTHCARE OPERATIONS, LLC AND CHANGE HEALTHCARE SOLUTIONS, LLC, | § § § § | **JURY DEMAND** |
| Defendants. | § § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

Plaintiff Diagnostic Imaging Alliance of Louisville, P.S.C. ("DIAL") by and through its counsel, states the following for its First Amended Complaint against Defendants Change Healthcare Operations, LLC and Change Healthcare Solutions, LLC (collectively the "Change Entities" or "Defendants").

## I.      PARTIES

1.      DIAL is a professional service corporation organized and existing under the laws of Kentucky with its principal place of business in Louisville, Kentucky. DIAL is a citizen of the State of Kentucky for diversity jurisdiction under 28 U.S.C. §1332(a).

2.      Change Healthcare Operations, LLC is a limited liability company organized and existing under the laws of the state of Delaware with its principal place of business in Nashville, Tennessee. Change is a citizen of Delaware and Tennessee for purposes of diversity jurisdiction under 28 U.S.C. §1332(a). To acquire funds under the Temporary Funding Assistance Program ("TFAP"), DIAL was required to accept non-negotiable terms offered by Change Operations.

4900-7271-0447

Despite extending funds to DIAL in Kentucky, Change Operations has not registered to do business in Kentucky.

3. Change Healthcare Solutions, LLC ("Change Solutions") is a Delaware limited liability company with its principal place of business in Nashville, Tennessee. Change Solutions is registered to do business in Tennessee, and it is a subsidiary of Change Healthcare Inc.

## II.    JURISDICTION AND VENUE

4. This Court possesses subject matter jurisdiction over this Complaint pursuant to 28 U.S.C. §1332(a) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and the matter in controversy is between citizens of different states.

5. Venue is proper in the United States District Court for the Middle District of Tennessee pursuant to 28 U.S.C. §1391, because Change Solutions and Change Operations are citizens of the State of Tennessee residing in the Middle District of Tennessee.

## III.    FACTUAL ALLEGATIONS

6. DIAL is a medical services provider, providing radiology services to the greater Louisville area.

7. Change Healthcare Operations, LLC through its subsidiaries, predecessors, and affiliates were the successors in interest to an Agreement for Comprehensive Medical Management Services dated September 1, 1996 (the "Management Agreement") with DIAL, which provides radiology services. Upon information and belief, in 2017, Change Healthcare Holdings, Inc. entered a joint venture with McKesson Corporation. The new company was named Change Healthcare. As a result of the joint venture, the Change Entities became the successor-in-interest to Medaphis Physician Services Corporation ("Medaphis").

8.     Under the Management Agreement, the Change Entities were obligated to provide a significant number of services that include, *inter alia*, processing DIAL's patient charges, submitting timely claims for DIAL's charges to insurance companies and other payers, collecting payments, pursuing accounts receivable, overseeing the repayment of refunds, maintaining compliance with regulatory rules governing confidential patient information, and implementing appropriate safeguards to prevent the use or disclosure of patient health information and DIAL's other confidential business information. Such services are a necessary part of DIAL's day-to-day operations. A true and accurate copy of the Management Agreement, along with its internal schedules, are attached here, collectively, as Exhibit A. The Management Agreement provides, in large part, that the Change Entities would provide billing and practice management services to DIAL (the "Services").

9.     Under the Management Agreement, the Change Entities agreed to, among other things, timely submit electronic filings with third-party payers, major insurance carriers, Medicare and Medicaid, provide monthly management reporting, follow up on delinquent insurance accounts, collect accounts receivable, and notify DIAL of unpaid accounts. *See* Exhibit A, Management Agreement.

10.     Typically, payments for healthcare services follow this process: providers, such as DIAL, submit charges for healthcare services as claims to health insurers, also referred to as "payers," who then process and pay those claims.

11.     The process starts when a patient seeks care from a healthcare provider like DIAL. Following treatment, the healthcare provider or its billing company submits a claim to the payer to receive compensation for the services provided. Before issuing payment, the payer reviews the claim to assess the appropriate payment amount, if any, for the services rendered. The payer then

provides the healthcare provider with an electronic remittance advice (ERA), detailing the claim, the approved payment amounts, and any denials, before processing the payment. The Change Entities were responsible for handling and overseeing the claims and reimbursement process, as well as processing and follow up on denials from payers and collecting outstanding accounts receivable.

