MINA HAKAKIAN (SBN 237666)
**HAKAKIAN WILLIAMS LAW GROUP PC**
1541 Westwood Blvd., Second Floor
Los Angeles, California 90024
Tel.: (310) 982-2733
Email: mhakakian@hwlgpc.com

Attorneys for Plaintiffs
PATH MD., INC. and SPECIALIZED UNIVERSITY
PATHOLOGISTS, INC.

**BEFORE THE UNITED STATES JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| IN RE: CHANGE HEALTHCARE, INC., CUSTOMER DATA SECURITY BREACH LITIGATION | MDL NO. 3108 |

**BRIEF IN SUPPORT OF MOTION OF PLAINTIFFS PATH MD., INC. AND**

**SPECIALIZED UNIVERSITY PATHOLOGISTS, INC. TO VACATE CONDITIONAL**

**TRANSFER ORDER (CTO – 30)**

### I.    INTRODUCTION

Pursuant to Panel Rule 7.1(f) and 28 U.S.C. §1407(a), Plaintiffs Path MD, Inc. and Specialized University Pathologists, Inc. (collectively, "Plaintiffs") respectfully move to vacate Conditional Transfer Order No. 30 ("CTO-30"), which conditionally transfers *Path MD., Inc. et al. v. Optum Inc.,* C.D. Cal. N. 2:26-01105 (the "*Path MD* Action") to the District of Minnesota for inclusion in MDL No. 3108.

After the underlying breach, Defendant Optum, Inc. ("Optum") disabled its own Optum Pay system and cut off deposits, electronic remittance advice, and payment histories needed to post and reconcile claims, including those claims Optum was processing for Plaintiffs. Plaintiffs' allegations in the *Path MD* Action turn on the case-specific facts and individualized proof of the processing of these Plaintiff-specific claims, not the common issues that drive the class and

- 1 -
**BRIEF IN SUPPORT OF MOTION TO VACATE CONDITIONAL TRANSFER ORDER
(CTO – 30)**

consumer actions in MDL No. 3108. Transfer would not serve the convenience of the parties or witnesses in the *Path MD* Action. Centralization simply would not promote the just and efficient conduct of this litigation. Plaintiffs assert that transfer under § 1407 is not warranted here for several significant reasons.

*First*, the facts of this case are distinct from "common questions" designed to litigate the cybersecurity attack and systemic failures. Rather than focus on the breach itself, Plaintiffs' Complaint centers around post-breach acts and omissions from February 21 to May 28, 2024, including initially disabling access to payment processing and then failing to restore access to payment processing for more than three months. This case turns on Plaintiffs' account-level Optum Pay access and restoration timeline, Optum's specific representations to Plaintiffs, Plaintiffs' reliance and mitigation decisions, and Plaintiff-specific damages due to Optum's failure to restore access to payment processing. Because the Provider Track's "common questions" do not overlap with the questions that will resolve the *Path MD* Action, transfer will not promote convenience or efficiency. Rather, transfer will impose upon Plaintiffs unnecessary cost, delay, and procedural complexity.

*Second*, arising solely out of Optum's failure to restore access to payment processing post-breach, Plaintiffs only bring California state law claims in this case for individualized injuries, not federal statutory or class claims. As opposed to the Provider Track's class posture and generalized damages arguments due to widespread and industry-level distress caused by the breach itself, the instant Complaint focuses on post-breach acts and omissions from February 21 to May 28, 2024. Plaintiffs' case under California law concerns a stand-alone, provider-business-injury action that Is based on individualized facts and proof. These plaintiff-specific failures to restore access to payment systems claims center on California-based witnesses, operations, and harm.  As such, this

- 2 -

**BRIEF IN SUPPORT OF MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO – 30)**

action is not appropriate for consolidation with consumer or class litigation relating to the breach.

*Third*, centralization will not promote convenience or efficiency. Consolidation will impose a substantial and burdensome forum shift for these California-based Plaintiffs who are already in dire financial straits, add MDL administrative overhead, and risk delay in a case that belongs, factually and practically, in the Central District of California, where the harm was felt and where key witnesses, the parties, and Plaintiffs' operations were located.

*Fourth*, Plaintiffs allege Optum has failed to produce any signed agreement or complete terms of use (including any arbitration or forum selection terms) despite Plaintiffs' direct request for those materials, creating an immediate, plaintiff-specific contract-formation and enforceability dispute that cannot be resolved through generalized MDL evidence and proof.

For the foregoing reasons, and as more fully set forth herein, the Panel should grant this Motion and vacate CTO-30, which conditionally transfers the *Path MD* Action to the District of Minnesota for inclusion in MDL No. 3108.

