# EXHIBIT B

MINA HAKAKIAN (SBN 237666)
**HAKAKIAN WILLIAMS LAW GROUP PC**
1541 Westwood Blvd., Second Floor
Los Angeles, California 90024
Tel.: (310) 982-2733
mhakakian@hwlgpc.com

*Attorneys for Plaintiffs,*
PATH MD, INC. and SPECIALIZED UNIVERSITY PATHOLOGISTS, INC.

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATH MD, INC., a California Corporation, and SPECIALIZED UNIVERSITY PATHOLOGISTS, INC., a California Corporation<br><br>*Plaintiffs*,<br><br>v.<br><br>OPTUM, INC., a Delaware Corporation<br><br>*Defendant*. | Case No. 2:26-cv-01105<br><br>**COMPLAINT FOR DAMAGES:**<br><br>**(1) Negligent Misrepresentation**<br><br>**(2) Breach of Contract**<br><br>**(3) Breach of Implied-in-Fact Contract (Alternative)**<br><br>**(4) Unjust Enrichment- Breach of Implied-in-Law Contract (Alternative)**<br><br>**(5) Breach of Covenant of Good Faith and Fair Dealing**<br><br>**(6) Intentional Interference with Prospective Economic Advantage** |

- 1 -
Complaint

Plaintiff, Path MD, Inc. ("Path MD") and Plaintiff Specialized University Pathologists, Inc. ("Specialized University Pathologists" or "SUP") (collectively "Plaintiffs") allege against Defendant Optum, Inc. ("Optum") as follows:

## I. INTRODUCTION

This action arises from Optum's disruption of Plaintiffs' business operations following a 2024 cybersecurity incident affecting Optum. Plaintiffs are clinical laboratory and pathology practice entities that relied on uninterrupted access to electronic remittances and funds through the Optum Pay platform.

On February 12, 2024, attackers gained access to Optum systems. Ransomware was deployed on February 21, 2024. To contain the incident, Optum severed connectivity on February 21, 2024, disabling Optum Pay and cutting off deposits, electronic remittance advice, and payment histories needed to post and reconcile claims. Optum rebuilt its systems while Plaintiffs lacked account access until May 28, 2024—a prolonged lockout that starved cash flow.

During this period, Optum characterized the incident as limited to Change Healthcare and repeatedly described restoration as near-term. Plaintiffs allege that these communications, including direct, specific communications to Plaintiffs regarding account access, restoration timing, and funding options, impeded mitigation and that the resulting business impacts included lost cash flow, canceled contracts, suspended expansion, workforce reductions, and capital infusions.

## II. JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiffs assert only state-law claims for individualized business injuries, not federal statutory or class claims.

2. Plaintiffs Path MD and SUP remain California incorporated entities but, as of mid-2025, have ceased nearly all active laboratory operations and have permanently closed their primary location in Los Angeles, California due to financial collapse stemming from the conduct alleged in this Complaint. SUP's Dallas facility lost its CLIA (Clinical Laboratory Improvement Amendments of 1988) certification, effective February 28, 2025, and Path MD's Los Angeles laboratories closed by April 30, 2025. Plaintiffs' last principal places of business, which are now closed, were in Los Angeles County, California.

3. Defendant Optum is a Delaware corporation with its principal place of business at 11000 Optum Circle, Eden Prairie, Minnesota 55344. Optum is registered to do business in California and has designated CT Corporation System, 330 N. Brand Blvd., Suite 700, Glendale, California 91203, as its agent for service of process under Cal. Corp. Code § 1505. Optum purposefully availed itself of California by operating a national payment and data infrastructure used by

California providers, including Plaintiffs, and by directing system access, payment communications, and account activity into this District. Plaintiffs' claims arise directly from these contacts.

4. Venue is proper in the Central District of California under 28 U.S.C. § 1391(b)(1) and (b)(2). Defendant is subject to personal jurisdiction in this District, and a substantial part of the events giving rise to the claims occurred here, including Plaintiffs' loss of access to payment systems, resulting financial harm, business disruption, and related communications with Defendant. Plaintiffs' principal places of business, employees, vendors, and financial operations are all located in this District, and the brunt of the harm from Defendant's conduct was felt here. Key witnesses, including Plaintiffs' billing staff and executives, reside in this District. This individualized action arises from Defendant's direct conduct toward Plaintiffs and is not appropriately consolidated with consumer or class litigation relating to the Change Healthcare breach.

## III. PARTIES

### A. Plaintiffs

5. Path MD and SUP were histopathology, clinical, laboratory entities that provided diagnostic testing services to healthcare providers. Plaintiffs Path MD and SUP remain incorporated entities but, as of mid-2025, have ceased nearly all active laboratory operations due to financial collapse stemming from the actions

- 4 -
Complaint

alleged in this Complaint. SUP's Dallas facility ceased operations effective February 28, 2025, as reflected in the CLIA cancellation notice[1], and Path MD's Los Angeles laboratories closed by April 30, 2025.

6.      Although legally distinct entities, Path MD and SUP operated in close coordination and under common ownership.  Path MD and SUP were the operating entities that directly contracted with payors, enrolled in Optum Pay, and suffered the injuries alleged herein.

**B.      Defendant**

7.      Defendant Optum is a Delaware corporation with its principal place of business at 11000 Optum Circle, Eden Prairie, Minnesota 55344. Optum is registered to do business in California and has designated CT Corporation System, 330 N. Brand Blvd., Suite 700, Glendale, California 91203, as its agent for service of process under Cal. Corp. Code § 1505.

**1.      Defendant Optum's Corporate Ownership and Structure**

8.      UnitedHealth Group Incorporated ("UHG") is the largest healthcare company in the world, ranking No. 5 on the 2024 Fortune Global 500 list, with total annual revenues exceeding $370 billion.  UHG operates through two principal wholly owned subsidiaries: UnitedHealthcare, which provides health benefits and insurance, and Optum, which delivers healthcare services, technology, and data

---

[1] *See ¶¶ 232, 234, 236 and 237*

Complaint

infrastructure. While Optum is wholly owned by UHG and shares UHG's principal place of business location in Minnesota, it functions as a distinct and independently operating corporate entity. UHG acts as a holding company and does not directly manage the service platforms at issue in this case.

9. For UHG, Optum independently manages and operates the three core business lines and service platforms: Optum Health, Optum Rx, and Optum Insight. Optum also oversees other business divisions, including Optum Financial, which administers provider-facing payment systems such as Optum Pay.

10. Optum Insight, Optum's main technology and analytics arm, sells software, revenue cycle services, clinical performance tools, and data infrastructure to hospitals, health systems, providers, and payers nationwide. Despite a Department of Justice Clayton Act §7 suit, in 2022, UHG acquired Change Healthcare, a major national provider of claims processing and payment infrastructure. Upon UHG's acquisition, Change Healthcare's operations and systems were officially merged into Optum Insight. In October 2022, Optum issued a public statement declaring that Optum's combination with Change Healthcare was complete.

11. By October 2022, Optum had assumed control of the core systems later at issue in this case, including those used by healthcare providers for claims processing, clearinghouse services, and fund disbursement. Optum retained control

of these core systems regardless of whether such systems had previously been Change Healthcare systems or were still designated by Optum as Change Healthcare systems. At all relevant times, Optum, through its control over Optum Insight and related units, exercised full operational authority over the systems giving rise to Plaintiffs' claims.

12. Through Optum Financial, Optum's core business division, Optum administered, managed, and operated Optum Pay, the most widely used healthcare reimbursement digital platform in the United States, which processes billions of dollars in annual payments. Optum marketed Optum Pay as a secure, centralized infrastructure for timely claims disbursement. Healthcare providers pay for and rely on Optum Pay to receive reimbursements and manage remittance data across multiple payers. Providers subscribe to Optum Pay for access to features including electronic funds transfers (EFT), electronic remittance advice (ERA), downloadable explanation of benefits (EOB) data, consolidated payment tracking, real-time dashboards, historical payment archives, user access delegation, and optional expedited funding and advanced reporting tools.

**2. Defendant Optum's Operational Control**

13. Plaintiffs are informed and believe, and on that basis allege, that Optum has publicly referred to the February 2024 ransomware cyberattack on its systems as the "Change Healthcare" breach. By the time of the attack, however,

Change Healthcare had long been acquired by UHG and merged into Optum. Rather than Change Healthcare or even UHG, Optum was the corporate entity primarily responsible for managing the recovery of its own impacted infrastructure, including all systems under its control, and those which were previously owned by Change Healthcare. Plaintiffs are informed and believe, and on that basis allege, that Optum exercised centralized operational control over the post-breach response to the ransomware attack on those systems.

14. Plaintiffs are informed and believe, and on that basis allege, that in practice, Optum directed provider communications, managed workaround payment processes, set restoration timelines, and controlled access to core infrastructure such as the Optum Pay system. Following the breach, Optum positioned itself as the primary operational interface for providers, consolidating claims workarounds, funding assistance, and system access through Optum-managed platforms and personnel. Breach updates and call center scripts were disseminated via Optum-branded domains, including optum.com, changehealthcare.optum.com, and optumfinancial.com. Provider access to impacted systems was rerouted through these Optum managed portals, rather than through any completely separate Change-branded infrastructure. Although UnitedHealthcare systems remained technically functional, provider access to reimbursement and claims processing functions was substantially impaired due to outages in Optum-rum systems,

including payment, login, and data access tools.

15.     UHG attributed both the cyberattack-related business disruption and the direct response costs to Optum in its 2024 filings with the U.S. Securities and Exchange Commission (SEC).  Plaintiffs are informed and believe, and on that basis allege that Optum exercised centralized operational and financial control over the affected systems.

16.     Despite attributing approximately $867 million in business disruption to the cyberattack, Optum still reported total annual revenues of $253 billion—an increase of more than 11% from the prior year. Even after subtracting $1.5 billion in direct response costs related to the breach, Optum's operating earnings remained $16.7 billion for 2024. Plaintiffs are informed and believe, and on that basis allege, that this attribution reflects Optum's centralized operational and financial authority over the affected systems, including responsibility for breach-related decisions and provider-facing infrastructure.

17.     In its 2024 filings with the SEC, UHG attributed the business disruption and direct response costs from the February 2024 cyberattack to Optum Plaintiffs are informed and believe, and on that basis allege, that this attribution reflects that UHG's executives' decisions and statements, including those Concerning ransom payment, system rebuild, public updates, and provider communications, were undertaken on behalf of Optum and are properly

attributable to Optum in this action.

18. Plaintiffs are informed and believe, and on that basis allege, UHG executives made public disclosures, gave congressional testimony, authorized payment of ransom, and filed reports with the SEC concerning the February 2024 cyberattack on behalf of Optum, and Optum authorized, adopted, or republished those UHG statements to providers, including by linking them on Optum-hosted webpages and incorporating them into provider-facing communications. Plaintiffs further allege that UHG and Optum coordinated incident response, provider communications, branding, and decision-making such that both entities participated jointly in the statements and actions at issue. Plaintiffs allege that the acts and omissions of UHG are fully attributable to Optum by reason of agency, ratification, and republication, and that UHG and Optum acted in concert in connection with the conduct alleged herein.

**IV. CORE FACTS UNDERLYING INDIVIDUAL CLAIM**

**A. Background (Pre-Breach and Breach- February 11-21, 2024)**

**1. Plaintiffs' Established Operations Prior to Optum Disruption**

**a. Plaintiffs' Coordinated, Multi-State, Accredited Operations**

19. Before the events giving rise to this action, Plaintiff Path MD operated an expansive, CLIA-certified and CAP-accredited laboratory in Los Angeles, providing anatomic pathology, molecular diagnostics, clinical, and infectious

- 10 -
Complaint

disease testing to physicians, surgery centers, skilled nursing facilities, and other healthcare providers nationwide. Path MD's pathology team included board-certified specialists in dermatology, gastroenterology, urology, and cytopathology, licensed across multiple states, including California, Arizona, Nevada, Texas, Utah, and Florida.

20. Plaintiff SUP, the affiliated professional corporation, employed board-certified pathologists who provided professional interpretation, diagnostic reporting, and medical consultation. SUP also maintained its own CLIA certification and payer enrollments, enabling it to bill directly for physician-pathology services. In addition to its California base, SUP operated CLIA-certified facilities in Arizona and Texas, thereby extending Plaintiffs' accredited laboratory presence beyond California.

21. Together, Plaintiffs Path MD and SUP functioned as a coordinated, multi-state enterprise, with Path MD managing the clinical and laboratory infrastructure and SUP providing the professional medical services required for patient care and reimbursement.

22. Plaintiffs together employed approximately one hundred staff members and operated across key business segments, including cancer diagnostics, molecular infectious disease testing, and COVID-related services. Through these operations, Plaintiffs delivered accredited laboratory testing to hospitals, skilled

Complaint

nursing facilities, surgery centers, urgent care clinics, schools, and other community facilities.

23. Plaintiffs also maintained more than 300 provider contracts across California, Arizona, and Utah with national insurers, regional plans, and specialized medical groups, ensuring broad patient access and stable reimbursement channels.

**b.     Plaintiffs' Industry Recognition and National Role**

24. Thermo Fisher Scientific, one of the world's largest laboratory technology companies, selected Plaintiffs as a "showcase laboratory" for advanced diagnostic operations. Plaintiffs also secured a national overflow-processing agreement with LabCorp, one of the largest diagnostic companies in the United States, under which Plaintiffs were entrusted to handle excess testing volumes.

25. During the COVID-19 pandemic, Plaintiffs' molecular infrastructure enabled Plaintiffs to play a critical role in American PCR testing, supporting schools, businesses, and healthcare facilities in meeting public health requirements. Plaintiffs were active participants in the national diagnostic testing market.

**c.     Plaintiffs' Financial and Operational History: Sustained Growth and Market Value**

26. In 2021, Plaintiffs' enterprise was valued at approximately $125 million during a potential sale process. By 2022–2023, Plaintiffs' anatomic

pathology business alone—excluding molecular testing—was valued between $8 and $10 million.

27. Plaintiffs' operations were further secured by a portfolio of multi-year service agreements with skilled nursing facilities, physician groups, and national laboratories across several states. In 2023 and early 2024, Plaintiffs expanded geographically and executed new agreements with healthcare operators in Texas and Florida, each with multi-year terms and automatic renewal provisions. Plaintiffs also maintained standing agreements with additional facilities and physician groups, providing a recurring and stable client base.

28. Plaintiffs' approximate total and net income performance through 2023 is approximated in the following table:

| Year | PATH MD Total Income | PATH MD Net Income | SUP Total Income | SUP Net Income |
|------|---------------------|--------------------|------------------|----------------|
| 2019 | $8,062,111.82 | -$1,421,683.40 | $2,343,607.93 | $117,841.35 |
| 2020 | $7,336,635.24 | -$226,249.59 | $2,201,535.35 | $51,607.28 |
| 2021 | $28,395,804.31 | $1,301,304.98 | $4,558,700.58 | $3,021,159.58 |
| 2022 | $42,569,846.60 | $2,871,357.59 | $6,049,644.60 | $2,297,293.31 |
| 2023 | $18,184,341.16 | -$1,331,065.79 | $6,957,692.98 | -$338,939.94 |

29. Plaintiffs' financials grew substantially through 2022, with Path MD increasing revenues more than five-fold from 2019 to 2022 and SUP more than

doubling over the same period. Both entities reinvested their earnings to expand capacity and sustain operations at scale. In 2023, Plaintiffs incurred reinvestment costs and transitional expenses and a Path MD total income dip from the previous year (SUP total income increased). Despite this, Plaintiffs' combined 2023 total income was $25,142,034.14.