### IV.    UnitedHealth Group Buys Change Healthcare

12.    In January 2021, UHG agreed to purchase Change Healthcare, Inc. and its affiliates, subsidiaries, and assigns for approximately $13 billion.[1]

13.    In October 2022, following a Department of Justice antitrust investigation and trial, the merger was ultimately approved, and UHG finalized its acquisition of Change Healthcare and integrated its operations under its existing umbrella organization, Optum.[2]

14.    In support of the merger, UHG and Change Healthcare claimed that the merger would result in significant benefits to the healthcare system, including simplifying and accelerating physician billing and patient payment processes, accelerating cash flow to providers, lowering financial burdens, decreasing the frequency of denied claims, and "minimize[ing] the amount of friction between payers and providers.[3]

15.    After completion of the merger, UHG "acquired all of the outstanding common shares of Change Healthcare" and, thus, wholly owns Change Healthcare.[4]

---

[1] *US. v. UnitedHealth Group Inc., and Change Healthcare Inc.*, 1:22-cv-481, Post-Trial Memorandum Opinion,
Dkt. No. 138 at 8 (D.D.C. Sept. 21, 2022).
[2] *Id.*
[3] *Id.* at 8-9.
[4] *Id.* at 9.

16.     After Change Healthcare integrated with Optum, employees from Optum started attending DIAL's board meetings and emailing DIAL to discuss the Change Entities' performance under the Management Agreement, and it was unclear to DIAL whether they were in business with the Change Entities or Optum.

## V.     Breach of Contract Following Change Healthcare's Acquisition

17.     After the October 2022 merger and acquisition by UHG, the Change Entities started using a new platform, protocols, and staff to provide the billing and management services under the Management Agreement, and the Change Entities' performance started to decline. DIAL's accounts receivables' balance increased in 2022, and for two years thereafter, beyond what would be acceptable in the industry, due to increased processing times, failing to timely submit physician charges, not effectively processing denials, and not resolving outstanding accounts receivables. These actions led to diminished collection rates. Additionally, the Change Entities stopped sending DIAL's collections agency, Transworld, accounts that historically should have been sent to the agency for further collections attempts. Because Transworld did not receive such accounts, no further collections attempts occurred outside of what the Change Entities purportedly did, compounding the issue of the Change Entities not collecting DIAL's accounts receivables.

18.     The Change Entities' breach of the Management Agreement was not immediately apparent to DIAL due to the ordinary lag time during which claims are submitted, verified, and collected. However, within a relatively short period of months, the Change Entities' poor performance under the Management Agreement became readily apparent to DIAL, and it was the source of concern in discussions between the parties.

19.     Based on historic trends and performance standards in the industry, a healthcare practice's accounts receivable should roughly track the volume of its charges and be consistent with the gross collection rate of the charges. That did not occur after the merger.

20.     After the 2022 merger, the Change Entities' insufficient billing practices and poor collection rate caused DIAL's revenue from charges to begin to diverge sharply from DIAL's total charges.

21.     The Change Entities' failure to timely process, efficiently bill, and later collect on claims resulted in a substantial growth in unpaid accounts receivable, even though there largely was not a corresponding increase in the volume of charges.

22.     Over time, Change Entities continued to breach their obligations under the Management Agreement to timely process, bill, and collect on charges billed. The Change Entities also failed to cure their default by ensuring a catch up of collections, despite promising to do so in various communications with the Change Entities.

23.     Because of Defendants' default, and in attempt to mitigate their losses, DIAL started to research new billing software and systems—as well as vendors—that might be needed to remedy the increasing disparity in billed charges and collections from filed insurance claims.

### VI.     The Change Entities' Payment Platform Collapses

24.     In February 2024, a ransomware cyberattack significantly worsened the Change Entities' existing contractual breach (the "Data Breach"). The attack rendered their data systems and healthcare payment platforms completely inaccessible, halting all claims billing activities and leading to the unauthorized access and exposure of confidential patient health information and other sensitive data belonging to DIAL and its patients. DIAL is one of the companies still suffering from the ransomware attack on Change. DIAL encountered major disruption to its operations and

was cut off from being able to collect on rendered services. For example, during this time, patients did not receive refunds and patients that were billed did not have the ability to pay or reach someone at Change or Optum to make a payment or inquire about their service.