## II.    LEGAL STANDARD

This Panel may transfer civil actions that "involve one or more common questions of fact" that are pending in different districts to a single district for coordinated or consolidated pretrial proceedings. 28 U.S.C. § 1407(a). Transfer is appropriate only where: (1) the actions share common questions of fact, (2) centralization will serve the convenience of the parties and witnesses, and (3) centralization will promote the just and efficient conduct of the litigation. *Id*.

Where, as in the instant case, the action has been conditionally transferred as a tag-along, the Panel's Rules impose a specific procedural framework. Under Panel Rule 7.1, the Clerk may enter a CTO and serve it on the parties, but the CTO is not transmitted to the transferee district court until seven days after entry. Rule of Procedure of the United States Judicial Panel on

- 3 -

**BRIEF IN SUPPORT OF MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO – 30)**

Multidistrict Litigation, Rule 7.1(a).  Any party opposing transfer must file a notice of opposition within that seven-day period; once a notice is filed, the Clerk does not transmit the CTO and instead issues a briefing schedule. *Id*., Rule 7.1(c). Within fourteen days of filing the notice of opposition, the opposing party must file a motion to vacate the CTO and a brief in support.  *Id*., Rule 7.1(f).

The question before the Panel on a Motion to Vacate is whether the three statutory requirements of § 1407(a) are satisfied as applied to this specific action, and whether conditional transfer of this case as a tag-along will, in fact, serve convenience and efficiency - rather than impose unnecessary cost, delay, and procedural complexity. Transfer will not promote convenience or efficiency given the allegations in the Complaint focus on post-breach acts and omissions from February 21 to May 28, 2024, including initially disabling access to payment processing and then failing to restore access to payment processing for more than three months. These allegations do not overlap with the questions that concern consumer or class litigation relating to the breach in MDL No. 3108.

### III.    RELEVANT PROCEDURAL BACKGROUND

On August 14, 2024, Pretrial Order No. 1 was entered in MDL No. 24-3108, emphasizing that consolidation is for pretrial purposes only and without prejudice to subclasses or separate tracks, and noting the potential for separate patient and provider tracks. Pretrial Order No. 1 at 2, MDL No. 24-3108 (D. Minn. Aug. 14, 2024). The same order applies its procedures to tag-along actions, consolidates them for pretrial purposes, grants Defendants an extension to respond, and stays discovery pending further order. *Id*. at 2–3. The provider track has proceeded on "common questions" centered on cybersecurity duties, the platform shutdown/disconnection, and causation. Provider Plaintiffs' Master Complaint ¶ 444(a)–(h) (attached hereto as Exhibit A).

On February 9, 2026, Optum filed a Notice of Potential Tag-Along Action identifying the

- 4 -

**BRIEF IN SUPPORT OF MOTION TO VACATE CONDITIONAL TRANSFER ORDER**
**(CTO – 30)**

*Path MD* Action as a potential tag-along to MDL No. 3108. Notice of Potential Tag-Along Action, MDL No. 3108, Doc. 533, at 1 (J.P.M.L. Feb. 9, 2026). On February 11, 2026, the Panel entered CTO – 30, stating that, pursuant to Rule 7.1 of the *Rules of Procedure of the United States Judicial Panel on Multidistrict Litigation*, the instant case was to be transferred under 28 U.S.C. § 1407 to the District of Minnesota for inclusion in MDL No. 3108.  Further, CTO – 30 stays the transmittal for seven days and provided that if any party files a notice of opposition within that period, the stay continues until further order of the Panel.  MDL No. 3108, Doc. 533, at 1. As a result, this Opposition is timely filed.

IV.    **THE *PATH MD* ACTION CONCERNS PLAINTIFF-SPECIFIC STATE LAW CLAIMS AND INJURIES**

For years, Plaintiffs Path MD., Inc. ("Path MD") and Specialized University Pathologists, Inc. ("SUP") relied on uninterrupted access to electronic remittances and funds through the Optum Pay platform offered by Optum to post and reconcile claims, as well as to maintain cash flow. On February 12, 2024, attackers gained access to Optum systems. Ransomware was deployed on February 21, 2024.  To contain the incident, Optum severed connectivity on February 21, 2024, disabling Optum Pay and cutting off deposits, electronic remittance advice, and payment histories needed to post and reconcile claims. Over the months when Optum was rebuilding its Optum Pay system, until May 28, 2024, Plaintiffs lacked account access, resulting in a prolonged lockout that starved Plaintiffs' cash flow.