30. AdvancedMD is a third-party practice-management and billing platform used by Plaintiffs for scheduling, claims submission, and revenue cycle activities. AdvancedMD tracked patient encounters and related billing activity for Plaintiffs. AdvancedMD invoicing and encounter reports reflect Plaintiffs' joint average of more than 5,000 patient cases per month from December 2023 through February 2024.

31. Plaintiffs' ability to meet payroll and vendor obligations depended on converting patient encounters into receivables through Optum Pay.

**2. Contract Formation Between Optum and Plaintiffs**

32. Plaintiffs and Optum entered a valid and binding contract governing the terms of their dealings, whether through a direct written agreement or an implied-in-fact contract arising from the parties' course of dealing. In the alternative, if no enforceable express or implied-in-fact contract is found to exist, Optum has nevertheless received and retained benefits conferred by Plaintiffs Under circumstances that makes its retention of those benefits unjust, and

Plaintiffs are entitled to restitution in quasi-contract.

33. On information and belief, the contractual terms in effect required Optum to provide account access and deliver ERA/EFT remittances with commercially reasonable continuity and to exercise quick restoration and support efforts consistent with that obligation. Plaintiffs paid fees as consideration for those and other services and benefits.

**a. Direct Written Optum Pay Agreement Between Plaintiffs and Optum**

34. Plaintiffs maintained active Optum Pay accounts during the relevant period. Plaintiffs relied on Optum Pay to receive claims reimbursements, access electronic remittance data, and manage revenue cycle operations for out-of-network services.

35. Access to the Optum Pay platform required credentialing, registration, and payment of enrollment fees. Plaintiffs completed these steps by submitting banking and business information and consistently paying applicable fees to maintain uninterrupted access.

36. During registration and later account administration, Optum communicated with Plaintiffs as the account holders, including on access, configuration, and support tickets. Plaintiffs maintained their own credentials and payment settings within Optum Pay.

37. On information and belief, Optum conditioned access to the Optum

Complaint

Pay platform on Plaintiffs' assent to written Optum Pay terms that purported to govern Plaintiffs' use of the platform and Optum's handling and disbursement of Plaintiffs' claim payments. Plaintiffs are informed and believe that they entered a binding contract with Optum regarding their Optum Pay accounts. Plaintiffs do not currently possess the operative written terms and do not concede the enforceability of any provision that purports to limit Optum's liability, restrict Plaintiffs' remedies, require arbitration or a particular forum, or otherwise conflict with governing law.

**b.    Agency Based Contract Formation (Pled in the Alternative)**

38.    During the relevant period, AdvancedMD's system may have included an integrated interface for enrolling in and accessing Optum Pay. In the alternative, to the extent Optum contends that any Optum Pay terms were accepted through AdvancedMD's interface rather than directly by Plaintiffs, Plaintiffs allege that AdvancedMD acted as Plaintiffs' authorized agent in assenting to those terms. AdvancedMD obtained and transmitted Plaintiffs' enrollment and banking information to Optum for the purpose of establishing Plaintiffs' Optum Pay accounts and did so on Plaintiffs' behalf and for Plaintiffs' benefit.

39.    Accordingly, any Optum Pay agreement formed through AdvancedMD's interface was an agreement between Optum and Plaintiffs as principals, and Optum's contractual duties under that agreement ran to Plaintiffs

Complaint

as the Optum Pay account holders.

**c.     Implied-in-Fact Theory (Pled in the Alternative)**

40.     In the alternative, Plaintiffs are informed and believe, and on that basis allege, that by registering for Optum Pay, submitting banking and business information, paying platform fees, and using Optum Pay to receive claim reimbursements, Plaintiffs and Optum entered implied-in-fact contracts concerning Optum Pay services and Optum's handling of Plaintiffs' funds.

41.     Plaintiffs are informed and believe, and on that basis allege, that Optum created and maintained Optum Pay accounts in Plaintiffs' names, mapped Plaintiffs' claim reimbursements to those accounts, deposited claim payments into bank accounts designated by Plaintiffs, provided ongoing online access to remittance and transaction data, charged and collected platform fees from Plaintiffs, and responded to Plaintiffs' Optum Pay support tickets. These acts constituted Optum's performance and assent under the implied-in-fact contracts alleged in the preceding paragraph.

**d.     Implied-in-Law Theory Through Quasi-Contract/Unjust Enrichment (Pled in the Alternative)**

42.     In the further alternative, to the extent no enforceable express or implied-in-fact contract is found to exist, Plaintiffs allege that Optum nonetheless received and retained Plaintiffs' payments and performance, including platform

fees and the routing of claim reimbursements through Optum Pay, without providing the full access and services for which Plaintiffs paid. Under these circumstances, Optum has been unjustly enriched and equity requires restitution.

**e.      Failure to Produce Governing Terms, Deny Existence of a Contract, and Inform Plaintiffs of Any Contractual Limitations Clauses**

43.    On June 25, 2025, Plaintiffs issued a formal written request via email to both Optum and AdvancedMD, at email addresses: optum support@optum.com; info@advancedmd.com; and enrollments@advancedmd.com, seeking a complete copy of any and all agreements governing Plaintiffs' use of Optum Pay and related remittance tools as well as arbitration terms, if any. The request specifically asked for a "*complete copy of all agreements executed between our company (Path MD, Inc. and Specialized University Pathologists, Inc) and your platform(s), including:*

*• Any signed or electronically accepted agreements related to our use of Optum Pay, AdvancedMD, or other billing/remittance systems;*

*• The terms and conditions in effect at the time of onboarding or during service;*

*• Any arbitration or dispute resolution clauses, and any records showing how and when we accepted them.*"

44.    Plaintiffs' email emphasized the importance of a complete response from both Optum and AdvancedMD, stating:

- 18 -
Complaint

*"This request is being sent to both AdvancedMD and Optum to ensure a full response. If no such agreements exist or cannot be located, please confirm that as well. We would appreciate a response within 14 calendar days. If we don't hear back by then, we will assume no such agreement is available and proceed accordingly."*

45.     In response, Plaintiffs received only two irrelevant communications from Optum: one was an automated message from Optum's One Healthcare ID Help Desk indicating that the inbox was not monitored for contract-related inquiries; the other was generic support message referencing login credentials. No agreement or arbitration clause was produced by Optum to date. AdvancedMD did not respond at all.

46.     As of the filing of this Complaint, Optum has not produced to Plaintiffs any signed contractual agreement, terms of use, or any documentation reflecting arbitration or forum selection provisions in response to Plaintiffs' June 25, 2025, request.

47.     As of the filing of this Complaint, Optum has not informed Plaintiffs of any limiting contractual provisions in response to Plaintiffs' June 25, 2025, request, including arbitration and forum selection clauses.

**3.     Plaintiffs' Operational Reliance on Optum Pay for Reimbursement**

48.      Following reinvestment into business expansion throughout 2023,

Complaint

Plaintiffs entered 2024 dependent on uninterrupted liquidity, generated by the timely conversion of earned claim payments (receivables) into cash needed to meet payroll, retain staff, pay vendors, and sustain patient care. Plaintiffs relied on Optum, through its Optum Pay platform, to promptly disburse payor reimbursements and to provide timely and predictable EFT and ERA delivery, which Plaintiffs require for their basic cash flow and day-to-day operations. In exchange, Plaintiffs paid Optum subscription fees and per-transaction fees for these services.

49.    Optum functioned as a clearinghouse facilitating EFTs and ERAs. Federal regulations, including 45 C.F.R. Part 162, Subparts I and J, establish standards requiring clearinghouses to ensure timely, secure, and accurate delivery of funds and remittance data. The National Automated Clearing House Association (NACHA) Operating Rules, applicable to ACH transactions nationwide, mandate prompt settlement (often within one business day), data security, and operational continuity.

50.    While Plaintiffs are not asserting any standalone cause of action for violations of NACHA or ACH rules, these laws contributed to Plaintiffs' reasonable expectation that, once a payer initiated an ACH payment, funds would reach the receiving bank promptly and continuously, and that intermediary systems would not introduce long, arbitrary delays. Optum knew or should have known of

these laws and the industry-wide expectations based upon these laws.

51.    Optum publicly promoted Optum's role of streamlining and accelerating payment and remittance processes. On January 6, 2021, UHG announced the 2022 OptumInsight–Change Healthcare combination, "Together we will help streamline and inform the vital clinical, administrative and payment processes on which health care providers and payers depend to serve patients."[2] Optum advertised its platform as one that "simplifies processes, saves time, and lowers costs for all involved," allowing providers to "spend less time reconciling claims and more time getting people the care they need."[3] Plaintiffs reasonably relied on these representations in selecting and maintaining use of Optum Pay.

52.    Plaintiffs did not maintain a redundant system for receiving payments. On information and belief, payor payer agreements and notices directed reimbursement through Optum Pay. Plaintiffs had no active account with any alternate payment processor, and once payors transmitted funds into Optum Pay, Plaintiffs could not practically access those funds through any other channel.

---

[2] *Press Release, UHG, OptumInsight and Change Healthcare Combine to Advance a More Modern, Information and Technology-Enabled Health Care Platform* (Jan. 6, 2021), https://www.unitedhealthgroup.com/newsroom/2021/2021-01-06-optuminsight-and-change-healthcare-combine.html.

[3] Optum Financial, *Welcome to Optum Pay*, https://myservices.optumhealthpaymentservices.com/registrationSignIn.do (last visited Sept. 18, 2025).

**4.      Optum "Change Healthcare" Breach (February 12-21, 2024)**

53.      In October 2022, UHG acquired Change Healthcare and absorbed it into the Optum Insight division. On information and belief, following that acquisition Optum operated, secured, and maintained the legacy "Change Healthcare" platforms and infrastructure. That infrastructure included installed Citrix Systems' remote-access software, which Optum operated as the external gateway into its internal systems.

54.      By late 2023, multifactor authentication for remote and privileged access and network segmentation to restrict lateral movement were recognized as baseline cybersecurity safeguards for healthcare clearinghouses and payment systems. Federal authorities, including the Department of Health and Human Services, the Office for Civil Rights, and the Cybersecurity and Infrastructure Security Agency, had issued multiple directives and guidance instructing covered entities to implement these measures as part of minimum compliance and risk-management practices.

55.      Optum did not employ multifactor authentication or adequate network segmentation for its remote access portal.[4]

---

[4] *Testimony of Andrew Witty, Chief Executive Officer, UHG, Examining the Change Healthcare Cyberattack: Hearing Before the Subcomm. on Oversight & Investigations of the H. Comm. on Energy & Commerce*, 118th Cong. (May 1, 2024),

Complaint

56.     On May 1, 2024, at the hearing of the United States Senate Committee on Finance, the Chairman of the Committee, Senator Ron Wyden, directly addressed UHG's CEO, Andrew Witty, regarding lack of safeguards, stating, "This hack could have been stopped with cybersecurity 101." He further remarked, "Let's talk about why things are taking so long. In particular, how hard providers are being hit, because they are paying the price for the failures that have been made on your watch." Senator Wyden continued, "Practically every provider I bump into is waiting to be paid."[5]

57.     An independent cybersecurity expert, Tom Kellermann, SVP of cyber strategy at Contrast Security, publicly described UHG/Optum's failure to adopt basic safeguards as "egregious negligence." [6]

58.     Defendant's omissions enabled the ALPHV/BlackCat ransomware group to gain entry, move through connected Optum internal systems, and

https://d1dth6e84htgma.cloudfront.net/Witty_Testimony_OI_Hearing_05_01_24_5ff52a2d11.pdf [hereinafter *UHG CEO House E&C Testimony*].

[5] Hacking America's Health Care: Assessing the Change Healthcare Cyber Attack and What's Next, *Full Committee Hearing, S. Comm. on Finance*, 118th Cong. (May 1, 2024) (transcribed from video available at https://www.finance.senate.gov/hearings/hacking-americas-health-care-assessing-the-change-healthcare-cyber-attack-and-whats-next.

[6] (*See, e.g., Tom Kellermann, Senior Vice President of Cyber Strategy, Contrast Security, Statement to Jessica Lyons, UnitedHealth's 'egregious negligence' led to Change Healthcare ransomware infection*, The Register (May 8, 2024, 2:58 AM UTC), https://www.theregister.com/2024/05/08/unitedhealths_egregious_negligence/.

ultimately deploy ransomware on February 21, 2024, which encrypted Optum systems and stole data.[7] Defendant repeatedly referred to the incident as the "Change Healthcare" cybersecurity issue in public communications.

59.     The exfiltration and encryption phase of the attack effectively ended when Optum severed connectivity on February 21, 2024. To contain the intrusion, Defendant disconnected Change Healthcare's data centers, which cut off access to core payment and claims-processing systems, including Optum Pay—the platform through which Plaintiffs and providers nationwide received electronic reimbursement.[8] While this measure may have limited the spread of malware and ended the breach, it simultaneously disabled Plaintiffs' sole pipeline to receivables.

60.     Plaintiffs are informed and believe that public testimony establishes the following chronology of the breach: (1) attackers first gained access to Defendant's systems on February 12, 2024, through the Citrix remote-access portal; (2) ransomware was deployed on February 21, 2024, encrypting systems and exfiltrating data; and (3) containment was achieved once Defendant disconnected its data centers on February 21, 2024.[9] That disconnection step is

---

[7] *UHG CEO House E&C Testimony*.
[8] *UHG CEO House E&C Testimony*.
[9] *UHG CEO House E&C Testimony*.

- 24 -
Complaint

generally recognized as the point when the breach itself ended, because the attackers were expelled from the network once connectivity was severed.

**B.      Individual Action Focused on Post-Breach Conduct (February 21, 2024, to May 28, 2024)**

61.     Plaintiffs are informed and believe that the "Change Healthcare" breach was contained when Defendant severed connectivity on or about February 21, 2024. From that point forward, Plaintiffs' injuries did not arise from the intrusion or encryption itself, but from Defendant's post-breach conduct. Specifically, Defendant:

1. Disabled Plaintiffs' access to payment systems and failed to restore access for more than three months;

2. Chose to rebuild infrastructure instead of deploying the purchased decryption key or adequate third-party back-up systems;

3. Repeatedly communicated to Plaintiffs that the disruption was attributable to "Change Healthcare"; and

4. Repeatedly represented to Plaintiffs that Optum Pay access had been, or would be imminently restored,

These independent acts and omissions form the basis of Plaintiffs' claims.

///

///

- 25 -
Complaint

## C.     Defendant's Visibility of Day-by-Day Compounding of Harm from February 21, 2024, to May 28, 2024

62.     Plaintiffs are informed and believe that on February 21, 2024, Defendant disconnected the Change Healthcare environment to contain the intrusion, which cut off access to Optum Pay and related claims and payment functions for providers, including Plaintiffs. On May 1, 2024, testimony before the House Committee on Energy and Commerce, UHG's CEO Andrew Witty stated that providers were "struggling to make payroll" and to "submit claims" because of the outage.[10]

63.     In the ordinary course, providers fund payroll and vendor obligations from receivables, and sustained interruptions in claim submission, ERA receipt, or EFT settlement typically lead to delayed payroll, vendor nonpayment, and reductions in services.[11]

64.     During the period when Plaintiffs' Optum Pay accounts were inaccessible (Feb. 21–May 28, 2024), Plaintiffs could not submit claims, receive ERAs, or settle EFTs. This incurred business struggles, including missed payroll, incurred vendor defaults, and reduced or suspended certain patient services.

---

[10] *UHG CEO House E&C Testimony*.

[11] *UHG CEO House E&C Testimony*.