25. The Change Entities had no viable backup plans or systems in place to combat the crisis. In response to the cyberattack, the Change Entities made the decision to take the remaining systems, including their healthcare payment platform, offline.

26. Because the Change Entities have failed to provide DIAL with its account receivables data for the end of January 2024 and February 2024 (the month of the Data Breach), DIAL has had to estimate the figures for those months.

27. Following more than five years of already significant collection shortfalls, the cyberattack on the Change Entities' payment platform was the final straw, and DIAL acted to mitigate its losses.

28. On August 29, 2024, DIAL entered into a Mutual Termination Agreement with Change Healthcare.

29. In the aftermath of the shutdown of Change Healthcare's systems, the Change Entities were unable to share charge files and accounts receivable data with DIAL even as of the date of this filing. Although DIAL had secured a new vendor, it was still unable to carry out essential billing operations for the accounts receivables that accrued prior to the data breach due to the Change Entities' failure to turn over the accounts receivables data. This included appealing claim denials or partial denials, posting payments from electronic remittance advices, billing secondary insurance or patients, collecting refunds, and obtaining payments from insurers for services rendered prior to the ransomware incident. As a result, DIAL experienced a prolonged period with minimal, if any, reimbursement from insurers for patient care, and in cases where

reimbursements were received, the reimbursements were not accurately posted to DIAL's accounts.

## VII.    The Change Entities Offer the TFAP as Part of a Scheme to Impose Unfair Terms

30.    The total operational halt was a direct consequence of the Change Entities' own mistakes and failures. However, the interruption of revenue flow left DIAL and other healthcare providers in a precarious situation, as their routine operating costs—such as employee wages, rent, and other financial obligations—continued to accrue and required payment despite the disruption.

31.    While downplaying their own responsibility for the incident, the Change Entities introduced the TFAP for DIAL and other providers, administered through Change Healthcare Operations, LLC. This program was not an independent transaction. Instead, the funds were specifically intended to compensate DIAL for amounts "that [DIAL] may have otherwise received but for the disruption in processing of electronic healthcare transactions, claims processing and administrative services and payments operations of Change Healthcare." However, instead of helping DIAL with a problem that the Change Entities caused, this program amounted to a short-term loan, allowing DIAL to access money that the Change Entities were already contractually obligated to collect under the Management Agreement.

32.    It only became apparent shortly before this lawsuit was filed that the TFAP was not a genuine effort to offer interim financial relief. Rather, it appeared to be a strategy by the Change Entities to impose one-sided and unreasonable repayment terms on DIAL for funds it would have rightfully received if not for the Change Entities' repeated failures, including those connected to the ransomware attack.

33.    A copy of the purported terms governing the TFAP is attached as **Exhibit B**.

4900-7271-0447

8

34. Based on available information, it appears the true purpose behind the Change Entities' offer of the TFAP was to exploit DIAL and similarly situated providers. While the program was presented as a good faith effort to provide temporary access to anticipated reimbursements, the Change Entities were in fact concealing critical details about the origin, scope, and impact of the ransomware attack. This allowed them to offer loans for funds that were unlikely to be recovered, all while leveraging their stronger negotiating position to enforce one-sided and unreasonable terms—most notably, a forum selection clause aimed at consolidating expected nationwide lawsuits in a venue favorable to them.

35. Prior to the introduction of the TFAP, DIAL had no existing relationship or direct interaction with Change Operations. It has since become clear that Change Operations was chosen to offer the TFAP—rather than Change Healthcare or Optum—because it had fewer ties to business activities in other states and was less directly associated with the previous failures of the other Change Entities. However, Change Operations was not acting independently; instead, it functioned on behalf of the broader group of Change Entities. This is implicitly acknowledged in the TFAP itself, which defines terms like 'Change Healthcare,' 'Change,' 'CHC,' 'We,' 'Us,' or 'our' as referring collectively to Change Healthcare Operations, LLC and its parent companies, affiliates, successors, and assigns.