During this period, Optum repeatedly characterized the disruption to Plaintiffs' claims on Optum Pay as limited to "Change Healthcare" and repeatedly represented that Optum Pay access had been, or would be, immediately restored. Plaintiffs allege these direct, specific communications from Optum regarding account access, restoration timing, and funding options

**BRIEF IN SUPPORT OF MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO – 30)**

impeded Plaintiffs' mitigation and precipitated severe business impacts on Plaintiffs, including lost cash flow, canceled contracts, suspended expansion, workforce reductions, and multiple capital infusions.

The claims asserted in the Complaint are not federal statutory or class claims. Plaintiffs' causes of action are California state-law claims for individualized business injuries and are grounded in Optum's post-breach acts and omissions from February 21 to May 28, 2024, including disabling access to payment systems and failing to restore access for more than three months. Further, as it centers on California-based witnesses, operations, and harm, the *Path MD* Action is not appropriately consolidated with consumer or class litigation relating to the breach.

### a. Plaintiffs and Optum Pay

The Provider Track's class-framed questions are primarily whether Optum had adequate cybersecurity controls and whether an industry-wide ransomware event caused systemwide disruption. Provider Plaintiffs' Master Complaint ¶¶ 213–214, 444(a)–(h), 446. Those questions are ancillary to the *Path MD* Action. The disputes that will drive merits discovery and the trial in the instant case start with Optum Pay enrollment and account configuration governing Plaintiffs' use of Optum Pay. The Complaint in the *Path MD* Action alleges: (i) Plaintiffs were enrolled in Optum Pay; (ii) Optum Pay essentially functioned as a clearinghouse/payment track for Plaintiffs' receivables, and (iii) Plaintiffs paid subscription and/or per-transaction fees for use of that platform service. Plaintiffs' Complaint ("Pls. Compl.") ¶¶ 33–36, 40–41, 48 (attached hereto as Exhibit B)[1]

---

[1] Plaintiffs also allege Optum has not produced any signed agreement or complete terms of use (including any arbitration/forum-selection regime) despite Plaintiffs' direct request for those materials, creating an immediate, plaintiff-specific contract-formation/enforceability dispute that cannot be resolved through generalized MDL proof. Pls. Compl. ¶¶ 37, 43–47. Discovery on this issue will be narrowly tailored to the facts of the *Path MD* Action.

- 6 -

**BRIEF IN SUPPORT OF MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO – 30)**

As a result, this case will require specific, account-level evidence on multiple issues, beginning with the terms of use and any signed agreements, including: (1) how and when acceptance occurred, (2) what entity was counterparty for which service component, and (3) what internal account settings and administrative controls Optum applied to Plaintiffs' accounts. Pls. Compl." ¶¶ 33–37, 40–47. Those issues are inherently specific to Plaintiffs in the *Path MD* Action and are not answered by the Provider Track's cybersecurity duty/common-proof framing. Provider Plaintiffs' Master Complaint ¶ 444(a)–(h).

### b. **Plaintiff-Specific Access/Restoration Timeline and Account Status Restrictions**

In the *Path MD* Action, Plaintiffs expressly plead the breach was contained by February 21, 2024. The instant case is singularly focused on what happened *after* that containment decision, specifically, the post-shutdown access, restoration, and account administration that followed through at least May 28, 2024. Pls. Compl. ¶¶ 61–62, 69–71. Those allegations alone are fatal to any attempt by Optum to characterize this case as "about the cyberattack itself." The lockout and restoration facts here are not generic. They are granular, account-level, and driven by specific interactions between Plaintiffs and Optum's support and resolution personnel.

During the period their Optum Pay accounts were inaccessible (February 21–May 28, 2024), Plaintiffs could not submit claims, receive Electronic Remittance Advice ("ERA"), or settle Electronic Funds Transfers ("EFT"); the practical consequences (missed payroll/vendor defaults/service reductions) followed. Pls. Compl. ¶¶ 62–65. Plaintiffs further allege the timing of access restoration was driven primarily by Optum's chosen rebuild plan, not by ongoing attacker activity, and Optum did not route Plaintiffs through alternative private-sector clearinghouse rails during the full inaccessibility period. Pls. Compl. ¶¶ 69–72.

Most importantly for JPML purposes, Plaintiffs plead a detailed, dated communications

- 7 -

**BRIEF IN SUPPORT OF MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO – 30)**

and ticket history reflecting plaintiff-specific "account activation error" restrictions and escalation paths. These facts will require plaintiff-specific discovery (tickets, internal notes, account logs, and communications) rather than MDL-wide generalized proof. For example, Plaintiffs allege repeated failed attempts to activate SUP's Optum Pay account; multiple support emails and calls; named tickets/case numbers; and internal representations about target resolution dates, culminating in SUP not gaining portal access on May 28, 2024. Pls. Compl. ¶¶ 151–169. Those are not "common questions" suitable for class wide proof; these issues are individualized access/administration disputes tied to specific accounts and specific support interactions.