Complaint

65. Defendant processed Plaintiffs' transactions through Optum Pay and collected subscription and/or per-transaction fees. On information and belief, Defendant had visibility into Plaintiffs' operations through transaction data it processed. Plaintiffs' 837 claim submissions and 835 ERA/settlement reports included ordering and rendering provider NPIs, service-facility NPIs, place-of-service codes, case volumes, allowed amounts, settlement dates, and receivables-aging metrics, including days to cash.

66. On information and belief, transactional data can be matched to named facilities and provider groups using those NPIs and codes. Recurring NPI-to-counterparty pairings and contractual adjustment codes (Claim Adjustment Reason Codes (CARCs)/Remittance Advice Remark Codes (RARCs), together with volumes, allowed amounts, and days to cash, indicate ongoing business relationships with those counterparties.

**C.     No Employment of Third-Party Alternative**

67. Based on information and belief, when Optum severed connectivity on February 21, 2024, Optum did not route claims or payments to any backup third-party clearinghouse or third-party alternate EFT/ERA channel, leaving Plaintiffs unable to operate.

68. On May 1, 2024, testimony before the House Committee on Energy and Commerce, UHG's CEO Andrew Witty stated that "by the afternoon of

- 27 -
Complaint

February 21," Optum had assembled experts "who immediately began the around-the-clock and enormously complex task of safely and securely rebuilding Change Healthcare's technology infrastructure from the ground up." He further testified that UHG paid approximately $22 million in ransom and received a decryption key. Optum continued with a ground-up rebuild after receiving a decryption key.[12]

69. Based on information and belief, Plaintiffs allege that Optum did not anticipate a same-day or few days restoration.[13]

70. Based on information and belief, Plaintiffs allege that restoration timing of Plaintiffs account access (from February 21, 2024, to May 28, 2024) was primarily driven by Optum's chosen rebuild plan rather than by an ongoing ALPHV attacker attack.[14]

71. Based on information and belief, Defendant did not route Plaintiffs' claims or payments through any third-party private clearinghouse or other non-governmental EFT/ERA rail throughout Plaintiff's entire period of account inaccessibility (from February 21, 2024, to May 28, 2024). For avoidance of doubt, this allegation does not refer to CMS's Accelerated and Advance Payment program or any government relief program.

---

[12] *UHG CEO House E&C Testimony.*

[13] *UHG CEO House E&C Testimony.*

[14] *UHG CEO House E&C Testimony.*

Complaint

72.     On information and belief, before the outage Defendant had no dedicated, prearranged private-sector backup arrangement with sufficient capacity and connectivity to Plaintiffs' payors to process all claims or disburse payments if Optum Pay became unavailable. Alternatively, if such an arrangement existed, Defendant did not use it for Plaintiffs' claims. For avoidance of doubt, this allegation does not refer to CMS's Accelerated and Advance Payment Program or any government relief program.

73.     Guidance from the U.S. Department of Health and Human Services, specifically the voluntary 405(d) Health Industry Cybersecurity Practices (HICP) and the Healthcare and Public Health Sector Cybersecurity Performance Goals (CPGs), recommends tested incident-response and continuity measures; reasonable steps include contracting a second claims-processing company and maintaining alternate payment and remittance channels.

74.     On information and belief, competing vendors maintained third-party clearinghouse capacity and alternate EFT/ERA channels that could have mitigated or resolved the disruption.

75.     Defendant's public updates did not announce any sector-wide emergency contracting, deployment of available prearranged private-sector backup clearing houses, or deployment of prearranged private-sector backup EFT/ERA channels.

Complaint

76.     Throughout Plaintiffs' period of account inaccessibility, Optum did not advise Plaintiffs to turn to competing private clearinghouses to preserve payment continuity.

77.     Federal authorities, including the Centers for Medicare & Medicaid Services (CMS), instructed providers who were able to do so to switch clearinghouses and use competitors such as Availity.

**D.     Public Misrepresentations Regarding "Change" and Duration of Optum's Disruption**

78.     Beginning on or about February 21, 2024, Optum's public updates, status pages, and direct communications contained material statements and omissions concerning: (i) projected timelines for restoration; (ii) the scope of the incident, by presenting it as confined to "Change Healthcare" and suggesting Optum's operations were unaffected; and (iii) the status of impacted services, including repeated assertions that systems were fully functional while Plaintiffs remained unable to transact. At the time these statements were made, Optum had severed connectivity, commenced a system rebuild, and had internal data showing continuing failures. Plaintiffs relied on these statements, deferred migration to alternate channels, and incurred foreseeable harm.

///

///

- 30 -
Complaint

**1.      Change Healthcare Rebranding Branding through Optum Solution Status Page**

**a.      "Change Healthcare" Did Not Exist Separately from Optum After 2022**

79.      Based on information and belief, UHG completed its acquisition of Change Healthcare on October 3, 2022, in a $13 billion transaction (including approximately $5 billion of assumed debt), and combined Change into its Optum Insight business.

80.      Based on information and belief, after October 3, 2022, Change Healthcare, Inc. no longer existed as a separate legal entity; its rights, obligations, and liabilities vested in the surviving UHG/Optum entity. Under Delaware General Corporation Law § 251, when a merger becomes effective "the separate existence of all constituent corporations except the one into which the others are merged shall cease," and the surviving corporation succeeds to all rights and liabilities of each constituent. Del. Code Ann. tit. 8, § 251(c).

81.      Based on information and belief, Nasdaq corporate actions reflect that trading in Change Healthcare Inc. (CHNG) was halted on October 3, 2022, and its public equity was thereafter extinguished and no longer independently listed.

82.      UHG and Optum announced the closing on October 3, 2022, stating that the combined business would "connect and simplify the core clinical, administrative and payment processes health care providers and payers depend

on."[15] Optum's integration communications identified Optum (including Optum Insight) as operating the Change-branded platforms and described a unified infrastructure supporting claims, remittance, and payment functions

83. In February through March 2024, Defendant's public communications framed the cyberattack as a Change Healthcare incident and presented Change as distinct from Optum. In light of the 2022 acquisition and integration into Optum Insight, that framing implied Optum's operations were unaffected or less affected.

84. Plaintiffs understood the event as so framed and deferred mitigation steps.

**b.      Misleading "Change Healthcare" Branding on Optum's Status Page**

85. The "Optum Solutions Status" page is Optum's public incident-and-uptime portal for Optum/Change products. During the February–May 2024 outage, Defendant used it as the primary channel for incident notices, restoration timelines, and product-level status.[16] A true and correct copy is attached as Exhibit 1. The page lists updates in reverse chronological order, so the earliest posts appear at the bottom of the exhibit.

---

[15] *See Press Release, UHG, Optum and Change Healthcare Complete Combination* (Oct. 3, 2022), https://www.unitedhealthgroup.com/newsroom/2022/2022-10-3-optum-change-healthcare-combination.html.

[16] *See Optum, Incident Report for Optum Solutions, Optum Solutions Status*, https://solution-status.optum.com/incidents/hqpjz25fn3n7 (last updated May 7, 2024).

86.     On February 21, 2024, Optum stated in their Optum Solutions page: "We are experiencing a network interruption and are working to resolve the issue. The disruption is expected to last at least through the day." (10:18 EST). Hours later it read: "Change Healthcare is experiencing a network interruption related to a cyber security issue… The disruption is expected to last at least through the day." (14:09 EST). Optum's statements shifted from first-person "we" to "Change Healthcare." *See* Ex. 1 at 28.

87.     The tagline "Change Healthcare is experiencing a network interruption related to a cyber security issue," or substantially similar phrasing, appeared more than forty times on the Optum Solutions Status feed during the lockout period (February 21–May 28, 2024). Within that Optum Solutions Status page, "Change Healthcare" appears more than twice as often as "Optum." *See* Ex. 1.

88.     Beginning March 4, 2024 (12:17 EST), posts described a "Change Healthcare cybersecurity issue" and stated, "Change Healthcare will use this solution status page to provide updates about specific products and services, including uptime and support availability. We are working on multiple approaches to continue to restore the impacted environments," presenting Change as distinct from Optum even while Optum hosted the page for its own products and services. *See* Ex. 1 at 6.

89.    As early as February 23, 2024, Optum described the affected environment as "Change Healthcare's systems," stating: "we took immediate action to disconnect Change Healthcare's systems to prevent further impact… We have a high-level of confidence that Optum, UnitedHealthcare and UnitedHealth Group systems have not been affected by this issue." (Feb. 23, 2024, 18:03 EST). Substantially the same language was repeated throughout the lockout period, moving from "high confidence" to "no indication" that Optum was affected. *See* Ex. 1 at 7, 8, and 9. ("Based on our ongoing investigation, there's no indication that Optum, UnitedHealthcare and UnitedHealth Group systems have been affected by this issue." (Feb. 29, 2024))

90.    As early as February 23, 2024, Optum described the affected environment as "Change Healthcare's systems," stating: "we took immediate action to disconnect Change Healthcare's systems to prevent further impact. This action was taken so our customers and partners do not need to. We have a high-level of confidence that Optum, UnitedHealthcare and UnitedHealth Group systems have not been affected by this issue." (Feb. 23, 2024, 18:03 EST). Substantially the same language was repeated throughout the lockout period, shifting from "high-level of confidence" to "no indication" that Optum was affected. *See* Ex. 1 at 9-22 ("Based on our ongoing investigation, there's no indication that Optum, UnitedHealthcare and UnitedHealth Group systems have

- 34 -
Complaint

been affected by this issue." (Feb. 29, 2024)).

91. On March 31, 2024, at 15:03 EDT, Defendant stated on the Optum Solutions Status page that "Change Healthcare and Optum are working together to restore products and services." Defendant presenting "Change Healthcare" and "Optum" as distinct actors "working together." *See* Ex. 1 at 3.

92. On May 7, 2024, at 09:22 EDT, Defendant wrote: "Real-time Change Healthcare product status updates can be found on the Optum Solutions Status page," and at 09:23 EDT posted: "This incident has been resolved." This May 7, 2024, resolution announcement was the first explicit labeling and use of "Change Healthcare" as a "product" on the page. Defendant did not state that the "Change Healthcare" "product" was an Optum product within the posted update. Defendant included a link to "Information on the Change Healthcare Cyber Response" within the posted update. Defendant stated within the update that UHG "continues to make progress in mitigating the impact to consumers and care providers of the unprecedented cyberattack on the U.S. health system and the Change Healthcare services." Ex. 1 at 1.

93. Plaintiffs are informed and believe, and on the basis alleges, following UHG's 2022 acquisition and integration of Change Healthcare into Optum Insight, any attack or interruption labeled "Change Healthcare" was an attack or interruption on Optum-operated systems.

Complaint

94. On information and belief, by presenting Change Healthcare as distinct from Optum, Defendant's communications conveyed that the disruption was confined to a third party and that Optum's systems were unaffected. Plaintiffs and other providers understood the event accordingly and deferred mitigation steps, including migration to alternate clearinghouses, which resulted in prolonged interruptions in receivables and related financial harm.

**2. Misrepresentation of Timeline through Solutions Status page**

95. Defendant made present-tense statements about the status of their systems on their Solution Status page. Plaintiffs reasonably relied on these statements in maintaining payroll, continuing patient services, and foregoing emergency alternatives. Plaintiffs incurred direct, foreseeable harm distinct from the general effects of the cyberattack.

**a. Misleading "Through the Day" Timeline Despite Known Ground-Up Rebuild**

96. Congressional testimony confirms that by the afternoon of February 21, 2024, experts had already converged to "begin the around-the-clock and enormously complex task of safely and securely rebuilding Change Healthcare's technology infrastructure from the ground up."[17] Yet Optum repeatedly told the

---

[17] *UHG CEO House E&C Testimony.*

public that "The disruption is expected to last at least through the day," on the night of February 21, 2024, at 09:55 EST. Ex. 1 at 28-29.

97. Optum continually issued this "at least through the day" message from February 21, 2024, at 09:55 EST through at least February 28, 2024, at 17:58 EST. Within this timeframe, Optum issued this statement to the public approximately 43 times on its Optum Status page alone. Ex.1.

**b. False Statements Indicating Optum was Operational and Unaffected in Solutions Status Page**

98. In an initial ticket (INC/CSA/Ref # 0529634) on 02:15 EST, February 21, 2024, Defendant identified the impacted Optum product families as: "Revenue Cycle Management (AccuPost, Revenue Performance Advisor), Clinical Exchange, Contract Manager, HealthQx, Provider Manager, Risk Manager, Risk View, and Pharmacy Solutions (MedRx)." On information and belief, contemporaneous listing reflects that Optum's core revenue-cycle, connectivity, contracting/analytics, and pharmacy-switch functions were affected from the outset. *See* Ex. 1.

99. From February 22 through February 28, 2024, following ransomware attack, Defendant repeatedly represented to the public that Optum believes "the [cyber security] issue is specific to Change Healthcare and all other systems across UnitedHealth Group are operational" (Feb. 22, 2024, 11:32 EST). Beyond

Defendant's "Change Healthcare" reframing, Defendant knew upon making this statement that all systems were not "operational." Plaintiffs could not access their Optum Pay accounts at this time. Ex. 1 at 25.

100. This statement was repeatedly issued, with Optum switching their "belief" to "high-level of confidence: "We have a high-level of confidence that Optum, UnitedHealthcare and UnitedHealth Group systems have not been affected by this issue" (Feb. 23, 2024, 14:20 EST). Ex. 1 at 23. Then the statement changed to saying there no indication of affectedness: "Based on our ongoing investigation, there's no indication that Optum, UnitedHealthcare and UnitedHealth Group systems have been affected by this issue" (Feb. 29, 2024, 10:50 EST). This statement was repeatedly issued through (Mar. 2, 2024, 09:08 EST). Ex.1 at 13-22.

101. After March 2nd, Optum entirely dropped the statement from its updates. After March 2nd, Optum issued the following statements regarding impacted systems, "Change Healthcare will use this solution status page to provide updates about specific products and services, including uptime and support availability. We are working on multiple approaches to continue to restore the impacted environments" (Mar 04, 2024 - 12:17 EST.) Ex. 1 at 6.

102. On March 9, 2024, CMS announced an emergency Accelerated and Advance Payment program for Medicare providers and suppliers affected by the "Change Healthcare/Optum Payment disruption," citing the inability of many

providers to submit claims or receive Medicare payments due to the outage. In parallel, HHS urged Optum and other payers to expedite interim payments and improve communication with providers.[18] The governmental acknowledged that the incident affected Optum systems, and Optum was given formal governmental notice to expedite interim payments and improve communication with providers.

103. Based on Defendant's statements, Plaintiffs maintained normal operations, deferred contingency migrations, and continued routing claims and payments through Optum Pay, which worsened cash flow when access and processing were not restored.

**c. False "Resolved" Status on Optum Solutions Status Page (May 7, 2024)**

104. On May 7, 2024, Optum Solutions Status public page declared, "This incident has been resolved." (9:23 a.m. EST) Ex.1. Plaintiffs were unable to even access their Optum Pay account until May 28, 2024.