36. The Change Entities were aware—but failed to disclose—that the ransomware attack was a foreseeable consequence of their own inadequate security measures meant to protect their platform and DIAL's confidential data. Leveraging their superior knowledge, they exploited the financial turmoil caused by the breach to recharacterize part of their financial obligation as a short-term loan. This maneuver positioned them to later use the debt as leverage and influence the direction and jurisdiction of anticipated legal proceedings to their advantage.

37.    The TFAP was presented as a temporary solution to help providers recover revenue from outstanding claims, with the implicit assurance that the Change Entities would ultimately process and collect those unpaid claims on behalf of DIAL. However, that commitment was never fulfilled, and a significant portion of those claims remain unresolved. Despite this failure, the Change Entities are now attempting to use the TFAP as leverage, seeking repayment for funds that were only needed due to their own prior breaches. There is no legitimate justification for requiring reimbursement under the TFAP, regardless of whether Change Operations has largely adhered to its terms.

### VIII.    The Change Entities Inflate Their Collections and Withhold Insurance Proceeds

38.    In April 2024, the Change Entities eventually restored access to their online systems and payment infrastructure. Following the termination of the Management Agreement, the parties initiated a workout period to pursue outstanding claims. During this process, however, the Change Entities misrepresented the amount of DIAL's accounts receivable they had collected. Based on available information, this misrepresentation enabled them to charge for fees they had not legitimately earned.

39.    Although DIAL has made numerous requests, the Change Entities have failed to produce documentation substantiating the collections they claim to have made, nor have they provided a reconciliation tying those amounts to specific patient claims. The deposits made into DIAL's accounts do not align with the reported collection activity, suggesting that the Change Entities billed fees for services that were not actually performed.

40.    Adding insult to injury, on February 3, 2025, the Change Entities informed DIAL that they would "start withholding payment on UnitedHealthcare claims" the following week if DIAL did not immediately repay the funds advanced under the TFAP. The UHG insurance

proceeds that the Change Entities threaten to withhold have no relationship to the historic claims impacted by the cyberattack (i.e., the claims that allegedly prompted the extension of the TFAP), and those third-party withholdings are just another example of the Change Entities' bad faith, the lack of true separation between the various entities, and their intent to weaponize the TFAP.

41.     DIAL has incurred significant and measurable damages—presently known to be $1,013,635.55—as a direct result of numerous breaches of the Management Agreement by the Change Entities. These breaches include, but are not limited to: delays and irregularities in claim collection efforts; failure to implement adequate cybersecurity measures to prevent the ransomware attack; mishandling of protected health information and other confidential data; withholding key information about the scope and origins of the cyberattack; leveraging an unfair bargaining position to impose one-sided contractual terms, such as a forum selection clause; failing to provide industry standard practice management services by failing to properly categorize DIAL employees as Jefferson County, Kentucky residents; and inflating reported collections during the post-termination recovery period. These actions have led to unpaid claims, fees, interest, tax liability, revenue loss, additional expenses, and a substantial diversion of DIAL's operational, management, and physician resources. However, as discovery uncovers the full extent of the Change Entities' misdeeds, DIAL anticipates that its damages will increase.

42.     DIAL further requests that this Court declare that DIAL is entitled to set off and retain the proceeds from the TFAP, that the purported terms of the TFAP, most notably its forum selection clause, are unenforceable, and that the Change Entities are barred from using the TFAP as a justification for instructing UHG or Optum to withhold payments for valid and unrelated insurance claims.

## COUNT I
## BREACH OF CONTRACT (Against All Defendants)

43.     DIAL realleges and incorporates by reference paragraphs 1 through 45 of this Complaint as if fully set forth herein.

44.     Defendants entered into a valid and enforceable contract with DIAL, as reflected in the Management Agreement. At no point did the Change Entities produce an assignment agreement clearly indicating which of them had legally assumed the interest in the Management Agreement originally held by PST Services/McKesson. As the provider of the practice management services, the Change Entities were the custodians of this type of agreement.