### c. Plaintiff-Specific Representations and Reliance/Causation Chain

Plaintiffs allege that, during the post-breach timeframe of February 21–May 28, 2024, Optum made affirmative statements and omissions regarding restoration timing, program relief, and account status that conveyed normalization or imminent normalization of claims-payment functionality and availability of temporary funding on a predictable basis. Pls. Compl. ¶ 259. Plaintiffs further identify categories of misleading communications, including representations that Optum Pay access had been restored or would be restored imminently while Plaintiffs remained unable to log in; public "resolved" messaging while Plaintiffs still lacked access; and specific communications implying the account could be registered when it could not. Pls. Compl. ¶¶ 261(c)–(d).

Liability here depends on plaintiff-specific proof: who said what, to whom, when, about which account, and what Plaintiffs did (or did not do) in reliance, including mitigation and financing. Important to their case, Plaintiffs set forth an individualized communications timeline (e.g., an Optum "Resolution Analyst" reporting backend changes and asking if Plaintiffs could "login," followed by Plaintiffs documenting that the activation error persisted). Pls. Compl. ¶¶

**BRIEF IN SUPPORT OF MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO – 30)**

165–169. That reliance/causation proof is individualized and contrary to the Provider Track's class wide "predominating proof" posture. Provider Plaintiffs' Master Complaint ¶¶ 444(a)–(h), 446.

V.    **NO PREDOMINATING COMMON QUESTIONS OF FACT EXIST, SO TRANSFER WILL NOT SERVE CONVENIENCE OR EFFICIENCY UNDER 28 U.S.C. § 1407**

Transfer is not warranted pursuant to § 1407 merely because cases can be traced to the same headline event. It requires "common questions of fact" and a showing that transfer "will be for the convenience of the parties and witnesses and will promote the just and efficient conduct" of the actions. 28 U.S.C. § 1407(a). In practice, centralization should materially reduce duplicative discovery and prevent inconsistent rulings on genuinely shared, disputed facts.

This Action does not fit that model. Plaintiffs sued Optum under California law for negligent misrepresentation, breach of contract (and alternative implied-in-fact and unjust enrichment theories), breach of the covenant of good faith and fair dealing, and intentional interference with prospective economic advantage. Pls. Compl. ¶ 1. The gravamen is not cybersecurity duties or generalized platform-outage theories. It is an account-level commercial dispute over Optum's administration of Plaintiffs' Optum Pay access, Optum's restoration representations to Plaintiffs versus Plaintiffs' actual experience, and the resulting operational and financial collapse unique to these Plaintiffs.

Pretrial litigation will therefore be driven by: (1) Plaintiff-specific Optum Pay enrollment and agreement formation (express, implied, and/or agency-based), (2) Plaintiffs' access restrictions and restoration timeline, (3) Optum's specific public and direct representations and Plaintiffs' reliance and business decisions, and (4) Plaintiff-specific damages tied to receivables, staffing/payroll, contracts, closures, and mitigation financing. Those issues will not be streamlined

- 9 -

**BRIEF IN SUPPORT OF MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO – 30)**

by transfer into a provider-track MDL focused on platform-wide cybersecurity and outage "common questions."

## VI.    THE PROVIDER TRACK'S STATED "COMMON QUESTIONS" CONFIRM THIS CASE IS NOT A PROPER TAG-ALONG ACTION

Substantively, the Provider Track's pleaded "common questions" confirm it is designed to litigate cybersecurity posture and platform-outage governance and asks whether defendants failed to implement adequate security, whether the alleged breaches proximately caused provider damages, whether defendants addressed vulnerabilities enabling the ransomware attack, and whether the class is entitled to compensatory and punitive damages and statutory/civil penalties arising from the attack and shutdown. Provider Plaintiffs' Master Complaint ¶ 527. The Master Complaint likewise premises causation on systemic, platform-level controls (e.g., alleged failures in segmentation and redundancy) that purportedly expanded the breach and "ultimately result[ed] in the complete shutdown" of operations. *Id*. ¶ 213. Thus, the Provider Track is framed around cybersecurity duties, platform shutdown/disconnection, and Temporary Assistance Funding Program ("TFAP") issues

The *Path MD* Action will turn on Plaintiffs' account-level Optum Pay access and restoration timeline, Optum's specific representations to Plaintiffs, Plaintiffs' reliance and mitigation decisions, and Plaintiff-specific damages. Because the Provider Track's "common questions" do not overlap with the questions that will resolve this case, transfer will not promote convenience or efficiency.