105. UHG's "Change Healthcare Cyberattack Support" page displayed from Apr. 22, 2024, through May 9, 2024, "Given the ongoing nature and complexity of the data review, it is likely to take several months of continued

---

[18] *Ctrs. for Medicare & Medicaid Servs., Change Healthcare/Optum Payment Disruption (CHOPD) Accelerated Payments to Part A Providers and Advance Payments to Part B Suppliers* (Mar. 9, 2024), https://www.cms.gov/newsroom/fact-sheets/change-healthcare/optum-payment-disruption-chopd-accelerated-payments-part-providers-and-advance.

analysis before enough information will be available to identify and notify impacted customers and individuals."[19]

### 3. Misrepresentation of Provider Impact in UHG April 22nd Press Release

### a. Admission of Ongoing Data Review Contrary to "Near-Normal" Messaging

106. UHG's "Change Healthcare Cyberattack Support" page website linked to UHG's April 22, 2024, press release where UHG repeated that statement, "Given the ongoing nature and complexity of the data review, it is likely to take several months of continued analysis before enough information will be available to identify and notify impacted customers and individuals."[20]

107. Yet in the same April 22, 2024, press release, UHG stated that only a "small number of providers" remained adversely impacted.[21]

---

[19] *UHG, Health Data Breach Information*, Change Healthcare Cyberattack Support, https://www.unitedhealthgroup.com/ns/health-data-breach.html (last visited May 9, 2024).

[20] *UHG Updates on Change Healthcare Cyberattack* (Apr. 22, 2024), https://www.unitedhealthgroup.com/newsroom/2024/2024-04-22-uhg-updates-on-change-healthcare-cyberattack.html

[21] *UHG Updates on Change Healthcare Cyberattack* (Apr. 22, 2024), https://www.unitedhealthgroup.com/newsroom/2024/2024-04-22-uhg-updates-on-change-healthcare-cyberattack.html

- 40 -
Complaint

### b. UHG April 22 Statements Compared to Contemporaneous AMA Results

108. On April 22, 2024, UHG issued a press release describing restoration progress: claims at "near-normal," payment processing "approximately 86% of pre-incident levels," other functionality "approximately 80% … restored," and only "a small number of providers … adversely impacted."[22]

109. During the same week, the American Medical Association (AMA)'s Change Healthcare Cyberattack Impact survey of physical practices and hospital contractors (open Apr. 19–24, 2024) reported widespread, ongoing disruption.[23]

110. UHG's April 22, 2024, press release statements and the contemporaneous AMA survey (Apr. 19–24, 2024) results are set out below, arranged by corresponding pairs based on Plaintiffs' information and belief.

• UHG: "Medical claims … now flowing at near-normal levels … small number of providers … adversely impacted."

• AMA: 75% still faced barriers submitting claims; 85% still had claim-payment disruptions.

---

[22] *UHG Updates on Change Healthcare Cyberattack* (Apr. 22, 2024), https://www.unitedhealthgroup.com/newsroom/2024/2024-04-22-uhg-updates-on-change-healthcare-cyberattack.html
[23] *Am. Med. Ass'n, Change Healthcare Cyberattack Impact: Key Takeaways from Informal AMA Follow-Up Survey* (Apr. 29, 2024), https://www.ama-assn.org/system/files/change-healthcare-follow-up-survey-results.pdf.

• UHG: "Payment processing … approximately 86% of pre-incident levels."

• AMA: 85% reported ongoing disruptions in claim payments.

• UHG: "Other services, including eligibility software and analytical tools, … approximately 80% of Change functionality … restored."

• AMA: 60% still had eligibility-verification problems; 79% still could not receive ERAs. [24] [25]

111.   Plaintiffs reviewed UHG's April 22, 2024, website statements when forecasting cash flow, sequencing mitigation, and deciding whether to migrate to alternate submission and payment channels. Plaintiffs deferred or limited certain additional emergency measures which contributed to ongoing cash-flow harm when processing was not restored.

**E.     Optum/Change Healthcare Temporary Funding Assistance Program (TFAP) as Applied to Plaintiff**

**1.     TFAP Program Promises**

**a.     "No Costs" Representations**

112.   On March 1, 2024, Optum launched a Temporary Funding Assistance

---

[24] *UHG Updates on Change Healthcare Cyberattack* (Apr. 22, 2024), https://www.unitedhealthgroup.com/newsroom/2024/2024-04-22-uhg-updates-on-change-healthcare-cyberattack.html

[25] Am. Med. Ass'n, Change Healthcare Cyberattack Impact: Key Takeaways from Informal AMA Follow-Up Survey (Apr. 29, 2024), https://www.ama-assn.org/system/files/change-healthcare-follow-up-survey-results.pdf.

Program ("TFAP"). TFAP is not a grant. It is a short-term, advance handed out at Optum's sole discretion which was marketed to "help bridge the gap in short-term cash flow." Providers were told there would be "no fees, interest or other associated costs with the assistance." [26]

113.   According to Optum's "Temporary Funding Assistance Program Overview," Optum promoted the TFAP through "Social Media Awareness Campaigns" which at least consisted of an "Optum Webinar Announcement," "UHC Webinar Announcement," and an "Email: UHC Funds available, not accepted." Each of these materials described TFAP's "financial relief at no cost" statement.[27]

114.   Optum explicitly urged adoption of their TFAP. Optum stated that TFAP is the fastest and most efficient way to address financial needs. "We strongly recommend providers implement the workaround solutions we have brought forward to restore services.  The funding assistance program now extends

---

[26] Press Release, UHG, *UnitedHealth Group Update on Change Healthcare Cyberattack* (Mar. 7, 2024) https://www.unitedhealthgroup.com/newsroom/2024/2024-03-07-uhg-update-change-healthcare-cyberattack.html

[27] (Cory Gundberg, COO, *Temporary Funding Assistance Program Overview* 2–4 (Optum Fin. Servs. 2024), [PDF]), https://naspnet.org/wp-content/uploads/2024/03/UHG_HHS-Roundtable-with-Providers-on-Temporary-Funding-Assistance.pdf.

the repayment period to 45 business days to provide even greater flexibility."[28]

"We urge all payers to do the same [register for the TFAP] as this is the fastest, most efficient way to address provider short-term cash flow needs."[29]

**b.      Plaintiff Path MD Enrollment and Reliance**

115.   Plaintiff Path MD relied on Defendant's assurances regarding TFAP's no-cost terms, funding methodology, and promised efficiency when choosing to apply and participate in the program. Upon Optum's approval of Plaintiff's application, Plaintiff Path MD enrolled in TFAP.

116.   Plaintiff Path MD accepted advances from Optum from March to May 2024, totaling approximately $49,400, in reliance on Defendant's assurances regarding no-cost terms, funding methodology, and promised efficiency representations.

117.   During the disruption period, Plaintiff Path MD's payroll and operating costs alone substantially exceeded this $49,400 amount, and the TFAP

---

[28] *Optum*, *Temporary Funding Assistance Program for providers* (Apr. 10, 2024), https://www.optum.com/en/business/providers/health-systems/payments-lending-solutions/optum-pay/temporary-funding.html

[29] Press Release, UHG, *UnitedHealth Group Update on Change Healthcare Cyberattack* (Mar. 7, 2024) https://www.unitedhealthgroup.com/newsroom/2024/2024-03-07-uhg-update-change-healthcare-cyberattack.html

advance Plaintiff Path MD received did not cover the cash-flow shortfall Plaintiff Path MD faced.

### c. Optum's Repayment Communications to Path MD

118. On August 13, 2024, approximately two and a half months after Plaintiffs regained account access, Optum, via info@info.optum.com, emailed Path MD regarding repayment of Temporary Funding Assistance Program funds.

119. The email stated that most providers reported their claims payments had returned to normal levels. During the same period, Path MD's claims-payment metrics remained below its pre-disruption baseline.

120. The email included a link to a form requiring the recipient, if not ready to begin repayment, to state that position, provide reasons, and supply additional details to avoid invoicing at that time.

121. On August 13, 2024, Path MD submitted the form indicating it was not ready to begin repayment, and provided the requested information on as required by Optum.

122. To date, Optum has recouped $12,657.73 of the $49,400 loan granted under TFAP, leaving Plaintiffs with a balance of $36,742.27.

### 2. Program's Costs, Risks, Burdens, and Contradictions

### a. Application Burdens and Discretionary Funding

123. Optum stated that while funding is at Optum's discretion, it is

Complaint

determined by Optum on a "case-by-case basis" which is "based on the difference between historical weekly claims/payments volume pre-disruption compared to weekly volume post-disruption."[30]

124.   Optum also stated, "For most providers, we only have partial visibility into their pre-disruption weekly claims payments, and therefore, are unable to see the full impact of their needs."[31]

125.   Optum stated TFAP program operated in the "fastest, most efficient way" for providers.

126.   To enroll in the TFAP, providers were required to complete an application and grant permissions for Optum to use provider data for funding determinations.[32]

127.   Optum's TFAP required weekly re-application and acceptance for temporary funding rather than automatic continuation or automatic consideration.

[30] Press Release, UHG, *UnitedHealth Group Update on Change Healthcare Cyberattack* (Mar. 7, 2024) https://www.unitedhealthgroup.com/newsroom/2024/2024-03-07-uhg-update-change-healthcare-cyberattack.html

[31] Press Release, UHG, *UnitedHealth Group Update on Change Healthcare Cyberattack* (Mar. 7, 2024) https://www.unitedhealthgroup.com/newsroom/2024/2024-03-07-uhg-update-change-healthcare-cyberattack.html

[32] Optum, *Temporary Funding Assistance Program for providers* (Apr. 10, 2024), https://www.optum.com/en/business/providers/health-systems/payments-lending-solutions/optum-pay/temporary-funding.html.

"The form must be submitted every 7 days to be considered for additional funding."[33]

### 3.    Actual Program Terms

### a.    Program Language vs. Contracting Counterparty

128.    Optum's Temporary Funding Assistance Program Overview represented that, on March 1, Optum launched a program to bridge short-term cash-flow needs for providers affected by the "Change Healthcare" disruption, and that UnitedHealthcare expanded the program. The overview did not identify "Change Healthcare Operations, LLC" as a contractor or an actor for the program.[34] The March 20, 2024, TFAP agreement names "Change Healthcare Operations, LLC" as the contracting counterparty and issuer of the temporary funding.[35]

---

[33] Optum, *Temporary Funding Assistance Program for providers* (Apr. 10, 2024), https://www.optum.com/en/business/providers/health-systems/payments-lending-solutions/optum-pay/temporary-funding.html

[34] (Cory Gundberg, COO, *Temporary Funding Assistance Program Overview* 2–4 (Optum Fin. Servs. 2024), [PDF]), https://naspnet.org/wp-content/uploads/2024/03/UHG_HHS-Roundtable-with-Providers-on-Temporary-Funding-Assistance.pdf.

[35] Optum/Change Healthcare '*Temporary Funding Assistance Program Agreement*' last updated March 20, 2024, publicly available at https://optumpaystatic.z19.web.core.windows.net/Provider_Funding_Agreement_v9.pdf (last visited Sept. 17, 2025).

Complaint

129.   Plaintiffs are informed and believe that Defendant issued a March 20, 2024 Temporary Funding Assistance Program agreement naming Change Healthcare Operations, LLC as the contracting entity, while the agreement: (i) authorizes CHC to share providers' claims-payment data with Optum and affiliates; (ii) requires disbursement through providers' Optum Pay accounts; (iii) directs notices to CHC, c/o Optum Financial, Inc., at an Optum address; and (iv) selects Minnesota law and venue. The documents present CHC as the counterparty while routing disbursement and administration through Optum Pay and Optum Financial.

130.   For clarity and consistency, references to Optum in the following section include actions performed through Change Healthcare Operations, LLC (CHC) and Optum Financial, Inc., as reflected in the TFAP Agreement. The Agreement defines "We" and "Us" to mean "Change Healthcare Operations, LLC its parents, affiliates, successors and assigns." If Optum, Inc. qualifies as a parent or affiliate of CHC, then Optum falls within that defined term.

**b.      Terms Imposing Financial Risk and Relinquishment of Rights**

131.   Plaintiffs are informed and believe that Optum's Temporary Funding Assistance Program terms reserve broad control over eligibility, amounts, timing, and repayment, with no guaranteed relief. The terms authorize mechanisms that can disrupt provider cash flow and operations, causing harm. They confer material

Complaint

benefits on Optum while limiting providers' recourse, and they bear on enforcement burdens and procedure, including venue and remedies. The following allegations plead these provisions as facts and explain their materiality to Plaintiffs' claims. References to the TFAP Agreement means the Optum/Change Healthcare '*Temporary Funding Assistance Program Agreement*' last updated March 20, 2024, publicly available at https://optumpaystatic.z19.web.core.windows.net/Provider_Funding_Agreement_v 9.pdf (last visited Sept. 17, 2025).

132. Optum's TFAP Agreement reserves unilateral discretion to set and change eligibility and funding criteria and states that enrollment does not guarantee funding. This eliminates any enforceable entitlement to TFAP funds and allows Optum to deny or vary funding.

133. Optum's TFAP Agreement permits Optum to require documentation, to decide in its sole discretion whether it is acceptable, and to deem a provider ineligible if the showing is insufficient. This centralizes gatekeeping with Optum and enables denial based on undefined standards.

134. Optum's TFAP Agreement authorizes Optum and affiliates to access prior and future claims-payment data for program services and includes a release of liability tied to that sharing. This transfers valuable data rights and waives claims related to that sharing in exchange for a discretionary advance.

135. Optum's TFAP Agreement provides that the Funding Amount is set in Optum's sole discretion, may be accepted only in full as displayed in the TFAP portal, and is incorporated into the Agreement upon acceptance. This prevents negotiation or partial draws and binds providers to Optum's number.

136. Optum's TFAP Agreement states that amounts received are for business purposes only, that CHC has no obligation to confirm or ensure business use, that any personal or household use does not affect CHC's right to repayment, and that CHC may invoke any legally available remedy even if that remedy would not have been available had the funds been provided to a consumer for consumer or personal purposes.

137. Optum's TFAP Agreement requires full repayment within forty-five business days after Optum sends notice that funding is due, and Optum sends that notice after it determines claims or payment processing has resumed for disruption-period payments. This keys the repayment trigger to Optum's determination rather than the provider's recovery or reconciliation pace.

138. Optum's TFAP Agreement permits CHC to demand immediate repayment, to offset the amount due against claims or claim payments processed or owed through CHC, Optum, or their parent companies, affiliates, or subsidiaries, and to report any unpaid amount as taxable income if repayment is not made by the due date. The Agreement permits both tax reporting of unpaid balances and

continued collection of those balances, and it does not state that one remedy waives the other.

139. Optum's TFAP Agreement subjects payments to UCC Article 4A and authorizes Optum to debit the provider's bank account to correct an administrative error, allows reliance on routing or account numbers even if they identify a different account, and treats payments as provisional until final settlement. This enables reversals and debits that undermine cash predictability and increase operational risk.

140. Optum's TFAP Agreement conditions participation on continuing representations through full repayment, including solvency, no contemplated bankruptcy, legal compliance, no conflicts with other agreements, valid existence and good standing, and proper authority. This shifts ongoing compliance and solvency risk to providers during the disruption.

141. Optum's TFAP Agreement allows Optum to give notices by email, while provider notices must be sent by registered or certified mail to a designated P.O. Box, and other methods are effective only upon actual receipt. This imposes procedural hurdles on providers seeking to object or give notice.

142. Optum's TFAP Agreement selects Minnesota law and states that jurisdiction and venue are proper in Minnesota. This increases litigation burden for non-Minnesota providers.

Complaint

143. Optum's TFAP Agreement bars providers from assigning rights or obligations and permits Optum and affiliates to assign without restriction. This limits provider flexibility while preserving Optum's.

144. Optum's TFAP Agreement contains an integration clause stating it is the complete agreement on this subject and supersedes prior agreements or understandings. This renders outside assurances nonbinding and confirms that the operative terms are discretionary and Optum-controlled.

145. Optum, acting through CHC and Optum Financial, reserved discretion to change TFAP eligibility criteria, funding criteria, and how those criteria are applied.