45.     In the ordinary course of business, Change Entities contract with healthcare providers, such as DIAL, to deliver its Services. These Services enable Change Entities to act as an intermediary between healthcare providers and insurance companies. Healthcare providers submit insurance claims through the Change Entities' platform, which then forwards them to the insurance companies. After evaluation and processing, the insurance companies make payments to the healthcare providers.

46.     DIAL paid for these Services.

47.     In exchange for DIAL's payment, the Change Entities promised, among other things, to deliver Services in accordance with industry standards. This included processing insurance claims, managing accounts receivable for DIAL, and fully equipping and staffing a billing office operation to handle billing, reimbursement, collections, and billing management functions necessary to optimize DIAL's collections of reimbursement for claims filed to insurance companies.

48.     However, in February 2024, the Change Entities stopped properly servicing DIAL's accounts and insurance claims, including causing DIAL to miss insurance claim submission

deadlines. Additionally, during the disruption period, patients did not receive claim refunds and patients that were billed did not have the ability to pay or reach someone at the Change Entities or Optum to make a payment. These actions were a direct breach of its contractual obligations.

49.    The Defendants breached their contractual obligations by failing to perform the agreed-upon Services. These breaches included but were not limited to: not collecting payments for DIAL's healthcare services; inadequately collecting accounts receivable; missing claims submission deadlines; misreporting collected claims; attempting to recharacterize their liabilities as loans; and failing to timely notify DIAL that its healthcare platform would be taken offline. These failures directly disrupted DIAL's ability to access the Services it paid for and interrupted its normal revenue stream.

50.    As a direct and foreseeable consequence of the Defendants' breaches, DIAL has suffered harm and is entitled to compensation in an amount to be determined at trial. These damages include, but are not limited to: (a) uncollected payments for services rendered, (b) delayed reimbursements, (c) costs associated with securing alternative funding, (d) incurred interest fees, (e) increased labor costs, (f) time and expenses related to hiring third-party staff or vendors to address operational disruptions, (g) costs and time spent adopting new billing systems and software, (h) penalties or lost revenue due to delayed claims submission, (i) the loss of bargained benefits, and (j) loss of the time-value of money, including, but not limited to, interest or other income, associated with the preceding injuries and damages.

## COUNT II
### FRAUDULENT INDUCEMENT (Against All Defendants)

51.    DIAL realleges and incorporates by reference paragraphs 1 through 45 of this Complaint as if fully set forth herein.

52.     Defendants fraudulently induced Plaintiff into entering the TFAP by knowingly making false representations of material fact and/or by concealing material facts with the intent to deceive and induce Plaintiff's reliance.

53.     Specifically, Defendants represented—expressly or by implication—that Plaintiff's obligations to repay the loan under the TFAP would not be expected until 45 days after normal billing operations and collections resumed. This representation was made by John Hannifan and Erik Ertzbischoff, both Change Entities and/or Optum employees, and formed a critical basis of the TFAP and was essential to Plaintiff's decision to enter into the transaction. This representation was made by email and verbally to DIAL in March 2024.

54.     At the time this representation was made, the representation was a false representation of a material fact and concealment of material facts because Defendants knew or should have known that the Change Entities—under common ownership and control with Optum and UnitedHealth—would not or might not timely deposit in Plaintiff's account the amounts owed from collections because of its inability to do so. Defendants failed to disclose this material risk and the Data Breach's impact on DIAL's collections, and instead structured the transaction so that the appearance of a conditional repayment obligation masked the actual, unconditional nature of the debt enforcement. In doing so, Defendants used their corporate relationship and inside knowledge to deceive Plaintiff.

55.     Plaintiff justifiably relied on Defendants' representations and omissions when agreeing to the TFAP. Plaintiff would not have entered into the agreement had it known that the repayment obligations would arise regardless of whether the Defendants collected revenue from services to patients, that the Defendants would fail to collect DIAL's accounts receivables, and that UnitedHealth would retain and divert those funds.

56.    As a direct and proximate result of Defendants' fraudulent inducement, Plaintiff has suffered damages, including but not limited to premature collection actions, the diversion of funds to which it is entitled, disruption to its business operations, and reputational harm.

**COUNT III**
**DECLARATORY JUDGMENT**

57.    DIAL realleges and incorporates by reference paragraphs 1 through 45 of this Complaint as if fully set forth herein.