## VII.    PLAINTIFFS' DAMAGES AND OPERATIONAL COLLAPSE ARE PLAINTIFF-SPECIFIC

The *Path MD* Action does not plead a class-wide, statutory, or "ecosystem" harm theory;

- 10 -

**BRIEF IN SUPPORT OF MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO – 30)**

instead, the Complaint alleges "individualized business injuries" under California law. Pls. Compl. ¶ 1. Plaintiffs further assert their injuries "did not arise from the system intrusion or encryption itself" but from Optum's post-breach conduct and administration decisions specifically towards Plaintiffs after the February 21, 2024, containment. Pls. Compl. ¶ 61.

The allegations of Plaintiffs' Complaint are materially different from the Provider Track's class posture and generalized damages arguments which assert widespread liquidity shock (including resorting to "high-interest loans") and industry level distress ("brink of closure," "layoffs"). Provider Plaintiffs' Master Complaint ¶¶ 6, 9-11. Further, when damages were itemized, the Providers Plaintiffs' Master Complaint does so in a way that over-generalizes the categories for "Plaintiffs and Class members" via examples such as missed/delayed payments, alternative financing, interest, labor and vendor costs, software and workarounds, late penalties, as well as time-value.  Provider Plaintiffs' Master Complaint ¶ 529.

By contrast, Plaintiffs' Complaint pleads account-level lockout consequences, quantified revenue collapse, specific lost expansion opportunities, identified funding and advance streams, as well as facility and workforce specific contraction events, all of which require individualized proof and third-party discovery.

### a.  Liquidity/Cashflow Dependence (Individualized Proof)

Plaintiffs plead that although the incident was contained by February 21, 2024, Optum's ensuing disconnection and platform administration caused Plaintiffs' Optum Pay accounts to be inaccessible from February 21 through May 28, 2024.  Pls. Compl. ¶ 61-62. During that time window, Plaintiffs allege they could not submit claims, receive Electronic Remittance Advice ("ERAs"), or settle Electronic Funds Transfer ("EFTs"), and that the resulting operational consequences included "missed payroll," "vendor defaults," and reduction or suspension of

**BRIEF IN SUPPORT OF MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO – 30)**

patient services. Pls. Compl. ¶ 62-64.

Plaintiffs also assert platform-specific visibility into their receivables pipeline, including ERA/EFT and "days to cash" style revenue-cycle data and that Optum did not route Plaintiffs through alternative clearinghouse routes leaving Plaintiffs unable to operate. Pls. Compl. ¶ 65, 69-71. Those allegations make the cashflow inquiry inherently plaintiff-specific: the critical proof will be Plaintiffs' own receivables aging, payer mix, deposit history, and cash-forecasting decisions - not MDL-wide averages.

Further, Plaintiffs plead quantifiable downstream effects tied to their internal business metrics and records, including a steep decline in "encounter volume" beginning immediately after the February 21 shutdown. Pls. Compl. ¶¶ 178–183. They also allege delayed posting of payer deposits relative to scheduled funding dates shown in remittances/835s/ERAs - facts that turn on Plaintiffs' own bank statements and remittance records. Pls. Compl. ¶¶ 184–186.

b. **Mitigation/Financing Steps (Individualized Proof)**

Plaintiffs plead specific, non-generic funding responses that will require individualized documentary proof and will drive discovery into banks, payroll vendors, Medicare contractors, and program records.  First, Plaintiffs allege TFAP participation and repayment: Plaintiffs received a TFAP loan in the amount of $49,400; Optum invoiced Plaintiffs on October 25, 2024 (with payment due within 45 business days); and, as of January 30, 2026, Plaintiffs had repaid $12,657.73, leaving an asserted TFAP balance of $36,742.27. Pls. Compl. ¶ 227. That repayment history is plaintiff-specific program accounting and payment proof.

Second, Plaintiffs allege Medicare advance payments beginning in March 2024 and later repayment demands starting in June 2024, with a recoupment schedule that reduced remittances beginning in June 2024 (and a continuing "substantial shortage" because deposits still did not

- 12 -
**BRIEF IN SUPPORT OF MOTION TO VACATE CONDITIONAL TRANSFER ORDER**
**(CTO – 30)**

match claims submissions). Pls. Compl. ¶¶ 228–231. Plaintiffs plead the Medicare advance repayment is administered through specific MACs (Noridian and Novitas), asserting continuing repayment obligations and repayment pressure. Pls. Compl. ¶¶ 228, 232–233. That necessarily drives third-party discovery to the MACs and requires account-level Medicare remittance/recoupment proof.