**4.      Unilateral Modifications After Enrollment (March 7, 2024)**

146. By March 7, 2024, Optum revised TFAP terms: tied repayment to an Optum-controlled invoice with a 45-business-day window and acknowledged that earlier versions included account-debit authority, arbitration, indemnification, limitation of liability, and a unilateral-change clause, which Optum then removed. While promoting TFAP as relief for financially distressed providers and publicly committing to support them, Optum shifted terms after assent and exercised opportunistic control over invoice timing. Optum benefited from this arrangement by retaining payment-timing control that foreseeably hindered providers' ability to

secure and perform future work.[36]

## 5. Government Warnings That Terms Were "Onerous"

147.   In an April 25, 2024 letter, a bipartisan coalition of twenty-one state Attorneys General and the Attorney General for the District of Columbia warned that "[o]btaining financial assistance should not require an affected entity to agree to choice of law, choice of venue, statute of limitations, or other onerous terms," and urged "longer pay back periods" and repayment by offsets. The letter reported "increasingly dire messages" from providers, stated some facilities were "in jeopardy of collapse," noted that only a "limited subset" had "successfully navigated … financial help systems," called aid "paltry," and raised concern that "practices owned by United may be getting more immediate relief."[37]

148.   The Senate described Optum's loan recoupment tactics as "abusive."[38]

---

[36] *See Press Release, UHG, UnitedHealth Group Update on Change Healthcare Cyberattack* (Mar. 7, 2024), https://www.unitedhealthgroup.com/newsroom/2024/2024-03-07-uhg-update-change-healthcare-cyberattack.html.

[37] *Letter from State Att'ys Gen. to Andrew Witty, Chief Exec. Officer, UHG,* Re: Change Healthcare Disruptions 2–4 (Apr. 25, 2024), https://oag.ca.gov/system/files/attachments/press-docs/4.25.24%20Letter%20to%20UnitedHealth%20Group%20CEO%20Andrew%20Witty%20re%20Change%20Healthcare%20Disruptions%5B1%5D.pdf.

[38] See Press Release, Ranking Member Ron Wyden, S. Comm. on Fin., *Wyden and Warren Press UnitedHealth for Answers on Abusive Tactics to Recoup Loans to*

- 53 -
Complaint

149. By April 25, 2024, Optum and UHG were on notice that TFAP terms were deemed improper by the government; any continued "no-cost," "optional," or "provider-friendly" messaging and contracting. Optum and UHG were on notice that public officials warned the program could coerce reasonable providers.

**F. Direct Communications Between Plaintiffs and Defendant Concerning Optum Account Access and Temporary Funding Assistance from March 26, 2024, to August 13, 2024**

150. Optum published present-tense statements portraying its technical and customer support channels as capable of prompt issue resolution and maintained active support lines and ticketing during the "Change Healthcare" disruption. Plaintiffs engaged these support channels expecting prompt issue resolution. Throughout the communications below, from March 26, 2024, to August 13, 2024, the Accounts Receivable Supervisor sent emails from the Path MD domain using a Path MD signature block and communicated on behalf of both Path MD and SUP. Each paragraph identifies which account the message concerns, where the

*Doctors After Mass Cyberattack* (Aug. 28, 2025), https://www.finance.senate.gov/ranking-members-news/wyden-and-warren-press-unitedhealth-for-answers-on-abusive-tactics-to-recoup-loans-to-doctors-after-mass-cyberattack (reporting "abusive tactics" and provider comparisons to "predatory 'loan shark' tactics"); *Letter from Elizabeth Warren & Ron Wyden to Stephen J. Hemsley & Dhivya Suryadevara* 2 (Aug. 27, 2025), https://www.finance.senate.gov/download/wyden-warren-letter-to-uhg-and-optumpdf.

document does so. On Plaintiffs' side, all outbound communications were sent from billing@pathmdlabs.com or made by phone as reflected in contemporaneous call notes. On the Optum side, inbound communications were from Optum EPS Support (epssupport@optum.com), Optum Resolution Analyst Brian Laakkonen, and Optum Support staff and supervisors identified in the call notes, including Gail, Carol, Karen, Kimberly, Clarisa, Peach, Klein, Angelo, Aki, Jorge, Mike, Jason, and Jenny.

151. March 26, 2024, 8:18 a.m. PT — The Accounts Receivable Supervisor (Path MD domain) emailed Optum EPS Support at epssupport@optum.com with subject "Activation Error." The message reported repeated failed attempts to activate SUP's Optum Pay account, attached screenshots of the error, and requested assistance in completing portal registration. Optum acknowledged receipt and assigned Ref. No. 2409612534154.

152. April 5, 2024, 11:38 a.m. PT — The Accounts Receivable Supervisor (Path MD domain) again emailed epssupport@optum.com regarding the continuing Optum Pay portal activation failure, noting that prior troubleshooting steps had not resolved the error. The email referenced Ref. No. 2409613183883 and attached updated screenshots.

153. April 5, 2024 (time not recorded) — The Accounts Receivable Supervisor (for Path MD and SUP) called Optum Support, spoke with an agent

identified as "Gail," and was asked to resend screenshots of the activation error to epssupport@optum.com. The call was logged under Ref. No. 2409613183883.

154. April 12, 2024 (time not recorded) — The Accounts Receivable Supervisor (for Path MD and SUP) called Optum Support and spoke with "Carol," who advised that the portal access issue had been fixed. After the Supervisor confirmed the error persisted, the call was escalated to "Karen," who associated the issue with Ticket/Case No. INC36639984 and instructed that screenshots again be attached to the support file.

155. April 17, 2024 (time not recorded) — The Accounts Receivable Supervisor (for Path MD and SUP) called Optum Support, spoke with "Kimberly," who confirmed that Ticket/Case No. INC36639984 remained unresolved, and was told to follow up again on or after April 25, 2024.

156. April 30, 2024 (time not recorded) — The Accounts Receivable Supervisor (for Path MD and SUP) called Optum Support, spoke with "Clarisa," and requested to be escalated to a supervisor, "Peach." The Supervisor was told that Ref. No. 2412110223397 had been logged, and that the access failure remained under investigation tied to Ticket/Case No. INC36639984.

157. May 3, 2024 (time not recorded) — The Accounts Receivable Supervisor (for Path MD and SUP_ called Optum Support, first speaking with "Klein" and then requested to talk to supervisor "Angelo." Angelo referenced Ref.

- 56 -
Complaint

No. 2412417383883 and created New Ticket/Case No. 2412910284687. He advised that Optum would attempt to "unregister" the account and then re-add it to resolve the activation error.

158. May 3, 2024, 3:46 p.m. PT — The Accounts Receivable Supervisor (Path MD domain) emailed epssupport@optum.com with subject "Optum Pay Account Activation Error," again describing SUP's inability to complete portal activation at the Terms and Conditions step, listing multiple unresolved reference numbers (including INC36639984), and attaching documentation of the repeated failures.

159. May 8, 2024 (time not recorded) — The Accounts Receivable Supervisor (for PATH MD and SUP) called Optum Support about Ticket No. 2412910284687. She first spoke with "Aki," escalated to supervisor "Jorge," and then to "Mike," a manager. Mike logged Ref. No. 2412910443902 and stated that the portal activation problem was affecting multiple providers, with a target resolution date of May 16, 2024.

160. May 13, 2024, 10:40 a.m. PT — The Accounts Receivable Supervisor emailed epssupport@optum.com with subject "Optum Pay – Online Portal Activation – ERROR." She explained that SUP continued to face an "Account Activation Error" despite multiple attempts, referenced prior ticket and reference numbers, and stated that SUP needed portal access in order to apply for Optum's

- 57 -
Complaint

Temporary Funding Assistance Program.  The Account Supervisor also stated, "This is putting our business in a huge financial burden, we need someone to resolve this issue asap."

161.   May 16, 2024 (time not recorded), the Accounts Receivable Supervisor (for Path MD and Optum) called Optum Support, spoke with "Jason," then supervisor "Jenny," and reported that the activation error persisted. Jenny referenced Ref. No. 2413717132606 and noted per Jason that the issue was not resolved on May 15, 2024, and the issue remained unresolved under Ticket No. 2412910284687.

162.   May 20, 2024, 9:11 a.m. — Optum's PPR Resolution Analyst emailed Plaintiff's Accounts Receivable Supervisor, subject "Optum Pay Access – SPECIALIZED UNIVERSITY PATHOLOGISTS," acknowledging issues registering for the Optum Pay account and initiating assistance.

163.   May 20, 2024, 2:30 p.m. PT — The Accounts Receivable Supervisor (PATH MD domain) emailed Optum Resolution Analyst Brian Laakkonen, stating that despite Optum's confirmation of backend changes and a new registration path, SUP continued to experience the same activation error.

164.   May 22, 2024, 12:09 p.m. PT — The Accounts Receivable Supervisor emailed Optum Resolution Analyst Brian Laakkonen, asking whether a shared

"Security Key" username on an already-active Path MD Optum Pay account might be preventing SUP from completing its own portal registration.

165. May 23, 2024, 7:06 a.m. — The Optum Resolution Analyst replied in the thread that the shared username should not matter because it is tied to a different email address, stated that Optum's tech team had made backend changes and the account could now be registered, and said he had resent the registration email. He further wrote: "Please let me know if you're able to login now."

166. May 23, 2024, 7:06 a.m. PT —Following backend changes Optum reported its tech team had made and advising that the new registration path for SUP should work, the Accounts Receivable Supervisor attempted to register SUP's account using the new activation link.

167. May 24, 2024, 10:26 a.m. PT — The Accounts Receivable Supervisor emailed Mr. Laakkonen again regarding SUP, reporting that despite trying the most recent registration link that morning, SUP continued to receive the same error message. She stated that, "We are in desperate need to get this account active so we can apply for temporary funding for this provider as we are facing financial hardship due to the cyberattack."

168. May 24, 2024, 8:33a.m. (header time; sender time zone, not PT) — The Optum Resolution Analyst replied in the thread, writing: "Thank you for the follow up. I agree, don't understand why this is so hard to fix. I will re-engage with

our tech team, and follow up when I can." The message listed attachments image001.png, image002.png, and image004.png.

169.   May 28, 2024 (time not recorded) — The Accounts Receivable Supervisor (for Path MD and SUP) documented that SUP was finally able to activate its Optum Pay account and gain access to the portal.

170.   August 13, 2024, 2:48 p.m. PT — The Accounts Receivable Supervisor completed and submitted Optum's Temporary Funding Assistance Program repayment form via the link embedded in Optum's August 13 notice.

171.   On the August 13, 2024, form, the Supervisor indicated that SUP was not ready to begin repayment, provided explanatory information, and submitted the response through the Optum system. (See also Complaint ¶121.)

**E.     Optum Acquisitions and Government Records**

172.   Public records reflect that Optum completed acquisitions of provider groups during and after the February 2024 Change Healthcare cyber incident.

173.   On March 13, 2024, the Oregon Health Authority approved an emergency transaction allowing Optum Oregon to acquire The Corvallis Clinic to avoid an interruption of patient care.

174.   In August 2025, Optum acquired Holston Medical Group.

175.   UHG's CEO noted that Optum was considering acquisition of Stewardship Health, a physician group and subsidiary of Steward Health. UHG's

CEO characterized Steward Health as an "already strained hospital system."[39]

176.   According to Becker's ASC Review summarizing the Center for Health & Democracy's Sunlight Report (funded by Arnold Ventures), as of late 2024 UnitedHealth Group, through Optum, controlled numerous healthcare entities, including: (a) 423 ambulatory surgery centers (ASCs), (b) more than 880 home health companies, and (c) 335 administrative or support subsidiaries.[40]

177.   The U.S. Senate Committee on Finance's "Responses to Questions for the Record" following its hearing "Hacking America's Health Care: Assessing the Change Healthcare Cyber Attack and What's Next" includes the following statement by Senator Ron Wyden addressed UHG's CEO: "Mr. Witty, United is already the largest employer of physicians in the country, and by all accounts United is continuing to buy physician practices. I am hearing a number of reports from providers that United has taken advantage of the crisis that the Change hack created to justify its purchases and acquire physician practices at a lower cost. As

---

[39] *See U.S. Senate, Comm. on Finance, Responses to Questions for the Record for Andrew Witty*, Chief Executive Officer, UHG, Hearing on Hacking America's Health Care: Assessing the Change Healthcare Cyber Attack and What's Next, 118th Cong. 22-23 (Posted June 10, 2024), https://www.finance.senate.gov/imo/media/doc/responses_for_questions_for_the_record_to_andrew_witty.pdf.

[40] *See Becker's ASC Review, Optum's Quiet Physician Empire in 24 Numbers (July 2, 2025)*, https://www.beckersasc.com/asc-news/optum-s-quiet-physician-empire-in-24-numbers.html.

one example, Optum acquired the Corvallis Clinic in Oregon in a fire sale, in part, driven by the group's inability to meet its obligations because of the breach related cash flow interruptions."[41]

**F.     Plaintiffs' Operational and Financial Impacts**

**1.     Lost Cash Flow**

**a.     Encounter Volumes and Associated Claims (AdvancedMD), December 2023 to June 2025**

178.   Plaintiffs attach as Exhibit 2 a chart and table generated from AdvancedMD reports reflecting monthly encounter volumes for Path MD and SUP from December 2023 through June 2025. In AdvancedMD, a patient encounter records a unit of care tied to diagnostic testing, professional interpretation, or related laboratory services. Based on information and belief, AdvancedMD patient encounter counts reflect the number of billable services and associated claims that would ordinarily be reimbursed through Optum Pay.

179.   The AdvancedMD patient encounters were as follows:

| Month | PATH MD Encounters | SUP Encounters |
|---|---|---|
| 23-Dec | 4,399 | 1,902 |

---

[41] *See U.S. Senate, Comm. on Finance, Responses to Questions for the Record for Andrew Witty*, Chief Executive Officer, UHG, Hearing on Hacking America's Health Care: Assessing the Change Healthcare Cyber Attack and What's Next, 118th Cong. 22 (Posted June 10, 2024), https://www.finance.senate.gov/imo/media/doc/responses_for_questions_for_the_record_to_andrew_witty.pdf.

| | | |
|---|---:|---:|
| 24-Jan | 3,845 | 2,499 |
| 24-Feb | 3,437 | 2,501 |
| 24-Mar | 2,438 | 2,133 |
| 24-Apr | 1,666 | 2,214 |
| 24-May | 1,372 | 1,092 |
| 24-Jun | 365 | 712 |
| 24-Jul | 0 | 599 |
| 24-Aug | 748 | 317 |
| 24-Sep | 42 | 1,092 |
| 24-Oct | 407 | 286 |
| 24-Nov | 1,413 | 1,210 |
| 24-Dec | 1,434 | 1,345 |
| 25-Jan | 2,621 | 2,231 |
| 25-Feb | 1,869 | 1,490 |
| 25-Mar | 1,310 | 1,111 |
| 25-Apr | 504 | 223 |
| 25-May | 628 | 321 |
| 25-Jun | 993 | 533 |

*See* Ex. 2.

180.  Path MD recorded 4,399 encounters in December 2023 and 3,845 in January 2024. By May 2024, Path MD's monthly encounters had dropped to 1,372. By July 2024,  Path MD's total encounters plummeted to less than 5% of the original volume due to the letting go of staff and well as the decrease in infrastructure resources and clients, as Path MD could no longer provide the necessary services.  Ex. 2.