58.    Under Tennessee Code Annotated, §29-14-101 et seq., this Court is empowered to resolve active disputes, interpret contract terms, and make binding adjudications of right. Three actual controversies exist here.

59.    First, a genuine dispute exists regarding whether DIAL has the right to retain the proceeds received through the TFAP, which were issued in response to the numerous breaches committed by the Change Entities as outlined above. These funds were intended to serve as a substitute for the revenue DIAL should have received, had the Change Entities fulfilled their obligations under the Management Agreement. Therefore, allowing DIAL to offset those amounts is equitable and helps preserve the current balance between the parties until the extent of the Change Entities' contractual failures can be fully assessed.

60.    Second, the TFAP includes a forum selection provision that seeks to mandate litigation in Minnesota, but only with respect to Change Operations—not the other Defendants. This clause should be considered unenforceable and invalid for multiple reasons. For instance, DIAL's claims do not arise from any alleged breach of the TFAP itself, but rather stem from the Defendants' failure to uphold their obligations under the Management Agreement, as subsequently amended. The TFAP is only relevant to the extent that DIAL seeks to offset its damages by

retaining the funds received through that arrangement. However, that financial transaction is not the foundation of DIAL's core breach of contract claims. Therefore, the forum selection provision contained in the TFAP should not dictate the appropriate venue for litigating DIAL's claims.

61.    The terms of the TFAP were presented on a non-negotiable basis, offered to DIAL in a "take-it-or-leave-it" format for online execution. The agreement was not delivered to a duly authorized representative of DIAL in a modifiable or redline-capable form. Rather, the Change Entities—acting through Change Operations—unilaterally imposed the TFAP terms without allowing for discussion or amendment, thereby making it a classic example of an adhesion contract.

62.    The forum selection clause is fundamentally unjust, unreasonable, and unconscionable, having been shaped by both deceptive conduct and a significant imbalance in bargaining power. At the time the TFAP was offered, the Change Entities failed to disclose their responsibility for the underlying cybersecurity incident and the improbability that the affected claims would be recoverable. This lack of transparency allowed them to restructure portions of their contractual payment obligations into what was framed as a loan agreement. This maneuver was enabled by the disparity in bargaining strength—stemming from withheld information and the dire financial situation that the Change Entities' own misconduct had caused for DIAL.

63.    Moreover, requiring separate litigation in Minnesota between DIAL and Change Operations over the TFAP proceeds would be inefficient and duplicative, especially while DIAL continues to pursue its main claims in Tennessee regarding the other Defendants' breaches of the Management Agreement.

64.    Third, while DIAL acknowledges its request for confirmation of the right to offset and retain the TFAP proceeds, those funds are reasonably connected to the Change Entities' breach

4900-7271-0447

16

of the Management Agreement, as the TFAP was explicitly intended to provide access to revenue that should have been collected under the terms of the Management Agreement. However, the right to set off should only apply to legitimate and equitable debts, and it would be unjust, unfair, and contrary to public policy to permit the Change Entities to use the unenforceable and unconscionable TFAP as a justification for instructing UHG to withhold insurance proceeds that are rightfully due for independent claims.

65.    Therefore, DIAL seeks the following declarations and relief: 1.) that DIAL has the right to offset and retain the TFAP proceeds paid by Change Healthcare Operations, LLC, to mitigate the damages resulting from the Change Entities' collective breach of the Management Agreement, including their failure to implement adequate safeguards for their revenue cycle management services platform; 2.) that the terms of the TFAP and its forum selection clause are unconscionable, unfair, unenforceable, and the result of fraud and unequal bargaining power;  3.) that the Change Entities are prohibited from using the TFAP as grounds for instructing or requesting UHG to withhold payment of valid third-party insurance claims; and 4.) that the Change Entities are barred from using the TFAP as a basis for instructing or requesting that UHG withhold payment of valid third-party insurance claims.

## IX.    ALTER EGO DOCTRINE

66.    Optum plays a significant role in the oversight and control of the Change Entities' operations. Employees working with DIAL, including those that attended DIAL's board meetings, represented themselves as employees of Optum, though they were acting on behalf of the Change Entities to deliver Services that were promised in the Management Agreement.