Third, Plaintiffs plead substantial owner/affiliate cash infusions to keep the business alive: in 2024, Plaintiffs' owners and affiliated entities advanced funds; each owner allegedly advanced $1,475,000 (total $2,950,000) between April 2024 and the filing of the Complaint; and affiliated entities contributed $1,397,485, for total alleged advances of $4,347,485. Pls. Compl. ¶¶ 223–226. Those figures will require individualized tracing (wire records, intercompany ledgers, promissory documentation if any, and allocation to payroll/operating expenses). Separately, Plaintiffs also allege an owner-loan narrative tied to contract losses and projected revenue collapse, including a loan totaling $1,800,000 during the April 2024–January 2026 time frame, with anticipated additional borrowing necessary to cover payroll and administrative costs. Pls. Compl. ¶ 215. Regardless of nomenclature, that allegation requires plaintiff-specific funding and solvency discovery. None of the foregoing issues will be resolved by litigating the Provider Track's generalized allegations that providers took out high-interest loans and incurred alternative financing costs. Provider Plaintiffs' Master Complaint ¶¶ 6, 529.

c. **Case-Specific Operational Consequences: Plaintiffs' Lost Business Opportunities and Counterparty-Specific Negotiations Create Individualized Causation and Third-Party Discovery**

a. **Revenue Collapse and Business Contraction**

Plaintiffs plead that 2024 total income and net income materially deteriorated, including

**BRIEF IN SUPPORT OF MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO – 30)**

Path MD 2024 total income of approximately $8,688,622, with a net loss of $3,447,585; and SUP 2024 total income of approximately $3,224,328, with a net loss of $209,186. These figures are compared to 2023 totals, resulting in year-over-year income declines of more than 50% for both entities. Pls. Compl. ¶¶ 188–190. Plaintiffs also plead specific reductions in test offerings in April 2024, quantify lost annualized revenue (approximately $322,664 versus a 2023 baseline), and attach internal records supporting those numbers. Pls. Compl. ¶¶ 191–194.

### b. **Workforce Reductions and Payroll Management**

Plaintiffs allege HR/payroll planning events (including ADP review/approval on April 15, 2024), internal payroll reduction communications on April 29–30, and implementation of a reduction in force effective May 6, 2024. Plaintiffs' Complaint ¶¶ 195–203. Plaintiffs further plead layoffs of multiple employees (including three layoffs in April 2024) and notice letters explaining the payroll crisis and describing reliance on anticipated restoration that did not occur. Plaintiffs' Complaint ¶¶ 203–204.

Further, it is important to note the MDL would not be able to properly address the sheer number of employees that were terminated because of Optum's actions. It would be incredibly difficult for these individuals involved in the reduction, now former employees, to travel to Minnesota if called as witnesses, let alone the resulting cost to Plaintiffs who have incurred substantial debt as a result of the damages caused by a multi-billion-dollar corporation, Optum.

### i. **Contract Terminations and Counterparty-Specific Lost Opportunities**

Plaintiffs plead termination or collapse of multiple revenue channels that will require third-party discovery:

- LabCorp: a written agreement signed November 28, 2023, a projected ramp to $3 million annual revenue, inability to perform after the outage, and termination in June

- 14 -

**BRIEF IN SUPPORT OF MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO – 30)**

2024.  Pls. Compl. ¶¶ 207–210.

- Skilled nursing facilities ("SNF"): expansion plans and projected SNF revenues for 2024, recorded revenues by April 2024 far below forecast, and cessation of servicing all SNFs due to disrupted revenue flows.  Pls. Compl. ¶¶ 221–222.

- Nursing home/SNF account losses and forced shutdown effects: allegations that Plaintiffs lost Texas and Florida nursing home accounts and were forced to shut down the Dallas laboratory, with operations at the Los Angeles laboratory ceasing by February 2025. Pls. Compl. ¶ 218.

- MY DR NOW expansion: Plaintiffs plead launch in mid-January 2024 of MY DR NOW with a planned expansion from two to forty-two locations, quantified revenue/run-rate (including a projected revenue opportunity of approx. $7,048,356) and allege the expansion did not proceed because the outage eliminated deposits and electronic remittance advice. Pls. Compl. ¶¶ 219–220.

ii.    **Facility And Operations Closure**

Plaintiffs plead they have "ceased nearly all active laboratory operations," including permanently closure of their primary Los Angeles location, ceased operations of the Texas laboratory with CLIA certification ending effective February 28, 2025, and closure of their Los Angeles laboratories by April 30, 2025. Pls. Compl. ¶¶ 2, 232.