181.  SUP recorded 1,902 encounters in December 2023 and 2,499 in

January 2024, peaking at 2,501 in February 2024. By May 2024, SUP's monthly encounters had declined to 1,092 and fell to 599 in July 2024. Ex. 2.

182.  By December 2024, Path MD's encounters were approximately 67 percent below its December 2023 baseline, and SUP's encounters were approximately 29 percent below the same baseline. Ex. 2.

183.  In April 2025, Path MD recorded 504 encounters and SUP recorded 223 encounters. For SUP, April 2025 reflects a decline of approximately 88 percent from the December 2023 baseline and approximately 91 percent from the February 2024 peak. Ex. 2.

**b.  Withheld Deposits**

184.  Payers routed claim payments through Change Healthcare/Optum for Plaintiffs' accounts, but deposits did not post to Plaintiffs' bank accounts until later dates.

185.  Remittance notices and 835/ERA files state the amounts due and the scheduled funding dates; corresponding bank statements show later posting dates.

186.  The principal amounts and due dates are ascertainable from the remittance notices, 835/ERA files, and bank records identified in the exhibits.

**2.  Revenue Loss (income/net income drop)**

187.  Plaintiffs attach as Exhibit 3 a chart reflecting approximate annual total income and net income for Path MD and SUP from 2019 through 2024,

Complaint

drawn from Plaintiffs' financial records. The table in Exhibit 3 is reflected below:

| Year | PATH MD Total Income | PATH MD Net Income | SUPP Total Income | SUP Net Income |
|---|---|---|---|---|
| 2019 | $8,062,111.82 | -$1,421,683.40 | $2,343,607.93 | $117,841.35 |
| 2020 | $7,336,635.24 | -$226,249.59 | $2,201,535.35 | $51,607.28 |
| 2021 | $28,395,804.31 | $1,301,304.98 | $4,558,700.58 | $3,021,159.58 |
| 2022 | $42,569,846.60 | $2,871,357.59 | $6,049,644.60 | $2,297,293.31 |
| 2023 | $18,184,341.16 | -$1,331,065.79 | $6,957,692.98 | -$338,939.94 |
| 2024 | $8,688,622.00 | -$3,447,585.00 | $3,224,328.00 | -$209,186.00 |

188. Plaintiffs' 2024 financial results reflect significant decreases compared to prior years. Path MD's total income for 2024 was approximately $8,688,622, with a net loss of $3,447,585. SUPP's total income for 2024 was approximately $3,224,328, with a net loss of $209,186.

189. In comparison, Path MD's 2023 total income was $18,184,341.16, with a net loss of $1,331,065.79. SUPP's 2023 total income was $6,957,692.98, with a net loss of $338,939.94.

190. The 2024 figures reflect a year-over-year reduction in total income of more than 50 percent for Path MD and more than 50 percent for SUP, accompanied by deepening net losses for both entities.

a. **Reduction in Test Offerings**

191. In April 2024, Plaintiffs were forced to reduce their laboratory test offerings to cut overhead in response to the financial impact of the Change Healthcare cyberattack.

Complaint

192. Internal records show that in 2023, these test lines generated the following revenues: (i) cytology-GYN testing, $66,444; (ii) HSV testing, $8,983; (iii) molecular/HPV testing, $226,973; and (iv) BV/CV panel testing, $149,154. Collectively, these services generated $451,554 in 2023.

193. Between January and April 2024, before services were curtailed, these same test lines produced a combined $128,889 in revenue.

194. The April 2024 elimination of these test offerings resulted in the loss of approximately $322,664 in annualized revenue compared to the 2023 baseline.

**3. Workforce Reductions, Furloughs, and Layoffs**

**a. Planning and Payroll Impact**

195. On April 15, 2024, Path MD's Human Resources Manager reported that ADP had reviewed and approved the proposed reduction in force and confirmed, "I can proceed once I receive confirmation from you."

196. On April 29–30, 2024, internal communications documented payroll reductions and workforce cuts attributed to the February 2024 Change Healthcare cyberattack. Management confirmed that the "financial constraints from the Change Healthcare Cyber Attack" required layoffs, furloughs, and reduced hours, and discussed WARN Act compliance and PTO payout obligations with ADP.

**b. Employee Notice**

197. On May 1, 2024, Plaintiffs issued a written notice to employees

Complaint

explaining that the "February 2024 cyberattack on Change Healthcare" had "crippled" operations by preventing the receipt of compensation for past services and ongoing financial responsibilities. The notice further stated, "Change Healthcare, a subsidiary of United Healthcare, had to disconnect their systems to prevent further attacks and protect their partners and clients," which in turn disrupted Plaintiffs' ability to process insurance claims. Citing limited revenue and borrowing capacity, the notice advised employees that effective May 6, 2024, the Company was required to reduce hours, furlough staff, and implement other cost-reduction measures. The notice explained that affected employees would be eligible for partial unemployment benefits and that benefits and PTO accrual would remain in effect during the reduced-hours period. A true and correct copy of this notice is attached as Exhibit 4.

**c.      Furloughs and Hour Reductions**

198.   HR records dated April 29, 2024, document furloughs and reductions in scheduled hours. The records reflect:

• Furloughs: one clinical lab scientist, one consults coordinator, and two intake associates, with accrued PTO to be paid during furlough.

• Reductions in scheduled hours: two physician assistants reduced to one day per week; histology tissue technicians and molecular lab technicians reduced to 20 hours; one clinical lab scientist, one cytology/molecular supervisor, one cytology

prep technician, and one molecular lab technician lead reduced to 24 hours; and one client service supervisor reduced to 30 hours. In total, at least 14 employees had reduced schedules.

**d.     Layoffs**

199.   Since February 21, 2024, HR records identify 57 separations categorized as "Lay Off" and 22 separations categorized as "Resignation." These counts exclude entries labeled "Job Abandonment," "Unsatisfactory Attendance," "End Temp Assignment," and "Unsatisfactory Performance."

200.   HR records show that terminations were not evenly distributed but occurred in concentrated waves. On April 25, 2024, at least fifteen employees were terminated on a single day, followed by additional separations on April 26 and April 30. On May 3, 2024, at least eight employees were terminated on the same date. The largest single-day concentration occurred on February 7, 2025, when at least fifteen employees were terminated at once. These clustered dates reflect the principal waves of layoffs during the period.

201.   HR records identify layoffs across all major departments. Terminated positions included: frontline laboratory staff (histotechnicians, clinical lab scientists, molecular lab technicians, intake associates, phlebotomists and phlebotomy leads, cytology prep technicians, cytotechnologist, grossing lab assistants, pre-analytical specialists); billing and administrative staff (billing and

coding personnel, medical billers/collectors, demographic and charge-entry staff, billing specialists, accounts receivable specialists); client services staff (medical assistants, client service representatives, call center representatives, client service supervisors); sales staff (business development directors and managers, senior business development manager, account relationship staff, epidermal nerve fiber density specialist, account development manager); and leadership roles (histology supervisor, cytology/molecular supervisor, comprehensive urology lead laboratory technician, lab operations manager, operations manager, and a CEO).

202. On June 11, 2024, approximately a month after regaining account access, Plaintiffs' management requested and received a full roster of employees laid off as a result of the "Optum/Change Healthcare fiasco." The roster confirmed that reductions encompassed multiple departments, including sales, phlebotomy, billing, intake, histology, and molecular lab staff.

**e. Leadership Resignation**

203. On June 6, 2025, Path MD's then-chief executive officer submitted a written resignation letter stating: "Considering our current state of business and challenging financial parameters we have discussed, I feel it is best to tender my resignation." The resignation was effective July 1, 2025, with payroll, PTO payout, and benefits termination processed by HR. The resignation occurred during the same period as Plaintiffs' 2024–2025 layoffs and workforce reductions.

Complaint

**f.      References to Change Healthcare in Workforce Cuts**

204.    In multiple contemporaneous communications, Plaintiffs described the February 2024 disruption as caused by "Change Healthcare." Plaintiffs' May 1, 2024, written notice to employees attributed the cyberattack and response to "Change Healthcare." Ex. 4.

205.    On April 18, 2024, Plaintiffs issued a written notice to skilled nursing clients advising that the Change Healthcare cyberattack had "crippled" Path MD's business by preventing receipt of compensation for past services and ongoing responsibilities. That notice invoked force majeure under Section 11.14 of the agreements and concurrently terminated those agreements. Ex. 5.

206.    Other payroll and HR communications during April 2024 likewise identified the disruption as the "Change Healthcare cyberattack" when explaining the need for workforce reductions and reduced hours.

207.    Plaintiffs understood during the account-lockout period that the disruption was attributable to Change Healthcare, in whole or in part, rather than solely to Optum.

**4.      Contractual Terminations (Labcorp, Skilled Nursing Facilities)**

**a.      Labcorp Pathology Services Agreement**

208.    In March 2024, SUP finalized a Pathology Services partnership agreement with Laboratory Corporation of America Holdings ("Labcorp"). The

- 70 -
Complaint

agreement required SUP to provide professional pathology services for Labcorp laboratories in California, with Labcorp holding exclusive billing rights.

209. The agreement provided for a one-year term, subject to automatic renewal, but allowed termination upon sixty days' notice or immediately for material breach, including failure to provide services for three or more consecutive months.

210. Following the February 2024 cyberattack and associated billing and cash flow collapse, SUP was unable to maintain operations necessary to perform its obligations. As a result, the terms of the agreement could not reasonably be fulfilled, and SUP lost associated client accounts, including its Texas and Florida nursing home relationships.

**b.      Skilled Nursing Facilities Contracts**

211. Between November 2022 and March 2024, Plaintiffs entered into a series of Laboratory Services Agreements with skilled nursing facilities (SNFs) in Texas. These included, but were not limited to: (i) a November 8, 2022 agreement with Creative Solutions in Healthcare covering multiple facilities; (ii) a February 6, 2023 agreement with Bertram Nursing & Rehabilitation; (iii) a May 22, 2023 agreement with Lakeview Nursing & Rehabilitation; (iv) a December 14, 2023 agreement with Bender Terrace Nursing & Rehabilitation in Lubbock; (v) a contract with Pampa Nursing Center; and (vi) a March 18, 2024 agreement with

Complaint

Gulf Coast Partners, Inc., covering facilities including Mi Casita Nursing & Rehabilitation and Lakeridge Nursing & Rehabilitation.

212. By March 2024, Plaintiffs were servicing approximately 40 SNFs, with plans to expand to 50 by June 2024. Internal records reflect that PCR testing alone for these facilities generated more than $3 million in 2023, alongside "Clinical Part A" revenues (tests purchased directly by facilities) and "Clinical Part B" revenues (claims billed directly to payors). Plaintiffs' 2024 forecast projected approximately $5,748,458.00 in revenue from this line of business, compared to the 2023 baseline of $3,140,816. Through April 2024, SNF-related revenues totaled approximately $932,460.00.

213. On April 18, 2024, Path MD issued a written notice to its SNF clients. The notice stated that the February 2024 Change Healthcare cyberattack had "crippled" operations by preventing receipt of compensation for past services and ongoing responsibilities. It invoked Section 11.14 of the agreements, designating the cyberattack as a Force Majeure Event, and advised that Path MD would be unable to continue performing laboratory services effective April 24, 2024. Ex. 5.

214. The same notice provided concurrent termination of the agreements pursuant to Section 3.4 of the agreement, explaining that Path MD did not believe its business could recover. Ex. 5.

215. As a result, all of Plaintiffs' Texas SNF contracts were terminated as

- 72 -
Complaint

of April 24, 2024, resulting in the loss of approximately $4.8 million in projected 2024 revenues. From April 2024 to January 20, 2026, the Plaintiffs have loaned PathMD $900,000 each, totaling $1,800,000. Plaintiffs will likely need to loan another $200,000 in the month of February 2026 to keep the business afloat. This is in addition to what the other related entities contributed. Further, Plaintiffs' two owners each personally advanced $1,475,000 to Plaintiffs between April 2024 and the date of filing this Complaint to keep the entities in business, totaling $2,950,000, as reflected in their records. In addition, Plaintiffs affiliated entities, Cadence and Telis, contributed a total of $1,397,485 to Plaintiffs between April 2024 and the date of the filing of this Complaint in order to keep the entities in business. In total, Plaintiffs received at least $4,347,485 in advances from April 2024 to the date of filing this Complaint from their owners and affiliates to cover payroll and administrative costs that were necessitated by the revenue collapse following the February 2024 cyberattack.

**4.      Lost Growth and Expansion Opportunities**

216.   Plaintiffs, through accountants, prepared documented internal growth projections for 2024 and 2025 anticipating continued revenue growth tied to expansion in Texas, retention of Florida and nursing home clients, and performance under the Labcorp services agreement.

217.   These business projections were derived accounting historical revenue

Complaint

data, contractual agreements, and expansion plans, and reflected reasonable estimates of expected performance.

218. Following the February 2024 cyberattack, those projections were rendered unattainable. Plaintiffs were forced to shut down the Dallas laboratory, could not perform under the LabCorp agreement, and lost Texas and Florida nursing home accounts. By February 2025, Plaintiffs had also ceased all operations at the Los Angeles laboratory, eliminating the capacity to achieve the growth reflected in their business plans.

a.      **MY DR NOW Account — Halted Expansion**

219.    In mid-January 2024, Plaintiffs launched PCR testing services for the MY DR NOW primary-care group at two locations, with a plan to expand to 42 locations. Internal records reflect PCR revenues of approximately $346,494 across 746 tests from January through April 2024.

220.   Following the February 2024 cyberattack and resulting downsizing, the planned expansion did not occur. Plaintiffs' internal worksheet for the MY DR NOW account reflected a twelve-month annualized run-rate of approximately $1,409,671 based on February–March activity and a conservative annualized figure of approximately $539,409 using April activity. The worksheet also noted a projected revenue opportunity of approximately $7,048,356 for MY DR NOW associated with expanding from two to 42 locations, according to internal

estimates. The MY DR NOW expansion did not proceed because the Change Healthcare outage eliminated, among other things, deposits and electronic remittance advice, which prevented claim posting, reconciliation, and cash-flow forecasting needed to support additional sites.

### b.      Skilled Nursing Facilities — Halted Expansion

221.   By March 2024, Plaintiffs were servicing approximately 40 SNFs in Texas, with plans to expand to 50 by June 2024. Plaintiffs' 2024 forecast projected approximately $5,748,458 in revenue from this line of business, compared to a 2023 baseline of $3,097430.73.

222. By April 2024, only $1,045,207.41 had been recorded for the SNFs, leaving a projected shortfall of approximately $4,703,250.59 The planned expansion to 50 SF facilities did not occur because Plaintiffs were required to cease servicing all SNFs following Optum's disruption of revenue flows. Ex. 5.

### 5.      Loans and Owner Contributions

### a.      Owner Contributions

223.   To keep Plaintiffs operational during the disruption, Plaintiffs' owners and affiliated entities advanced substantial funds throughout 2024.

224.   Plaintiffs' two owners each personally advanced $1,475,000 to Plaintiffs between April 2024 and the date of filing this Complaint to keep the entities in business, totaling $2,950,000, reflected in record.

Complaint

225. In addition, Plaintiffs affiliated entities, Cadence and Telesis, contributed a total of $1,397,485 to Plaintiffs between April 2024 and the date of filing this Complaint to keep the entities in business, reflected in record.

226. In total, Plaintiffs received at least $4,347,485 in advances from April 2024 to the date of filing this Complaint from their owners and affiliates to cover payroll and administrative costs necessitated by the revenue collapse following the February 2024 cyberattack.