67.    On current information and belief, after the merger, the Change Entities and Optum operations lack separateness, operate as mere instrumentalities, fail to follow corporate formalities,

utilize overlapping operations, jointly enter contracts, and commingle finances. For example, individuals providing Services under the Management Agreement identified themselves, interchangeably, as working for Optum and Change Healthcare. Similarly, Change Healthcare Operations, LLC extended funds under the TFAP to provide access to capital that the Change Entities should have collected for DIAL. Change Healthcare Operations, LLC did not have any independent business purpose for entering such an agreement.

## X.    DISCOVERY RULE-TOLLING OF STATUTE OF LIMITATIONS

68.    DIAL's claims are timely under the discovery rule, which tolls the statute of limitations until the plaintiff knew, or through the exercise of reasonable diligence should have known, of the facts giving rise to the claim. In this case, the harm suffered by DIAL, as well as the underlying wrongful conduct, was not reasonably discoverable at the time it occurred. The complex and obscured nature of the Change Entities' conduct—particularly the intertwined roles and representations made by various entities—prevented DIAL from discovering the true source and scope of the injury, which through discovery, DIAL anticipates will continue to evolve.

69.    Accordingly, DIAL asserts that the filing of its claims are timely under the discovery rule, and any applicable statute of limitations should be tolled to reflect the date of discovery.

## XI.    DAMAGES

70.    As a direct and proximate result of numerous breaches of the Management Agreement by the Change Entities, DIAL has suffered significant and measurable damages in an amount that is presently known to be at least $1,013,635.55. Discovery in this matter remains ongoing, and DIAL anticipates uncovering further damages once it learns of the full extent of the

breaches, failures, and fraudulent actions. Accordingly, DIAL currently estimates its total damages to be no less than $2,500,000.

## XII.    JURY DEMAND

71.    DIAL respectfully requests a trial by jury for all claims and issues in its Complaint to which it is or may be entitled to a trial by jury.

## XIII.    REQUEST FOR RELIEF

WHEREAS PREMISES CONSIDERED, DIAL prays for the following relief:

a. Enter a judgment in favor of DIAL on Count I, Count II and Count III against all named Defendants, including Change Healthcare Solutions, LLC and Change Healthcare Operations, LLC, collectively and individually, for a principal amount of actual damages of $2,500,000, or another amount determined at trial, after deducting any applicable credits, along with interest from the date of breach until the amount is fully paid;

b. Enter an Order mandating Defendants to transfer to DIAL its accounts and data;

c. Award an Order for damages, including lost profits and consequential damages as allowed by law in an amount to be determined by the trier of fact;

d. Enter an Order of declaration under Tennessee Code Annotated, §29-14-101 *et seq.* as follows:

   i. That DIAL is entitled to set off and retain the proceeds of the TFAP paid by Change Healthcare Operations, LLC, to offset the damages sustained as a result of the collective default by the Change Entities under the Management Agreement;

   ii. That the terms of the TFAP and the forum selection clause contained therein are unconscionable, void, unjust, unenforceable, and the result of fraud and an imbalance of bargaining power; and

iii. That the Change Entities may not rightly instruct and are barred from having UHG withhold payment on unrelated third-party insurance claims.

e. Award reasonable attorneys' fees, costs, and expenses;

f. Award pre and post judgment interest on any amount awarded; and

g. Award and other further relief the Court deems just and proper.

Dated: April 30, 2025            Respectfully submitted,

NELSON MULLINS RILEY & SCARBOROUGH LLP

By:/s/ *Carson W. King*
**Carson W. King (BPR 34305)**
1222 Demonbreun Street, Suite 1700
Nashville, TN 37203
Phone: (615) 664-5388
Fax: (615) 664-5399
Carson.king@nelsonmullins.com

ATTORNEY FOR PLAINTIFF,
DIAGNOSTIC IMAGING ALLIANCE OF
LOUISVILLE, P.S.C.

## CERTIFICATE OF SERVICE

I hereby certify that on April 30, 2025, the foregoing pleading was filed via the court's CM/ECF system and electronically served on all known counsel of record.

/s/ *Carson W. King*
Carson W. King