These pleaded damages are not just "more detailed" versions of the Provider Track's categories; they are different in litigation posture, discovery, and proof. They put at issue plaintiff-specific causation and third-party facts: LabCorp contracting and termination; SNF relationship records; MY DR NOW expansion planning and negotiations; payroll vendor (ADP) documentation; bank posting records; Medicare MAC remittances/recoupment accounting; TFAP

- 15 -

**BRIEF IN SUPPORT OF MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO – 30)**

invoicing and repayment activities; and owner/affiliate funding traces. Pls. Compl. ¶¶ 184–186, 195–203, 207–210, 219–223, 227–231. The matters at issue in the *Path MD* Action are the opposite of the Provider Plaintiffs' Master Complaint's class-wide "predominating proof" model. Provider Plaintiffs' Master Complaint ¶¶ 444–446, 529.

## VIII.    CONVENIENCE AND EFFICIENCY WEIGH AGAINST TRANSFER

### a.    Plaintiff-Specific Witnesses, Local Evidence, Non-Class Posture

Plaintiffs allege the events and omissions giving rise to the *Path MD* Action occurred in the Central District of California, where Plaintiffs' principal places of business, employees, vendors, and financial operations were located; and where key witnesses (including billing staff and executives) reside. Pls. Compl. ¶ 4. Plaintiffs also plead the closure of their Los Angeles County operations and at least one permanent lab closure. Pls. Compl. ¶ 2. These allegations describe a localized witness set and localized evidence, not a case whose proof will be streamlined by MDL-wide discovery.

The witnesses most central to the merits and damages are Plaintiff-specific and include former employees and operational decisionmakers. These individuals are precisely the witness group for whom MDL transfer increases cost and difficulty rather than reducing it. Plaintiffs plead payroll and workforce events (including HR and payroll-process facts), layoffs, and the departure of key personnel. Pls. Compl. ¶¶ 195–203. Those facts put at issue what Plaintiffs did, when they did it, and why - questions that require individualized testimony and documents.

The documentary proof is likewise specifically account centered. Plaintiffs allege a detailed Optum Pay access failure timeline. Pls. Compl. ¶¶ 151–169. The records are plaintiff-specific (tickets, internal notes, access logs, and communications). Discovery in the *Path MD* Action will not be addressed by generalized MDL discovery. Finally, Plaintiffs plead the

- 16 -
**BRIEF IN SUPPORT OF MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO – 30)**

asymmetry relevant to convenience: Plaintiffs' catastrophic financial injury and employment fallout, contrasted with Optum's scale and resources (including UnitedHealth's size and revenue). Pls. Compl. ¶ 8; ¶¶ 195–203. That disparity matters because the burden of transfer falls disproportionately on Plaintiffs and the witnesses least able to absorb it.

### b. Transfer Would Impose Delay, Undermining § 1407 Efficiency

Transfer would not simply "coordinate" this case; it would subject it to MDL-wide sequencing and a discovery stay that undermines § 1407 efficiency for this plaintiff-specific action. Pretrial Order No. 1 provides discovery is stayed except for preservation, and it extends defendants' response deadlines. Pretrial Order No. 1 at 3. That structure delays precisely the individualized discovery required by this case requires: account access history, tickets/logs, contract formation/terms, representations, reliance, and damages tracing.

The current delay is especially inefficient here because Plaintiffs allege business collapse and employee displacement conditions that make evidence much more time sensitive. Plaintiffs plead their Los Angeles County locations are now closed and a lab permanently closed. Pls. Compl. ¶ 2. They also assert workforce reductions and personnel departures. Pls. Compl. ¶¶ 195–203. Given these allegations, delay increases the cost and difficulty of locating former employees, reconstructing records, and obtaining third-party documents.

Again, the MDL Provider Track's "common questions" focus on platform-level, class-framed issues. Provider Plaintiffs' Master Complaint ¶ 444. The *Path MD* Action, by contrast, turns on plaintiff-specific access/restoration restrictions, representations, and reliance. Pls. Compl. ¶¶ 22-27, 151–169, 259–261. Centralization would impose delay and a discovery pause while the work that must be done remains individualized and requires immediate action.

- 17 -
**BRIEF IN SUPPORT OF MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO – 30)**

IX.    **ALTERNATIVES TO CENTRALIZATION OF THE CASES ADEQUATELY ADDRESS ANY LIMITED OVERLAP**

The only plausible overlap between the *Path MD* Action and the Provider Track is the background fact that a February 2024 ransomware event triggered a shutdown. Pls. Compl. ¶¶ 57–60; Provider Plaintiffs' Master Complaint ¶¶ 5–7. Yet the merits disputes pleaded here are not "the cyberattack itself"; they are, account-level disputes about post-containment access/restoration failures and reliance. Pls. Compl. ¶¶ 61–62, 69–72, 151–169, 259, 261. That pleading posture matters because § 1407 centralization is not the only way - and not the best way - to manage any narrow factual overlap.