**b.     TFAP (Optum Temporary Funding Assistance Program) Loan**

227. On or about August 13, 2024, Optum contacted Plaintiffs regarding Plaintiffs' repayment of the $49,400 TFAP total advance that Path MD received from Optum via disbursements throughout March to May. Optum issued a TFAP repayment invoice for the full amount dated October 25, 2024, with repayment due within 45 business days.  According to Plaintiffs' "Temporary Funding Repayment Status" Optum account page, which had invoice information, since January 30, 2026, $12,657.73 out of the $49,400 Optum advance to Path MD has been paid, with a balance of $36,742.27 remaining.  Linked as "Terms and Conditions" were the "last updated March 20, 2024" version of the TFAP Agreement.[42]

---

[42] '*Temporary Funding Assistance Program Agreement*' last updated March 20, 2024, publicly available at https://optumpaystatic.z19.web.core.windows.net/Provider_Funding_Agreement_v 9.pdf (last visited Sept. 17, 2025).

**6.    Medicare Advances and Repayment**

228.    In March 2024, both Plaintiffs received accelerated or advance payments from Medicare under the Change Healthcare/Optum Payment Disruption program, by Medicare Administrative Contractors. Path MD received $331,915.67 from Noridian Healthcare Solutions. SUP received $966,777.10 from Novitas Solutions in two advances of $551,087.20 and $415,689.94.

229.    Path MD: Between March and June 2024, Path MD repaid the Noridian advance in full ($331,915.67). Upon full repayment, interest was waived, and as of November 2024 Path MD had no outstanding balance.

230.    SUP: Between April and August 2024, SUP's Medicare advance repayments totaled $677,486.16 across the two Novitas loans, consisting of $92,105.98 in April, $449,801.20 in May, $8,698.10 in June, $17,042.98 in July, and $109,837.90 in August.

231.    As of November 2024, SUP's Novitas's ledger reflected cumulative Second Loan repayments of $145,145.11 posted through November and an outstanding principal on that loan of approximately $270,544.83. The same ledger records interest-accrual entries during this period.

232.    SUP's Texas laboratory ceased operations effective February 28, 2025, as reflected in the CLIA cancellation notice, eliminating SUP's ability to repay the advance through Medicare offsets in that region.

Complaint

233. As of May 16, 2025, SUP's Novitas's ledger showed total repayments across both advances of $772,361.33 and a remaining combined balance entry of $223,172.93. The same ledger reflects an interest remaining balance entry of $(3,521.04), yielding a loan remaining balance figure of $219,651.89. SUP noted three "collections" entries totaling $343.34 on January 16, 2025 ($147.64), March 4, 2025 ($34.76), and May 2, 2025 ($160.94), which are reflected in the ledger totals.

234. On June 17, 2025, SUP's chief executive officer transmitted financial records and related correspondence (including 2024 financial statements, Novitas repayment letters, the ERS submission, and the Texas lab CLIA cancellation notice) to Coast Professional, Inc., the agency handling collection of the Novitas balance. Collection activity on the SUP account remained pending as of that submission

**7. Laboratory Closures (Dallas and Los Angeles)**

**a. Dallas Laboratory Closure**

235. By mid-2025, Plaintiffs had ceased all laboratory operations in both Texas and California, resulting in the loss of their primary testing capacity and most of their business.

236. On March 17, 2025, SUP's medical director submitted a resignation and notice of closure to CMS. CMS issued a CLIA cancellation notice confirming

that the Dallas laboratory's CLIA certification (No. 45D2269921) was cancelled effective February 28, 2025.

237. Cancellation of the CLIA certification formally terminated SUP's authority to perform or bill for laboratory services under federal law, thereby confirming the permanent shutdown of the Dallas facility.

**b.     Los Angeles Laboratory Closure**

238. Path MD operated its principal anatomic pathology and histology laboratory at 8158 Beverly Boulevard and 8201 Beverly Boulevard, Suite 405, Los Angeles, California.

239. Financial records reflect continuing operating losses at the Los Angeles facility throughout 2024 and 2025.

240. On February 7, 2025, Path MD ceased all laboratory operations at 8158 Beverly Boulevard, terminating all remaining staff on that date.

241. All operations at 8201 Beverly Boulevard, Suite 405 ceased on May 30, 2025, with complete closure by June 6, 2025.

242. On May 19, 2025, Path MD's medical director submitted written notice of intent to terminate Path MD's CAP accreditation (CAP #8859615). The notice confirmed that Path MD would end its CAP accreditation and defer to state oversight through the California Department of Public Health. Termination of CAP accreditation ends accreditation-based authorization to perform and bill high-

- 79 -
Complaint

complexity testing under CLIA and is commonly treated by payors and providers as a prerequisite for credentialing and payment.

243. Following closure, Path MD transferred certain services to competitor laboratories to ensure continuity of patient care. Equipment vendors subsequently repossessed assets, and the Beverly Boulevard building was listed for sale.

**c.      Combined Effect**

244. By mid-2025, Plaintiffs had ceased all laboratory operations in both Texas and California, resulting in the loss of their primary testing capacity and most of their business.

**8.      Vendor Collections**

**a.      Sakura Reagent Acquisition Agreement Default, Termination, and Collections**

245. On June 17, 2024, Path MD entered into a Reagent Acquisition Agreement with Sakura Finetek U.S.A., Inc.

246. On April 2, 2025, Sakura issued a written default notice declaring Path MD in breach of the agreement, demanding payment of past-due invoices totaling approximately $100,560.70 and an early-termination amount of approximately $228,989.70. The notice further stated that the agreement was terminated effective immediately and asserted rights to repossess equipment.

247. On May 30, 2025, Path MD transmitted a written notice to Sakura

invoking a hardship and cessation-of-operations provision. Path MD advised that its 8158 Beverly Boulevard facility had ceased operations on February 7, 2025, and that Sakura equipment had been removed on April 23, 2025. Path MD enclosed financial statements for 2024 reflecting insolvency.

248. On June 17, 2025, Sakura's account for Path MD was placed with a third-party collection agency, which issued a written demand for the outstanding balance of $228,989.70 and stated that the account had been transferred for further action. Sakura then filed a lawsuit against PathMD for $228,000, plus fees, interest, and damages and repossessed the equipment.

249. Sakura's records reflected credit memos issued in February 2025 that reduced, but did not eliminate, the asserted balance.

**b.    Cannon Financial Services Lease Cancellation Request**

250. On May 27, 2025, Cannon Financial Services issued invoices to Path MD for copier lease accounts, reflecting outstanding balances of $57,094.18 and $11,207.55. The invoices stated that obligations would continue month-to-month until the equipment was returned.

251. On May 30, 2025, Path MD transmitted a written request to Cannon Financial Services for early termination of those lease accounts. In connection with the request, Path MD's chief executive officer executed sworn affidavits attesting that operations at 8158 Beverly Boulevard ceased on February 7, 2025,

and that operations at 8201 Beverly Boulevard, Suite 405 ceased on May 30, 2025, with complete by June 6, 2025.

252. In support of the request, Path MD also submitted financial records reflecting continuing operating losses in early 2025 and liabilities that exceeded assets. Plaintiffs eventually settled with Cannon and Cannon's equipment was repossessed.

## 9. Additional and Ongoing Impacts

253. Plaintiffs' financial and operational impacts described above are not exhaustive. Plaintiffs continue to compile and analyze records reflecting further losses and damages arising from Defendant's conduct, which will be established through discovery and at trial.

## V. INDIVIDUAL ACTION

254. Plaintiffs' claims do not rest on the breach itself or on generalized allegations of system-wide disruption. Rather, they arise from Defendant's direct communications and provider-facing misconduct. Plaintiffs relied on Defendant's repeated assurances that Optum Pay access had been restored in making staffing, contracting, and operational decisions. As a result, Plaintiffs sustained measurable, business-specific damages, including terminated staff, cancellation of more than forty SNF contracts, suspension of diagnostic test lines, and infusion of personal capital. These elements require individualized proof of communication, reliance,

causation, and damages.

255. Plaintiffs' damages are distinct and traceable. Defendant's direct misrepresentations to Plaintiffs caused severe operational losses unique to their businesses. Consolidation into multidistrict proceedings focused on consumer data exfiltration and broad provider disruptions would obscure these claims, delay adjudication, and prejudice Plaintiffs.[43] The operative facts here occurred in California, where Plaintiffs' facilities, staff, and contracts are located.

256. Defendant have publicly acknowledged that provider harms will be addressed "on a case-by-case basis." In responses filed with the U.S. Senate Committee on Finance, Defendant stated: "To the extent providers have incurred other costs associated with the attack, UHG is committed to reviewing their issues and working to resolve their concerns on a case-by-case basis."[44] This admission confirms that provider impacts and damages are individualized and suitable for adjudication on an individual basis. Plaintiffs therefore allege that this case should proceed independently, so that Defendant's provider-facing misconduct and

---

[43] *See, e.g., In re CVS Caremark Corp. Wage & Hour Litig.,* 684 F. Supp. 2d 1377, 1379 (J.P.M.L. 2010) (declining consolidation where individualized issues overwhelmed common questions of fact).

[44] U.S. Senate Comm. on Finance, Responses to Questions for the Record for Andrew Witty 4–5 (May 1, 2024), https://www.finance.senate.gov/imo/media/doc/responses_for_questions_for_the_record_to_andrew_witty.pdf.

Plaintiffs' individualized damages can be adjudicated on the merits without being obscured in unrelated proceedings.

## VI. CAUSES OF ACTION

257. Plaintiffs incorporate by reference all preceding paragraphs (1-256).

**COUNT 1: Negligent Misrepresentation**

258. Plaintiffs incorporate the preceding allegations by reference. Paragraph citations in this Count are illustrative and not exhaustive; Plaintiffs rely on all factual allegations incorporated by reference.

259. Optum made affirmative statements and omissions regarding restoration timing, program relief, and account status that conveyed to reasonable providers that claims-payment functionality had normalized or imminently would normalize, and that temporary funding would be promptly available on a predictable, objective basis.

260. Particulars include:

(a) platform status updates and direct communications while Plaintiffs remained locked out until May 28, 2024;

(b) an August 13, 2024 email pressing for TFAP repayment while Plaintiffs' receipts and clearing were still materially below baseline; and

(c) program descriptions suggesting a difference-based award methodology

- 84 -
Complaint

despite Optum acknowledging only partial visibility into many providers' data.

261. Categories of misleading statements and omissions:

a. **Attribution/Framing.** Beginning February 21, 2024, Optum's "Solutions Status" and other Optum-branded updates framed the disruption as a "Change Healthcare" incident, implying the issue was external to Optum and downplaying Optum Pay impact. Plaintiffs remained locked out until May 28, 2024 despite messaging suggesting separate, unaffected Optum systems.

b. **"Unaffected" Optum Systems.** Optum stated or implied that Optum, UnitedHealthcare, and UHG systems were operational or unaffected during periods when Plaintiffs could not access Optum Pay.

c. **Restoration Imminent.** Between February 21 and May 28, 2024, Optum represented that Optum Pay access had been restored or would be restored imminently while Plaintiffs remained unable to log in or access receivables.

d. **Incident "Resolved."** On May 7, 2024, Optum publicly marked the incident "resolved" while Plaintiffs lacked access until May 28, 2024. On May 23, 2024, at 7:06 a.m., the Optum Resolution Analyst stated that the account could be registered when it could not.

e. **Omissions Regarding Backup/Continuity**. Optum failed to disclose that no private clearinghouse or alternative EFT/ERA rail would be deployed for

Plaintiffs despite their full dependence on Optum Pay and did not advise migration to competitors even as public guidance suggested doing so.

f. **TFAP Marketing.** Starting March 1, 2024, Optum promoted TFAP as a no-cost, fastest, and most efficient solution to bridge cash-flow needs while reserving unilateral discretion over eligibility and funding amounts, acknowledging only partial visibility into provider data, and imposing a short post-invoice repayment window tied to Optum's determination of processing resumption.

g. **TFAP Contracting Structure.** Optum issued a March 20, 2024 TFAP agreement naming Change Healthcare Operations, LLC as counterparty while routing disbursement and administration through Optum Pay and Optum Financial, authorizing broad data sharing, and selecting Minnesota law and venue.

h. **Onerous Terms Despite "No-Cost" Messaging.** By April 25, 2024, a bipartisan coalition of Attorneys General publicly warned that providers should not be required to accept choice-of-law, venue, shortened limitations, similar onerous terms to obtain assistance and urged longer pay-back periods and offsets. Despite this notice, Optum continued to present TFAP as provider-friendly and at no cost while operating under terms that concentrated discretion and risk with Optum.

- 86 -
Complaint

i. **Adequacy of Support Channels.** Optum published present-tense statements portraying its technical and customer support as capable of prompt resolution. Plaintiffs engaged those channels from March 26 through August 13, 2024, but the issues persisted for months despite repeated tickets and escalations.

j. **TFAP Repayment Communications.** On or about August 13, 2024, Optum emailed Path MD stating that providers had returned to normal payment levels and required Plaintiffs to complete a repayment form to avoid invoicing, while Plaintiffs' encounter and payment metrics remained below pre-disruption baselines.

k. **General Omissions.** Optum did not disclose material facts necessary to make its statements not misleading, including the extent of access restrictions, data gaps affecting TFAP calculations, and the discretionary, non-entitlement nature of TFAP advances.

262. Optum supplied this information in its business capacity and for the guidance of existing platform users and TFAP applicants in their business transactions. Optum owed Plaintiffs a duty to use reasonable care in obtaining and communicating these facts. Optum lacked a reasonable basis for the statements and omitted qualifying facts known or accessible to it.

- 87 -
Complaint

263. Optum owed Plaintiffs a duty to use reasonable care in obtaining and communicating platform-status and TFAP information because Optum supplied such information in the course of its business for the guidance of providers in their ongoing transactions with Optum Pay and payers. Optum lacked reasonable grounds for its statements and omitted qualifying facts then known or readily available to it, including continued account inaccessibility, data gaps bearing on TFAP calculations, and the discretionary, non-entitlement nature of TFAP.

264. Optum knew, or at minimum should have known, that Plaintiffs were experiencing acute cash-flow strain during the disruption period based on information available to Optum, including Plaintiffs' inability to access Optum Pay until May 28, 2024, repeated support tickets and calls, TFAP application data and the August 13, 2024 repayment-deferral submission, depressed claims receipts relative to baseline, and contemporaneous communications reflecting delayed remittances. These circumstances were known or reasonably accessible to Optum through its own platforms and provider-facing channels, making the omitted qualifying facts and the challenged statements material to providers' business decisions.

265. Plaintiffs reasonably relied on these statements and omissions by maintaining staffing and operations, deferring emergency migration and wind-down decisions, engaging Optum's processes, and paying for access and services.

Complaint

266.     Plaintiffs' reliance caused concrete loss. Encounter volumes cratered, skilled-nursing relationships were lost or suspended, and revenues declined, forcing contraction of business operations.

267.     As a direct and proximate result, Plaintiffs suffered damages in an amount to be proven at trial, including general, special, and consequential damages, and are entitled to restitution and equitable relief as allowed by law.

**COUNT 2: Breach of Contract— Express**

268.     Plaintiffs incorporate the preceding allegations by reference. Paragraph citations in this Count are illustrative and not exhaustive; Plaintiffs rely on all factual allegations incorporated by reference.

269.     Plaintiffs and Optum entered binding contracts governing provider payment platform services, including Optum Pay enrollment and related platform terms. Plaintiffs performed, including paying subscription and per-transaction fees and maintaining required credentials. The contractual terms in effect required Optum to provide account access and deliver ERA/EFT remittances with commercially reasonable continuity and to exercise quick restoration and support efforts consistent with that obligation. Plaintiffs paid fees as consideration for those services and benefits.