a.    **Targeted Stipulations and Issue-Narrowing Can Isolate the Limited Common Background**

If Optum contends certain facts about the February 2024 incident are "common," the parties can eliminate repetition by stipulating to non-merits background points not in genuine dispute - e.g., the existence of the attack, the February 21 shutdown decision, and high-level sequencing - without introducing class-wide cybersecurity duty litigation into the *Path MD* Action. Pls. Compl. ¶¶ 57–62. That kind of issue-narrowing preserves efficiency while keeping the case focused on what Plaintiffs allege caused the losses: the post-containment lockout, the rebuild plan, account-status restrictions, and the ticket-level failure to restore access until May 28, 2024. Pls. Compl. ¶¶ 61–62, 69–72, 151–169.

b.    **Voluntary Discovery Coordination Can Prevent Duplication Without Transfer**

Nothing about vacating transfer prevents the parties from coordinating discovery to avoid waste. The parties can:

- 18 -

**BRIEF IN SUPPORT OF MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO – 30)**

- Adopt consistent protective-order terms across proceedings to allow cross-use of produced materials where appropriate, without forcing the *Path MD* Action into the MDL docket and its discovery stay. Pretrial Order No. 1 ¶ 4 (D. Minn. Aug. 14, 2024).

- Coordinate deposition sequencing so that any witness with potentially overlapping testimony (e.g., platform-level incident-response witnesses) is deposed once in a manner that allows practical reuse, while this action proceeds immediately on the account-specific witnesses and evidence that the MDL will not meaningfully develop. Pls. Compl. ¶¶ 33–37, 43–47, 151–169.

The critical point is the discovery that will drive the *Path MD* Action is uniquely plaintiff-specific and not advanced by MDL centralization: Optum Pay enrollment presentation and acceptance, account configuration and status restrictions, ticket histories, internal notes and account logs, and the content/timing of specific representations to Plaintiffs. Pls. Compl. ¶¶ 33–37, 43–47, 151–169, 259, 261.

### c.  Narrow, Plaintiff-Specific Discovery Advances Efficiency; MDL Transfer Would Impede It

The Provider Track alleges systemic cybersecurity failures and frames proof at a class-wide level. The *Path MD* Action is different, involving a post-shutdown account administration and restoration failures and individualized damages that cascaded into unique layoffs and closures. Pls. Compl. ¶¶ 61–62, 69–72, 195–203. The discovery needed to adjudicate those individualized allegations in the *Path MD* Action is not "common discovery"; it is plaintiff-specific, account-level evidence.

Keeping the *Path MD* Action outside the MDL allows immediate targeted discovery into the account-level issues pleaded, without being frozen by the MDL discovery stay. Pretrial Order

**BRIEF IN SUPPORT OF MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO – 30)**

No. 1 ¶ 4 (D. Minn. Aug. 14, 2024); Pls. Compl. ¶¶ 151–169. That approach advances § 1407 efficiency far better than centralization would, by preventing the *Path MD* Action from being subordinated to class-wide sequencing and macro discovery priorities that do not resolve the account-specific disputes here. Provider Plaintiffs' Master Complaint ¶¶ 444(a)–(h), 446; Pls. Compl. ¶¶ 61–62, 151–169.

### d. Any Overlap in Damages Theories Can Be Managed By Document Sharing, Not Transfer

The Pleadings themselves illustrate why transfer is unnecessary: the Provider Track frames damages as broad, generalized categories for the class, while the *Path MD* Action pleads specific, plaintiff-level collapse, financing issues, and demands for program repayment. Provider Plaintiffs' Master Complaint ¶ 529; Pls. Compl. ¶¶ 195–203, 223–227. Those individualized proof burdens are exactly why centralization is not a solution. The damages record will be built from Plaintiffs' own books, payroll records, and counterparty-specific relationships, in addition to other experiences that are unique to Plaintiffs. Pls. Compl. ¶¶ 151–169, 195–203, 208–222, 223–227, 259, 261.

## X.    CONCLUSION

For the foregoing reasons, this Panel should vacate CTO – 30 as it relates to *Path MD., Inc. et al. v. Optum Inc.*, C.D. Cal. N. 2:26-01105 and allow Plaintiffs to pursue their California law claims efficiently in the Central District of California.

**DATED:** February 18, 2026

By: /s/ *Mina Hakakian*

MINA HAKAKIAN
Hakakian Williams Law Group PC
Attorneys for Plaintiffs
Path MD., Inc. and
Specialized University Pathologists, Inc.

- 20 -
**BRIEF IN SUPPORT OF MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO – 30)**