270.     Optum materially failed to perform core contractual obligations, including to provide and maintain functional platform access needed to receive and

- 89 -
Complaint

reconcile claim payments and remittances. Plaintiffs remained locked out of Optum Pay until May 28, 2024.

271. Optum's performance further failed to conform to its program descriptions and operative platform communications regarding payment processing, remittance delivery, and the timing and mechanics of temporary funding calculations and repayment.

272. Particular breaches include, without limitation:

a. **Loss of Access/Availability.** Failure to provide and maintain working account access and receivables visibility necessary to receive EFT/ERA and reconcile payments for an extended period.

b. **Failure to Provide Functional Alternatives.** Failure to provide any alternate clearinghouse, EFT/ERA rail, or transition pathway despite Plaintiffs' full dependence on Optum Pay for receivables.

c. **Nonconforming Payment/Remittance Handling.** Failure to timely process, route, or make available payments and ERA consistent with platform commitments communicated to users.

d. **Defective Restoration.** Announcing or representing restoration while access and functionality for Plaintiffs remained unavailable, preventing the contracted-for services from being delivered.

Complaint

e. **TFAP Calculation/Administration Inconsistencies.** Administering temporary funding using discretionary calculations despite acknowledged data gaps and partial visibility, and requiring repayment on schedules inconsistent with the platform's actual restoration for Plaintiffs.

f. **Contracting Structure/Administration.** Implementing a funding arrangement naming Change Healthcare Operations, LLC as counterparty while channeling disbursement and administration through Optum Pay and Optum Financial in a manner that impeded Plaintiffs' ability to receive funds and reconcile payments through the platform they contracted to use.

g. **Fees Charged During Nonperformance.** Charging and retaining subscription and per-transaction fees while failing to provide platform access or remittance functionality.

273.   Failure to conform to commercially reasonable continuity obligations in the contract terms. Optum failed to maintain system availability and timely EFT/ERA delivery consistent with the contract's incorporated industry rules and standards, and failed to exercise restoration efforts consistent with those obligations, including by allowing prolonged loss of Optum Pay access without furnishing a functional alternative rail, despite fee-paid enrollment and reliance.

Complaint

274. Optum's breaches were material, went to the essence of the contracts, and deprived Plaintiffs of the benefit of their bargain by withholding timely payment access and remittance data necessary to operate.

275. As a direct and proximate result, Plaintiffs sustained damages, including lost revenues tied to encounter collapse, disruption and loss of skilled-nursing relationships, business contraction, and fees paid during periods of nonperformance.

276. Plaintiffs seek expectancy damages, consequential and incidental damages, restitution of fees paid during nonperformance, prejudgment interest, and any other relief available at law or under the governing contracts.

**COUNT 3: Breach of Implied-in-Fact Contract (in the Alternative)**

277. Plaintiffs incorporate the preceding allegations by reference. Paragraph citations in this Count are illustrative and not exhaustive; Plaintiffs rely on all factual allegations incorporated by reference.

278. Independently of any written terms, the parties' course of dealing created an implied-in-fact contract in which Optum would provide reliable claims-payment platform access and remittance delivery, and Plaintiffs would continue using the platform and paying subscription and per-transaction fees. Plaintiffs maintained active Optum Pay enrollment, submitted banking and business information, kept credentials current, and paid the required fees. Consideration

included Plaintiffs' recurring fee payments and continued exclusive routing of receivables through Optum Pay.

279. The implied terms were manifested by the parties' conduct: Plaintiffs' recurring payments and daily use of Optum Pay to receive EFT and ERA, Optum's administration of the accounts for named users and NPIs, and repeated two-way communications about access, configuration, and support during the disruption.

280. Optum failed to perform the core platform functions that were the subject of the parties' implied agreement. Plaintiffs were locked out of Optum Pay until May 28, 2024, could not access receivables or ERAs, and were not provided a functional alternate rail despite full dependence on Optum Pay.

281. Particular failures include, without limitation:

a. Loss of platform access and receivables visibility needed to receive EFT and reconcile ERA for an extended period.

b. No provision of a functional alternate clearinghouse or EFT/ERA pathway during the outage despite Plaintiffs' sole reliance on Optum Pay.

c. Announcing or representing restoration while access and functionality for Plaintiffs remained unavailable, preventing delivery of the service Plaintiffs were paying to receive.

d. Charging and retaining subscription and per-transaction fees during periods of nonperformance.

Complaint

282. Optum's nonperformance was material and deprived Plaintiffs of the benefit of their bargain, including timely access to funds and electronic remittance data necessary to operate.

283. As a direct and proximate result, Plaintiffs suffered damages, including lost revenues tied to encounter collapse, disruption and loss of skilled-nursing relationships, business contraction, and fees paid during periods of nonperformance.

284. Plaintiffs seek expectancy and consequential damages available in implied-in-fact contract, restitution of fees paid during nonperformance, prejudgment interest, and equitable relief.

**COUNT 4: Unjust Enrichment/Restitution - - Quasi-Contract (in the Alternative)**

285. Plaintiffs incorporate the preceding allegations by reference. Paragraph citations in this Count are illustrative and not exhaustive; Plaintiffs rely on all factual allegations incorporated by reference.

286. This claim is pled in the alternative to Plaintiffs' contract claims. To the extent no enforceable contract governs some or all of the conduct at issue, equity imposes an obligation on Optum to make restitution for benefits unjustly retained.

- 94 -
Complaint

287. Plaintiffs conferred benefits on Optum by paying subscription and per-transaction fees, providing banking credentials and transaction data, and participating in TFAP based on Optum's platform communications.

288. Optum accepted and retained those benefits while failing to deliver core payment-platform services and while announcing or representing restoration when Plaintiffs still lacked access, and without providing a functional alternate rail for EFT/ERA or remittances.

289. Optum further sought to recoup TFAP advances on schedules tied to Optum's determination of "resumed" processing despite acknowledged data gaps and Plaintiffs' below-baseline receipts, thereby shifting risk and extracting value from providers during the disruption.

290. Under these circumstances, it would be unjust for Optum to retain fees paid during periods of nonperformance, or to retain TFAP-related benefits obtained through discretionary calculations and repayment triggers that did not correspond to Plaintiffs' actual restoration and cash recovery.

291. Plaintiffs suffered resulting harm including cash-flow collapse, encounter declines, lost and suspended SNF relationships, business contraction, and other consequential losses. Restitution is appropriate at least in the amount of fees paid during nonperformance and any TFAP-related sums obtained through unjust means.

292.   Plaintiffs seek restitution and disgorgement measured by Optum's unjust gain, recessionary relief as appropriate to TFAP participation, prejudgment interest, and equitable relief necessary to prevent further unjust enrichment.

**COUNT 5: Breach of the Implied Covenant of Good Faith and Fair Dealing**

293.   Plaintiffs incorporate the preceding allegations by reference. Paragraph citations in this Count are illustrative and not exhaustive; Plaintiffs rely on all factual allegations incorporated by reference.

294.   In every contract alleged here, Optum owed a duty of good faith and fair dealing not to do anything that would unfairly interfere with Plaintiffs' right to receive the benefits of the agreements. That duty required Optum to exercise contractual and operational discretion reasonably, to refrain from opportunistic conduct, and to cooperate so that Plaintiffs could obtain the promised benefits of timely payment access and remittance data.

295.   Optum exercised discretion and control in ways that frustrated Plaintiffs' justified expectations and denied them the contracts' benefits, including:

a. **Framing and status messaging that masked ongoing unavailability.** Optum publicly presented the disruption as a "Change Healthcare" incident and repeatedly suggested Optum systems were unaffected, while Plaintiffs remained unable to access Optum Pay.

Complaint

b. **Premature "resolved" declaration.** Optum announced the incident "resolved" on May 7, 2024, even though Plaintiffs could not access Optum Pay until May 28, 2024.

c. **Restoration sequencing without workable continuity.** Optum chose a rebuild path and failed to provide any functional alternate clearinghouse or EFT/ERA rail during the lockout, despite Plaintiffs' full dependence on Optum Pay.

d. **Administration of TFAP using discretionary criteria despite known data gaps.** Optum promoted TFAP as the fastest, efficient, no-cost relief while reserving unilateral discretion over eligibility, amounts, and repayment triggers, and while acknowledging only partial visibility into provider data.

e. **Repayment pressure while Plaintiffs remained below baseline.** Optum pressed for TFAP repayment on August 13, 2024, asserting most providers had normalized, while Plaintiffs' receipts and encounter metrics remained below pre-disruption baselines.

f. **Fees during nonperformance.** Optum charged and retained subscription and per-transaction fees while access and core functionality were unavailable.

g. **Support channel representations vs. performance.** Optum represented

that its support channels could promptly resolve issues, yet months of tickets and escalations left Plaintiffs without functional access.

h. **Failure to cooperate with the provider-facing pipeline.** Optum controlled the Optum Pay pipeline used through the AdvancedMD interface for Plaintiffs' EFT/ERA and account functions and did not take reasonable steps to maintain or restore provider access so Plaintiffs could receive the contracted benefits.

296. This claim does not duplicate the express breach claim because it challenges Optum's abuse of discretion and opportunistic sequencing (framing, premature 'resolved' statements, invoice-tied repayment triggers, and support gating) that unfairly interfered with Plaintiffs' right to the contract's benefits independent of any single express term.

297. Optum's conduct was not an exercise of express rights consistent with the contracts' purposes. It was an abuse of discretion and a failure to cooperate that deprived Plaintiffs of timely payment access and remittance data, impaired operations, and damaged business relationships.

298. As a direct and proximate result, Plaintiffs suffered damages including lost revenues from encounter declines, disruption and loss of skilled-nursing relationships, business contraction, and fees paid during periods of nonperformance.

Complaint

299. Plaintiffs seek contract damages, consequential and incidental damages, restitution of fees paid during nonperformance where appropriate, prejudgment interest, and equitable relief necessary to protect their contractual benefits.

**COUNT 6: Intentional Interference with Prospective Economic Advantage**

300. Plaintiffs incorporate the preceding allegations by reference. Paragraph citations in this Count are illustrative and not exhaustive; Plaintiffs rely on all factual allegations incorporated by reference.

301. Plaintiffs maintained ongoing economic relationships with patients, referring providers, hospitals, and skilled nursing facilities that carried a probable future economic benefit, as reflected by multi-year agreements and active encounter pipelines across California, Arizona, Texas, and Florida.

302. Optum knew of these relationships and their value. Optum processed Plaintiffs' claims and remittances through Optum Pay, received subscription and per-transaction fees, and had direct visibility into encounter and payment flows through 837 and 835 transaction data containing ordering and rendering NPIs, facility NPIs, place-of-service codes, volumes, allowed amounts, settlement dates, and days-to-cash. Optum also communicated with Plaintiffs throughout the disruption about access and restoration.

303. Optum is a national operator of provider-payment platforms,

Complaint

including Optum Pay and related clearinghouse functions, whose core business is the intake, processing, and delivery of claim payments and electronic remittances for providers. By virtue of this role and its administration of TFAP enrollment, eligibility, funding, and repayment using provider data, Optum possessed superior access to information about payment flows, restoration status, and operational impacts on providers. Of all market participants in the payment pipeline, Optum was uniquely positioned to know whether providers like Plaintiffs could access receivables and how Optum's actions with Plaintiffs' account and finances would disrupt Plaintiffs' business and business relationships.

304. Optum intended to disrupt Plaintiffs' relationships, or knew disruption was certain or substantially certain to occur, when it chose the restoration and communication posture alleged. Optum engaged in intentional acts that disrupted those relationships, including:

a. Disabling and failing to restore Plaintiffs' Optum Pay access for more than three months while making present-tense statements that suggested normalization and, on May 7, 2024, publicly declaring the incident "resolved" when Plaintiffs remained locked out until May 28, 2024.

b. Framing the outage as limited to "Change Healthcare" and stating Optum, UnitedHealthcare, and UHG systems were unaffected, which caused

Complaint

Plaintiffs to defer migration to functional alternatives that could have preserved receivables.

c. Failing to provide any functional alternate clearinghouse or EFT/ERA rail or to advise Plaintiffs to migrate, despite federal guidance urging providers to switch clearinghouses and the availability of competing channels.

d. Administering TFAP on discretionary criteria despite acknowledged data gaps, representing TFAP as the fastest and most efficient solution, and later pressing for repayment on August 13, 2024 while Plaintiffs' receipts remained below baseline.

305. Plaintiffs are informed and believe that Optum knew that disruption of payment access and remittance flows would predictably disrupt provider relationships. Optum had real-time and historical visibility into Plaintiffs' encounter volumes and counterparties through transaction data and NPIs that map to named facilities and provider groups. With access severed, Plaintiffs could not timely reconcile ERAs or receive EFTs, which in the ordinary course leads to delayed payroll, vendor nonpayment, reduced services, and loss or suspension of facility relationships. Moreover, public records reflecting Optum acquisitions during the incident period, further placed Defendant on notice of market sensitivity to such liquidity disruptions.

306. Optum's conduct was a substantial factor in causing actual disruption.

Complaint

Plaintiffs experienced encounter collapse and the loss or suspension of skilled nursing facility relationships, together with business contraction and cessation of operations, after Optum Pay access was severed and while restoration was delayed and misrepresented.

307.  Optum lacked justification. The acts alleged above were independently wrongful, including negligent misrepresentation and bad-faith exercise of discretion, and were undertaken with knowledge of Plaintiffs' active pipelines and the substantial certainty that continued blockage of payment access would disrupt those relationships.

308.  Plaintiffs suffered economic harm as a result, including lost revenues tied to encounter declines, the loss or suspension of facility relationships, workforce reductions, and fees paid during periods of nonperformance.

309.  Plaintiffs seek damages for intentional interference with prospective economic advantage and all other relief allowed by law.

## VII. PRAYER FOR RELIEF

Plaintiffs bring this individual, non-class civil action and request judgment against Defendant as follows:

1.  Compensatory damages according to proof, including general, special, consequential, expectancy (for contract counts), and reliance (for tort counts) damages.

Complaint

2.      Punitive damages, only to the extent permitted by law and only as to the tort counts.

3.      Restitution and disgorgement.

4.      Rescission and rescissory restitution related to the Temporary Funding Assistance Program (TFAP) and any related instruments.

5.      Equitable setoff and restitution against any TFAP invoicing, collection, or offset efforts.

6.      Declaratory relief under 28 U.S.C. § 2201 stating the parties' rights and obligations, including that Plaintiffs have no duty to repay TFAP amounts obtained through misrepresentation and that Defendant may not collect or offset such amounts.

7.      Injunctive relief as appropriate, including orders prohibiting TFAP collection or offset during this action and requiring correction of account records. Imposition of a constructive trust over fees or monies unjustly retained.

8.      An accounting of amounts received, retained, offset, or invoiced, including TFAP-related transactions.

9.      Prejudgment interest under Cal. Civ. Code § 3287(a) from the dates amounts became due until paid, and post-judgment interest under 28 U.S.C. § 1961.

10.     Costs of suit under Fed. R. Civ. P. 54(d) and applicable law.

Complaint

11.     Reasonable attorney's fees where authorized by contract, statute, or other law.

12.     Such other and further relief as the Court deems just and proper.


**Dated:** February 3, 2026          Respectfully submitted,

**HAKAKIAN WILLIAMS LAW GROUP PC**


By:     /s/ Mina Hakakian

Mina Hakakian
Attorneys for Plaintiffs
PATH MD, INC. and
SPECIALIZED UNIVERSITY PATHOLOGISTS,
INC.